**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DARAIUS DUBASH, and | ) | |
| | ) | |
| DR. FARAZ HARSINI | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| | ) | CASE NO. 23-3556 |
| v. | ) | |
| | ) | |
| CITY OF HOUSTON, TEXAS; | ) | **COMPLAINT FOR CIVIL RIGHTS** |
| | ) | **VIOLATIONS** |
| HOUSTON DOWNTOWN PARK | ) | |
| CORPORATION; | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| OFFICER ROBERT DOUGLAS | ) | |
|  (# 7943), in his individual capacity; | ) | |
| | ) | |
| OFFICER VERN WHITWORTH | ) | |
| (# 7595), in his individual capacity; | ) | |
| | ) | |
| DISCOVERY GREEN CONSERVANCY | ) | |
| f/k/a HOUSTON DOWNTOWN PARK | ) | |
| CONSERVANCY; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BARRY MANDEL, in his individual | ) | |
| capacity. | ) | |
| | ) | |
| *Defendants.* | ) | |

# INTRODUCTION

1.      Public parks have always occupied a special place in American society—and our First Amendment jurisprudence has long recognized as much. Since "time out of mind," public parks have been places for "assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). That is why the First Amendment strongly protects speech in public parks.

2.      Discovery Green is Houston's only major downtown park, and is "a dedicated public park" that Defendant City of Houston owns through its local government corporation, Defendant Houston Downtown Park Corporation.[1] Thus, the First Amendment broadly protects speech at Discovery Green.

3.      But Defendants defied that core First Amendment protection, four times barring Plaintiffs Daraius Dubash and Dr. Faraz Harsini from peacefully advocating for animal rights in Discovery Green. And the fourth time, Houston police arrested Mr. Dubash because of the content of the videos he and Dr. Harsini showed, which depict true, standard practices of industrial meat, fish, egg, and dairy production.

4.      After seeing his friend arrested, Dr. Harsini asked the arresting officer, "We have First Amendment rights, right?" The arresting officer's response? "It's up to the management." Ex. G-3, Video 3 of July 23, 2022, at 00:11:55. That management is Defendant Discovery Green Conservancy, a private organization that runs the park's day-to-day operations for the City's benefit.

---

[1]   Discovery Green Conservancy, *Park Rules: Discovery Green* § 1.2.2(p) (July 17, 2014), https://www.discoverygreen.com/wp-content/uploads/2023/06/Park-Rules.pdf.

5.      But the City and Discovery Green Conservancy cannot contract around the First Amendment. In America, "the management" does not get to decide who can speak or what can be said in a public park like Discovery Green. The Constitution does.

6.      Dr. Harsini and Mr. Dubash bring this complaint to vindicate their rights and to speak freely in downtown Houston's only public park.

7.      Defendants' unlawful acts, policies, and practices deprived and continue to deprive Mr. Dubash and Dr. Harsini of their constitutional right to free speech under the United States Constitution and deprived and continue to deprive Mr. Dubash of his religious rights under the Texas Religious Freedom Restoration Act (TRFRA) and the United States Constitution.

8.      Thus, under 42 U.S.C. § 1983 and the Texas Religious Freedom Restoration Act, Tex. Civ. Prac. & Rem. Code § 110.003, Mr. Dubash and Dr. Harsini seek injunctive relief, declaratory relief, and monetary damages.

## JURISDICTION AND VENUE

9.      This action raises federal questions under the First, Fourth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

10.     This Court has federal question jurisdiction over Mr. Dubash and Dr. Harsini's claims under 28 U.S.C. § 1331, has jurisdiction over the damages claims under 28 U.S.C. § 1343, and may exercise supplemental jurisdiction over Mr. Dubash's claims under the Texas Religious Freedom Restoration Act pursuant to 28 U.S.C. § 1367. This Court has jurisdiction over requests for declaratory relief under 28 U.S.C. §§ 2201 and 2202. Under 42 U.S.C. § 1988, this Court has jurisdiction over Plaintiffs' claims for costs and attorney's fees.

11.     Venue in this court is proper under 28 U.S.C. § 1391(b) because all claims arise out of actions that occurred in this district and all defendants reside in this district.

## PARTIES

12.     Plaintiff Daraius Dubash is a follower of the Vedantic stream of Hinduism, who believes in *ahimsa* (non-violence) and that his religion requires him to advocate for animal rights. He does so through Anonymous for the Voiceless, a grassroots organization that holds demonstrations across the globe shedding light on animal cruelty. He resides in Austin, Texas.

13.     Plaintiff Dr. Faraz Harsini is an esteemed biomedical scientist whose research has led him to advocate for an end to industrial animal production for the good of animals and humanity. He is an active member of Anonymous for the Voiceless. He resides in Austin, Texas.

14.     Defendant City of Houston is a municipality in the State of Texas. The City controls and is responsible for public streets, sidewalks, and parks in the city. Houston also authorizes and oversees various municipal departments, such as the Houston Police Department and the City's Parks and Recreation Department.

15.     The Houston Downtown Park Corporation is a corporation in the State of Texas, authorized by the City of Houston, Texas, to act on the City's behalf. It is a Texas local government corporation created by the City of Houston for the purpose of operating a "public park"— Discovery Green. Its board of directors is appointed by the Mayor, subject to confirmation by the City Council, and its operations "are governmental and not proprietary functions." Ex. A, Houston Downtown Park Corporation, Articles of Incorporation, art. IV, VI.

16.     Discovery Green Conservancy is a 501(c)(3) organization in Houston, Texas, that "operates a public park, open year-round at no charge to residents and visitors of the Greater Houston area." Ex. D, Discovery Green Conservancy Form 990 for 2020, at pt. III, question 4a. Discovery Green, the public park it operates, was created with mostly public funds and is "a

dedicated public park owned by the Houston Downtown Park Corporation and operated under contract by the Conservancy."[2]

17.     Officer Robert Douglas (#7943), sued in his individual capacity, is a police officer employed by the Houston Police Department and a resident of Texas.

18.     Officer Vern Whitworth (#7595), sued in his individual capacity, is a police officer employed by the Houston Police Department and a resident of Texas.

19.     Barry Mandel, sued in his individual capacity, is a resident of Texas and was the president of Discovery Green Conservancy from 2010 until summer 2023. As president, he was responsible for the Conservancy's partnership with the City of Houston, including the Conservancy's day-to-day management of Discovery Green park.

20.     At all relevant times, each Defendant acted under color of state law.

## FACTUAL ALLEGATIONS

**Daraius Dubash advocates *ahimsa* (non-violence) to animals as an exercise of his religion— the *Advaita Vedanta* stream of Hinduism.**

21.     Daraius Dubash is a proud naturalized citizen who came to America because of the political, religious, and economic freedoms the United States affords its residents. He calls the choice to study in America the best decision of his life.

22.     Mr. Dubash is a follower of the *Advaita Vedanta* stream of Hinduism, in particular as taught by the spiritual teacher Acharya Prashant, which he believes has given him a deeper insight into what it means to be human and the best way to live one's life. His studies and practice in that tradition have led him to believe that consuming animal products is inherently violent, and that he is obligated to spread that message to others.

---

[2] *Park Rules: Discovery Green*, *supra* note 1 § 1.2.2(p).

23.     A key teaching of Vedantic scripture is the concept of *ahimsa*, which can be understood as non-violence. Mr. Dubash believes *ahimsa* extends to animals and requires him to protect animals from violence. Although Hindu scriptures have long promoted a vegetarian diet, Mr. Dubash believes that in today's world, that teaching extends to a vegan lifestyle, which includes avoiding animal products such as cow's milk when non-animal substitutes are readily available.

24.     Mr. Dubash's Vedantic beliefs impel him to proselytize on behalf of animals. He believes that it is not enough for him to individually practice *ahimsa*, but that he must also spread that teaching to others, whether or not they practice Vedanta. Mr. Dubash believes that if he were not allowed to speak out against animal abuse, he would be complicit in violence against animals. He traces his belief to a passage in the *Srimad Bhagwad Gita*, a sacred Hindu text, where Lord Krishna exhorts a reluctant Arjuna to fight a just war against Arjuna's own family because to do nothing would be sinful and evil.

25.     Mr. Dubash believes the most effective way for him to practice his faith is by having personal interactions with others to persuade them to adhere to *ahimsa* as it relates to animals. His service to the Houston chapter of Anonymous for the Voiceless is therefore a key aspect of his religious exercise.

26.     Mr. Dubash discusses his religious views with those who seem receptive to the message, particularly those who may come from a similar religious background. He does not engage individuals who are uninterested, and he believes that annoying others is unproductive.

**Dr. Faraz Harsini's research as a scientist led him to educate others on the dangers of industrial animal consumption.**

27.      Dr. Faraz Harsini[3] is a scientist who came to the United States on a full scholarship to earn a Master of Science degree in cancer research and a doctoral degree in cell physiology and molecular biophysics, both from Texas Tech University. In recognition of his scientific contributions toward discovering new therapeutics for infectious diseases, particularly during the COVID-19 pandemic, the United States rewarded him for his research with the rare grant of permanent residency via the National Interest Category.

28.      Dr. Harsini fled his native Iran, where he faced the threat of capital punishment for his homosexuality and atheism. In 2009, he was targeted and nearly killed by the Iranian Revolutionary Guard because of his protests against the Iranian regime for violating human rights and freedom of speech. Dr. Harsini will likely never be able return to Iran or see his mother again. Today, he cherishes the rights he possesses as a permanent resident of the United States.

29.      Dr. Harsini's research led him to believe that many public health threats and environmental issues are the result of our industrial food system. Dr. Harsini discovered links between animal consumption and major causes of death, dangerous substances, and long-term hazards such as increasing resistance to antibiotics caused by factory farming. And so Dr. Harsini has concluded that plant-based diets preserve both the environment and human life.

30.      Dr. Harsini's realizations led him to leave his work developing therapeutics for pharmaceutical companies and begin researching and working towards producing lab-grown meat. He also founded a nonprofit organization, Allied Scholars for Animal Protection, which hosts educational events at top universities and medical schools including Harvard, MIT, Columbia, and

---

[3] Dr. Harsini's name is misspelled as Faraz Mohammadrezaharsini in some government documents due to a clerical error combining his middle and last names.

the University of Texas at Austin. The group also has student chapters at schools such as Texas A&M and Texas Tech.

31.     Dr. Harsini believes that the best way to teach others about what happens in industrial animal farming is to show them accurate images and videos of standard industry practices. In his experience, the documentary film *Dominion* is particularly effective because it shows true and accurate footage of practices that are lawful and industry standard.

**Cubes of Truth are public educational events held to persuade others to treat animals fairly.**

32.     Mr. Dubash and Dr. Harsini are co-organizers of the Houston Chapter of Anonymous for the Voiceless, an animal rights advocacy group. There are active local chapters of Anonymous for the Voiceless across the country.

33.     Anonymous for the Voiceless engages in educational actions called "Cubes of Truth." A Cube of Truth is a peaceful public event that seeks to persuade individuals to treat animals fairly.

34.     A Cube consists of two small teams: the "Cube Team," which displays a video, and the "Outreach Team," which interacts with interested passersby.

35.     The Cube Team typically consists of one or two members dressed in black and wearing the "Guy Fawkes mask" popularized by the film *V for Vendetta*, holding televisions that silently display videos of animal treatment in industrial meat, egg, milk, and fish production.

36.     The mask is widely understood as an international symbol for anonymous protest, and as expressing support for protest more broadly. The mask also helps attract the attention of passersby. The masked members of Cube Teams do not speak in order to focus interested park goers on the television screen.

37.    The video clips are taken from the documentary film *Dominion*, which uses drone and handheld footage of industrial animal agriculture to reveal the hidden treatment of animals. The film features overhead shots of cramped pig stalls, pest-ridden duck living quarters, close-up shots of caged egg-laying chickens, and electrical prodding of cattle. In all, it covers the treatment of around two dozen types of animals. The full film is narrated by award-winning actors Joaquin Phoenix and Rooney Mara and is available in its entirety online for free.[4] For Cubes of Truth, members show an abridged version without audio.

38.    The following picture shows an Anonymous for the Voiceless member at a Cube of Truth in Discovery Green park.



---

[4]    *Dominion:    Watch    the    Film*,    Farm    Transparency    Project    (Oct.    10,    2018), https://www.dominionmovement.com/watch. [https://perma.cc/YYA8-E6U9]

.

39.     The specific content of the videos—which show lawful, industry-standard practices like macerating baby male chicks (killing male chicks at birth who offer no economic value), or using farrowing or gestation crates (keeping pregnant pigs in small cages where they can only sit or stand, but not turn around)—causes some passersby to inquire what is being depicted.

40.     For Plaintiffs, this content is key to educating and persuading others. Dr. Harsini, for instance, believes that the behind-the-scenes reality has been intentionally hidden from consumers, who deserve to know what their purchases support.

41.     A larger group of unmasked members engage passersby that display interest in the videos. Cube organizers do not engage uninterested passersby. Members do not hand out literature, unless a passerby has engaged in a conversation with an Outreach Team member, in which case the member may pass out a QR code that links to a website with more information about animal treatment.

42.     Members do not speak to children under the age of twelve, as the Cube's rules bar them from doing so, and Mr. Dubash and Dr. Harsini enforce those rules at the Cubes they organize and lead. If a member were to repeatedly violate the rules of the Cube, Mr. Dubash and Dr. Harsini would remove him or her from the chapter.

43.     It is vital to Mr. Dubash and Dr. Harsini that their conversations are only with those who have made a free choice to engage. Both men are trying to persuade people and believe passersby will only be persuaded if they come to the conversation freely and make the choice for themselves.

44.     Mr. Dubash or Dr. Harsini have led Cubes of Truth in Austin, San Marcos, Waco, and San Antonio without being asked to leave a public area, including sidewalks and public parks.

**Discovery Green is the only public park green space in downtown Houston.**

45.     Discovery Green is a public park. The park's website describes Discovery Green as "a beautiful, vibrant 12-acre park in the heart of downtown Houston that opened to the public in April 2008."[5]

46.     The park is free and open to the public. There is no admission fee and no ticketed entrance or exit. Visitors may come and go as they please.

47. The park rules state that Discovery Green is "a dedicated public park."[6] In its 2020 filed Form 990, Discovery Green Conservancy stated under penalty of perjury that "Discovery Green Conservancy operates a public park, open year-round at no charge to residents and visitors of the Greater Houston area." Ex. D, Discovery Green Conservancy Form 990 for 2020, at pt. III, question 4a.

48.     Like any public park, visitors come to the park for pleasure, exercise, amusement, recreation, green space, and cultural activities.

49.     The City of Houston acquired the land for Discovery Green in 2002 and in 2004.

50.     "[T]he Houston City Council approved the contracts to provide funding and support to the park" and "mandated that the 'public at large' be engaged in the design and development of the park."[7]

51.     In sum, the City of Houston provided most of the $125 million that it took to create the park.

52.     More than a third of Discovery Green Conservancy's annual revenue came from government grants. Ex. D, Discovery Green Conservancy Form 990 for 2020, at pt. VIII.

---

[5] *Our History*, Discovery Green, https://www.discoverygreen.com/history/. [https://perma.cc/87CM-BH7H]

[6] *Park Rules: Discovery Green*, *supra* note 1 § 1.2.2(p).

[7] *Our History*, *supra* note 5.

53.     Visitors entering Discovery Green are told on a prominent sign at the park that the Houston Downtown Park Corporation and the City of Houston own the park.

54.     On December 15, 2004, the City of Houston conveyed to the Houston Downtown Park Conservancy—now known as Defendant Discovery Green Conservancy— just over 11 acres of land in Downtown Houston. *See* Ex. B, Special Warranty Deed from City of Houston to Houston Downtown Park Conservancy, at 1, 7, A-1-1, A-1-3, A-2-1, A-2-3, A-3-1.

55.     That deed contained a "Condition and Covenant to Develop" that required the Conservancy to develop the property "as park land and open space . . . that could reasonably accommodate activities and events for tourist and convention visitors and their families, as well as residents of the City of Houston." *Id.* § 3(a)(i).

56.     That same day, December 15, 2004, the Conservancy deeded the property to Houston Downton Park Corporation, a local government corporation created for the purpose of developing Discovery Green park. *See* Ex. C, Special Warranty Deed from Houston Downtown Park Conservancy to Houston Downtown Park Corporation, at 1, 8.

57.     The deed to the Houston Downtown Park Corporation requires the land be used for a public park. Under "Covenants as to Use," the deed requires that "[s]uch property shall be used solely as an urban *public park* of high quality, reputation and natural beauty including but not limited to open green space, gardens and plantings and water features, for the use, benefit and enjoyment of residents of the City of Houston, and tourists and convention and business visitors and their families." *Id.* § 2(b)(i) (emphasis added).

58.     Similarly, in its "Covenants as to Operation and Maintenance" the Conservancy and the Park Corporation agreed that the "property shall be operated and maintained solely as an urban *public park* of high quality . . . ." *Id.* § 2(c)(i) (emphasis added).

59.     The Houston Downtown Park Corporation was "incorporated to aid and act on behalf of the City [of Houston] to accomplish the City's governmental purposes consisting of the acquisition, development, operation and maintenance of a new *public park . . . .*" Ex. A, Houston Downtown Park Corporation, Articles of Incorporation, art. IV (emphasis added). That park is Discovery Green.

60.     Members of the Board of Directors of the Houston Downtown Park Corporation "must, at the time of their initial appointment to the Board, be members in good standing of the Board of Directors of Houston Downtown Park Conservancy, a Texas non-profit corporation (or its successor)." *Id.* art. VI.

61.     Discovery Green Conservancy operates the park pursuant to an operating agreement with Houston Downtown Park Corporation. Officers of the Houston Police Department enforce city ordinances within the park, which Discovery Green announces on public signs.

62.     The City, directly and through Park Corp, has delegated final rule-making authority for use of Discovery Green park to the Conservancy.

63.     For example, the very first sentence of the "Park Rules" announces:

The Discovery Green Conservancy has been charged with developing rules and regulations governing use of Discovery Green (Park Rules) to maintain a safe environment for the general public, to protect the Park from damage, to provide opportunities for conventions and tourism, and to ensure equitable access to the Park for Houstonians and visitors.[8]

64.     In delegating that authority to Discovery Green Conservancy, the City placed no meaningful constraints or any objective and definite standards, and provided no training, on how the Conservancy was to exercise that authority consistent with First Amendment requirements.

---

[8] *Park Rules: Discovery Green supra* note 1 § 0.1.

65.     Discovery Green receives significant public funding each year, both directly and through its operating agreement with the Houston Downtown Park Corporation, a local government corporation.

66.     On information and belief, Discovery Green Conservancy regularly employs off-duty Houston Police Department officers to act as park security including, at relevant times, Officers Douglas and Whitworth.

67.     In sum, Discovery Green Conservancy fulfills a public function of administering a public park, on behalf of the City and the Park Corporation and for their benefit.

**Discovery Green regularly hosts political and expressive speech, adults-only festivals, and controversial events that spur public complaints.**

68.     Like all public parks, Discovery Green hosts a variety of speakers, speech, events, and activities that some members of the public may not like.

69.     Discovery Green has long served as a locus of protest on matters of public concern for the Houston area. For instance, shortly after it opened, the park served as the designated protest area for the 2008 Texas Republican Convention.

70.     The park hosted hundreds of attendees to a "Tea Party" rally in February 2009, opposing the policies of then-President Barack Obama.

71.     Dozens of citizens gathered in Discovery Green in 2013 to protest the National Security Agency in the wake of leaked documents revealing the collection of private data.

72.     In 2020, thousands of Houstonians assembled in Discovery Green for a Black Lives Matter protest, listened to speeches, and then marched from the park to City Hall.

73.     The Houston Police Department and Mayor Sylvester Turner have frequently worked with Discovery Green Conservancy to facilitate protests in the park on matters of public interest.

74. For instance, in response to the National Rifle Association's annual convention in Houston on May 27–29, 2022, the Harris County Democratic Party "work[ed] with City of Houston officials to make sure everyone can express themselves freely" in Discovery Green.[9]

75. The City, including the Mayor and the Houston Police Department, even helped create and maintain a protest zone in Discovery Green, located just across the street from the NRA convention.[10]

76. The Mayor boasted that Houston Police and the Office of Emergency Management created "a public safety plan to ensure the safety of convention-goers and those exercising their First Amendment rights to demonstrate."[11]

77. No Houston police officer or other city official arrested or interfered with protestors of the NRA convention based on the content of their speech.

78. On February 17, 2023, Discovery Green hosted "Rainbow on the Rink," an LGBTQ celebration that featured music, performances by local drag queens, and a roller-skating dance party.

79. The event spurred complaints from parents who believed the act was not family appropriate.

80. But Barry Mandel, who at the time was president of Discovery Green, ignored those complaints, choosing instead to support the content and views expressed by the event.

81. No Houston police officer or other city official arrested or interfered with speakers at Rainbow on the Rink based on the content of their speech, despite the complaints.

---

[9] Chaz Miller, *Houston leaders taking safety precautions as city prepares for the NRA convention and protests*, ABC 13 (May 26, 2022), https://abc13.com/national-rifle-association-nra-convention-houston-gun-meeting-protests/11897928/. [https://perma.cc/HK4S-Z6KH]

[10] *Id.*

[11] *Id.*

82.     As described above, Discovery Green hosts numerous artistic, cultural, and other expressive events open to the public.

**The Houston Police Department and Discovery Green Conservancy justify arbitrary and content-based censorship by insisting Discovery Green is a private park.**

83.     Four times, Houston police and Discovery Green Conservancy censored Plaintiffs' speech at Discovery Green because of its content and viewpoint.

84.     The first time, on November 13, 2021, after researching Discovery Green as a public park in downtown Houston, Mr. Dubash led a Cube of Truth in Discovery Green with several Anonymous for the Voiceless volunteers.

85.     About ten to twenty minutes after beginning the Cube of Truth in Discovery Green, then-Discovery Green Facilities Manager William Flowers and Houston Police Officer R. Stanfield ordered Mr. Dubash to leave the park without providing a justification. After identifying himself as a Houston police officer, Officer Stanfield stated that Discovery Green is a private park and that William Flowers is in charge. Following Flowers's request, Officer Stanfield demanded that Mr. Dubash exit the park.

86.     When Flowers was asked by a Cube member if he was speaking on behalf of the park, Flowers answered affirmatively and reiterated his demand that they leave. Mr. Dubash told the officer that they did not want to get arrested. In response, Officer Stanfield flashed his handcuffs and twice threatened to arrest them.

87.     Discovery Green displays its park rules within the park.  No park employee or police officer identified any park rule that Dr. Harsini or Mr. Dubash purportedly violated.

88.     **The second time**, on April 16, 2022, Mr. Dubash and Dr. Harsini organized another Cube of Truth at Discovery Green after conducting further research to confirm that Discovery Green was in fact a public park. A Park Security Officer, accompanied by uniformed Officer

Richard Douglas of the Houston Police Department, ordered the Cube teams out of the park, which he asserted was private property.

89.     The Park Security Officer told Mr. Dubash that he and Officer Douglas had no problem with what they were showing, but that they had to leave because of alleged complaints.

90.      No park employee or police officer identified the source of any purported complaint.

91.     Officer Douglas asserted that even Avenida De Las Americas, the public street running between Discovery Green and the George R. Brown Convention Center, was private property during flea markets because the George R. Brown Convention Center pays vendors to be there.

92.     The Park Security Officer cautioned that he would order the Cube of Truth to leave if park management or employees gave the command.

93.     Out of fear of arrest, Mr. Dubash and Dr. Harsini left Discovery Green.

94.     No park employee or police officer identified any park rule that Dr. Harsini or Mr. Dubash purportedly violated.

95.     The third time, on June 18, 2022, Park Manager, Brian Wilmer, ordered Mr. Dubash, Dr. Harsini, and other Cube participants off the sidewalk at Discovery Green across from Lamar.

96.     Despite Discovery Green defining itself as a public park in its park rules and operating as one, Wilmer told Mr. Dubash that it was not public property, claiming instead that it was a private park.

97.     Wilmer then stated that Discovery Green is open to the public.

98.     But he also stated that the park was foreclosed to Mr. Dubash because of the content of his speech. The public is welcome to walk through on our property, he announced, but Mr. Dubash was not. The reason? Because Mr. Dubash displayed images that might "disturb children."

99.     Those images were lawful and standard practices of industrial animal production in America and around the world.  The display of these images did not violate any park rule or city ordinance.

100.    On information and belief, there were no complaints from park guests surrounding the June 18 Cube of Truth.

101.    No park employee or police officer identified any park rule that Dr. Harsini or Mr. Dubash purportedly violated.

102.    Again, wanting to avoid more confrontation, Plaintiffs left Discovery Green.

**Police arrest Mr. Dubash and tell him that whether he can exercise his First Amendment rights is "up to the management" of Discovery Green.**

103.    The fourth time, on July 23, 2022, not only did Houston Police and Discovery Green Conservancy censor Mr. Dubash and Dr. Harsini, but they arrested Mr. Dubash.

104.    That day, the Cube of Truth, organized by Mr. Dubash and Dr. Harsini, set up near another group of citizens exercising their First Amendment rights by seeking out passersby and speaking to them about their voter registration status. That group was not asked to leave or censor its speech. Nor were any of its members arrested.

105.     Before the arrest, Discovery Green security approached Mr. Dubash, Dr. Harsini, and fellow members of Anonymous for the Voiceless, announcing (falsely) that Discovery Green is a privately owned park.

106.    Attempting to reason with the security guards, Mr. Dubash gently asserted his First Amendment rights.

107.     A security guard explained that the unbridled discretion of the park manager at hand determined what was allowed in the public park. The security guard stated that whether content is permitted is "just a case by case" determination, so his "manager is going to come and come look at it." Ex. G-1,  Video 1 of July 23, 2022, at 00:03:31.

108.     When that manager, Production Coordinator Floyd Willis, arrived, Mr. Dubash presented him with information showing that the First Amendment protected his speech, because although a private conservancy managed the park, the land was public property and Discovery Green's own website called it a public park.

109.     Willis responded to Mr. Dubash: "I guess the problem before is like, what, the content of the videos." *Id.* at 00:07:20.

110.     The security guard added: "The problem before was the content of the videos. We did talk about that before. And I mean, Brian has asked me multiple times to come and talk to him . . . It's what he shows. So that's the only problem that Discovery Green has." *Id.* at 00:07:23.

111.     Willis reiterated that content ban to Mr. Dubash: "I, we're good with like, if you want to talk to people but, we're not comfortable with the TVs . . . the content on those." Ex. G-2, Video 2 of July 23, 2022, at 00:00:02.

112.     Willis revealed Discovery Green Conservancy's criterion in administering a public park on the City's behalf is simply what it deems "appropriate."

113.     Willis acknowledged Mr. Dubash's point that "you still have to abide by the First Amendment because [the park] is publicly owned." *Id.* at 00:01:23.

114.     But Willis ultimately stated: "Right. But we also choose, we don't feel the content is appropriate." *Id.* 00:01.27

19

115.    Notably, neither security nor police stated that the speech was unprotected. And on a half-dozen occasions, Mr. Dubash accurately noted that obscenity is limited to sexually explicit content.

116.    At approximately 8:00 pm, the two security guards approached Mr. Dubash and Dr. Harsini, accompanied by uniformed HPD Officers Douglas and Whitworth.

117.    One security guard reiterated the video was not allowed because "it's chickens getting slaughtered." Ex. G-3, Video 3 of July 23, 2022, at 00:01:32.

118.    Mr. Dubash and Dr. Harsini have found that it is precisely this content that makes their message—of *ahimsa* for Mr. Dubash and fair treatment of animals for Dr. Harsini—so effective.

119.    Mr. Dubash asserted his rights, noting that Discovery Green was public property.

120.    Officer Douglas responded by claiming that Discovery Green is a private park. Officer Whitworth agreed.

121.    Mr. Dubash then showed the officers property records showing that the land is publicly owned by the Houston Downtown Park Corporation, as well as information from Discovery Green's website stating the park was a public space.

122.    Despite this information, Officer Douglas told Mr. Dubash that, because it is privately managed, they have the right to say who should be in the property or not.

123.    Officer Douglas assured Mr. Dubash that he was aware of the First Amendment's free speech protections.

124.    But he then stated that "if you are showing offensive material he [i.e., Discovery Green management] does not like, you can't be here." *Id.* at 00:04:41.

125.    The following image shows Officer Douglas telling that to Mr. Dubash:



126.    Officer Douglas reiterated that the content was the problem, telling Mr. Dubash that his problem was "someone stabbing a goat or cow in the neck to kill them. *That seems offensive*." *Id.* at 00:05:55 (emphasis added).

127.    After a conversation on the merits of veganism between Dr. Harsini, Mr. Dubash, and two security guards, Barry Mandel, then-president of Discovery Green Conservancy, issued his edict through Production Coordinator Willis: "So I just talked to Barry, and we are officially asking you to leave the property." *Id.* at 00:10:25. Willis continued, "So we're officially asking you to leave. And as such, if you don't, then it will be a trespass . . . ." *Id.* at 00:10:34.

128.    No park employee or police officer identified any park rule that Mr. Dubash or Dr. Harsini purportedly violated.

129.    Throughout Mr. Dubash and Dr. Harsini's dialogue with park security and Houston Police, the *only* purported reasons security and the police gave were that (1) the content was offensive and (2) someone may have complained.

130.     By this point, neither Officer Douglas nor Officer Whitworth had conducted any independent investigation.

131.     They did not interview any witnesses or bystanders.

132.     Mr. Dubash sought clarification from the police officers, asking, "I would like to know from you folks [i.e., Officers Douglas and Whitworth], do we have to leave?" *Id.* at 00:11:34. Office Douglas responded by asking, "What does he [i.e., Willis] say?" *Id.* at 00:11:38.

133.     Again, seeking clarity, Mr. Dubash asked, "Are you as Houston police officers asking us to leave?" to which Officer Whitworth responded, "That's up to the management." *Id.* at 00:11:57.

134.     Mr. Dubash, unable to get a straight answer from the police officers, explained, "If you're going to arrest me under threat of arrest, I will leave. So are you threatening to arrest me?" to which Officer Douglas assured him, "I am not threatening you." *Id.* at 00:12:12.

135.     The officers repeatedly refused to answer Mr. Dubash's questions about whether he had to listen to the park manager. Mr. Dubash explained, "You're the police officer. I've been trained to listen to police officers. If you ask me to leave, I will leave; I do not want to be arrested. But if you're gonna say I'm fine to be here, I will be here." *Id.* at 00:13:05.

136.     Officer Whitworth responded, "Whatever management wants." *Id.* at 00:13.18.

137.     Then Park Manager Willis ordered, "Private park security has determined that this is now a criminal trespass." *Id.*at 00:13.19.

138.     Officer Douglas asked to see Mr. Dubash's driver's license, to which Mr. Dubash asked, "Am I being arrested, Officer?" Officer Douglas answered, "Yes." *Id.* at 00:14:39.

139.     Mr. Dubash responded, "If you're going to arrest me can I leave? Am I free to go?" to which Officer Douglas stated, "No." *Id.* at 00:14:45.

140.    The image below shows Officer Douglas and Officer Whitworth arresting Mr. Dubash:



141.    Seeking clarification of the arrest, Dr. Harsini asked Officer Whitworth, "We have First Amendment rights, right?" *Id.* at 00:18:43. Officer Whitworth replied: "***It's up to the management***." *Id.* at 00:18: 47 (emphasis added).

142.    Officer Douglas walked Mr. Dubash, handcuffed, to a Discovery Green park office. Officer Douglas placed Mr. Dubash in a chair, where he was forced to sit, handcuffed, with his arms behind his back, for two to three hours.

143.    Officer M Q Ta arrived and did not make any serious effort to determine if Mr. Dubash was unlawfully arrested for exercising his First Amendment rights.

144.    The police then humiliated Mr. Dubash by walking him handcuffed through the park and frisking him.

145.    The police then transported Mr. Dubash to a detention center, where he was forced to spend the night. Mr. Dubash was released the next afternoon after spending more than 16 hours in the detention center.

146.    Mr. Dubash's arrest and detention caused him abrasions and injuries on his wrists that took months to heal. The arrest also caused him additional anxiety and exacerbated his high heart rate, shortness of breath, and fatigue, compounding his post-acute sequelae of COVID-19.

147.    Mr. Dubash was forced to expend time and money to hire a criminal defense attorney.

148.    The District Attorney's office dismissed the criminal trespass charge on July 27, 2022.

149.    Officers Douglas and Whitworth knowingly arrested Mr. Dubash solely on the basis of the content of his speech, including Discovery Green management's subjective edict that the speech was "offensive" and not appropriate.

150.    The officers arrested Mr. Dubash knowing Mr. Dubash's speech and conduct violated no park rules.

151.    The officers arrested Mr. Dubash without conducting any type of investigation such as interviewing third-party witnesses.

152.    The officers arrested Mr. Dubash without even telling him what crime he had purportedly committed.

153.    Having authority over park management and acting on behalf of the City and the Downtown Park Corporation to operate a public park, Mandel imposed his personal views on speech in the park: If he liked its content or message, it could stay. If he didn't, it could not.

154.    Mandel and the Conservancy, acting on behalf of the City in administering a public park, deemed Plaintiffs' speech offensive and knowingly censored it as a result.

**The City of Houston and the Houston Downtown Park Corporation confirm adoption of Discovery Green Conservancy's content-based speech ban in a public park.**

155.    In an effort to resolve the situation, as well as to comply with the procedural requirements of the Texas Religious Freedom Restoration Act, Mr. Dubash mailed Defendants City of Houston, Houston Downtown Park Corporation, and Discovery Green Conservancy letters outlining the past and ongoing constitutional and statutory injuries they were inflicting. *See* Ex. E, Copies of Letters to Arturo G. Michel and Aaron Roffwarg and Proofs of Receipt.

156.    Specifically, the letters detailed the Defendants censoring his speech on November 13, 2021, April 16, 2022, June 18, 2022, and July 23, 2022, as detailed above. *Id.*

157.    The letter noted that Defendant Downtown Park Corporation was "incorporated to aid and act on behalf of the City" for the "operation and maintenance of a new public park," *viz.* Discovery Green. *Id.* at 3. The letter also highlighted the Mayor's and City's role in utilizing Discovery Green park as a nexus for protest in Houston. *Id.* at 1. The letter explained that the City's censorship violated both Mr. Dubash's free speech rights and his religious rights under TRFRA. *Id.* at 2–4.

158.    Finally, the letters identified the specific prior restraints the City was imposing on him through HPD's enforcement of Discovery Green Conservancy's ban: (1) "depicting the truth of industrial animal production" through the film *Dominion*, and (2) "wearing a 'Guy Fawkes' mask" associated with Anonymous. *Id.* at 4.

159.    The City confirmed receipt of the letter, but never responded, indicating its approval of the content bans.

160.    The Conservancy, for its part, responded to say that "Discovery Green's position has not changed" and that Mr. Dubash and Dr. Harsini would only be allowed in the park under an "alternate method" of speech—meaning no masks and no *Dominion*. Ex. F, Email of Aaron Roffwarg dated May 24, 2023.

**Mr. Dubash and Dr. Harsini have suffered and are suffering irreparable harm.**

161.    Both Dr. Harsini and Mr. Dubash would like to hold another Cube of Truth in Discovery Green as soon as possible, engaging in advocacy that highlights animal treatment in America.

162.    Since the July 2022 arrest, Dr. Harsini and Mr. Dubash have organized Cubes of Truth at other locations around Texas, including at least one Cube at Memorial Park in Houston.

163.    Being the sole public park in downtown Houston, Discovery Green is an important public forum for Dr. Harsini and Mr. Dubash to share their message on a matter of significant public interest. No other public location in Houston affords them a similar opportunity to voice their message to the public.

164.    Yet Defendants have effectively barred them from their expressive activity in Discovery Green with their edict that Plaintiffs cannot show *Dominion* or wear Guy Fawkes masks in the park.

165.    Discovery Green Conservancy has told Dr. Harsini and Mr. Dubash that they will not be permitted in the park if they (1) show clips of the video *Dominion* or (2) wear Guy Fawkes masks.

166.    No park rule prohibits wearing masks or peacefully displaying visual clips for noncommercial purposes.

167.    What's more, both men are abstaining from holding a Cube of Truth at Discovery Green because they fear arrest. There is a real and substantial threat of an arrest if they engage in their protected advocacy in Discovery Green based on Mr. Dubash's prior arrest and Discovery Green Conservancy's threat to again exclude them from the park if they display content that management disagrees with.

168.    As a result, Dr. Harsini and Mr. Dubash have suffered and are continuing to suffer irreparable harm to their expressive rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## <u>COUNT 1</u>

### First Amendment Violation—Prohibiting free speech in a traditional public forum (Injunctive and Declaratory Relief)

### (All Plaintiffs Against Defendants City of Houston, Houston Downtown Park Corporation, and Discovery Green Conservancy)

169.    Plaintiffs re-allege and incorporate paragraphs 1 through 168 as though fully set forth herein.

170.    Mr. Dubash and Dr. Harsini's expression in the public park Discovery Green, including peaceful display of silent videos about the treatment of animals, wearing Guy Fawkes masks, and discussions of the treatment of animals constituted protected speech.

171.    As a matter of city policy, the City of Houston, through the Houston Downtown Park Corporation, delegated final authority to make rules about the use of Discovery Green to Discovery Green Conservancy. The Conservancy itself proclaims that it "has been charged with developing rules and regulations governing use of Discovery Green."[12]

---

[12] *Park Rules: Discovery Green*, *supra* note 1 § 0.1.

172.     But the City placed no meaningful constraints on how the Conservancy was to exercise that power, resulting in Conservancy management censoring speech based on it being "offensive" or not "appropriate." The First Amendment requires "narrow, objective, and definite standards" that do not restrict speech on its content or the viewpoint it conveys. *See Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)).

173.     As a result of the City's unbounded delegation of rule-making authority over a public park, Defendants enforced unlawful content- and viewpoint-based restrictions against Plaintiffs' speech in a public park, including through the enforcement by the Houston Police Department.

174.     The only reason Discovery Green Conservancy staff and Houston police provided for excluding Plaintiffs from Discovery Green and for Houston police arresting Mr. Dubash was that the content of Mr. Dubash and Dr. Harsini's speech was "offensive." But a policy "disfavoring ideas that offend discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) (internal quotation marks omitted).

175.     Defendants can provide no compelling reason that can justify censorship of Plaintiffs' expression in the space and sidewalks of Discovery Green, which Defendants admit is a public park. The content- and viewpoint-based restriction lacks narrow tailoring and is not the least restrictive means of advancing any compelling interest.

176.     Defendants' acts, policies and practices, and enforcement of the same against Plaintiffs, violate the Free Speech Clause of the First Amendment of the United States Constitution, as applied through the Fourteenth Amendment.

177.    Plaintiffs want and intend to engage in their protected expression at Discovery Green.

178.    Yet Defendants have made clear, under the threat of arrest, that Plaintiffs are not allowed at Discovery Green if they (1) show clips of the video *Dominion* or (2) wear Guy Fawkes masks.

179.    Because of that viewpoint- and content-based ban and threat to Plaintiffs' freedoms, Plaintiffs are effectively barred from sharing their message at the only public park in downtown Houston.

180.    Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutional acts, practices, and policies.

181.    Thus, Plaintiffs require immediate injunctive relief, permanent injunctive relief, and declaratory relief to protect their core expressive rights from ongoing harm.

182.    Absent injunctive and declaratory relief upholding Plaintiffs' First Amendment rights, Defendants will continue to infringe on Plaintiffs' protected expression.

183.    Because a justiciable controversy exists over Defendants' ongoing restraint of and threat to Plaintiffs' protected expression, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

## COUNT 2

**First Amendment Violation—Prior Restraint (Injunctive and Declaratory Relief)**

**(All Plaintiffs Against Defendants City of Houston, Houston Downtown Park Corporation, and Discovery Green Conservancy)**

184.    Plaintiffs re-allege and incorporate paragraphs 1 through 183 as though fully set forth herein.

185.   Mr. Dubash and Dr. Harsini's expression in a public park—Discovery Green—including peaceful display of silent videos about the legal treatment of animals, wearing Guy Fawkes masks, and discussions of the treatment of animals constituted protected speech.

186.   With its edict and acts banning Plaintiffs from showing the video *Dominion* or wearing Guy Fawkes masks, Discovery Green Conservancy, exercising its final rulemaking authority delegated by and on behalf of the City of Houston and Houston Downtown Park Corporation, has imposed an unconstitutional prior restraint on speech against Plaintiffs and against any other individual or group seeking to express similar content in Discovery Green.

187.   The City and Park Corporation placed no "narrow, objective, and definite standards to guide" Discovery Green Conservancy in administering the park on behalf of the City and the Park Corporation. *Contra Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Instead, they have rendered the exercise of First Amendment rights in Discovery Green contingent upon the subjective whims of the Conservancy, including its views on what speech it deems "offensive" or "appropriate."

188.   Government actions making "speech contingent on the will of an official . . . are unconstitutional burdens on speech classified as prior restraints." *Chiu v. Plano Indep. Sch. Dist.,* 339 F.3d 273, 280 (5th Cir. 2003).

189.   In addition, Defendants' content-based ban on Plaintiffs' showing the video *Dominion* or wearing Guy Fawkes masks is an unconstitutional prior restraint because it is an edict "forbidding certain communications when issued in advance of the time that such communications are to occur." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)).

190.   Because the City of Houston and Houston Downtown Park Corporation have

willfully delegated decisions concerning expressive activity in a public park to the unfettered discretion of Discovery Green Conservancy, they have "encourag[ed] some views and discourag[ed] others through the arbitrary application" of Discovery Green Conservancy's subjective preferences, including that which it deems "acceptable" or "offensive." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992). For instance, Discovery Green Conservancy did not censor "Rainbow on the Rink," despite the fact that some onlookers may consider the activity "offensive" or "inappropriate."

191.   The prior restraint is a rule and policy attributable to the City of Houston, the Houston Downtown Park Corporation, and Discovery Green Conservancy.

192.   Despite receiving notice of this unconstitutional prior restraint in May 2023, neither the City, the Park Corporation, nor Discovery Green Conservancy has given any indication that they do not intend to continue to maintain and enforce it. *See* Ex. E, Copies of Letters to Arturo G. Michel and Aaron Roffwarg and Proofs of Receipt. This refusal is especially chilling in light of Mr. Dubash's *arrest* for this speech.

193.    Prior restraints are presumptively unconstitutional. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

194.   Defendants' content-based prior restraint provides no procedural safeguards. Prior restraints must (1) "be imposed only for a specified brief period during which the status quo must be maintained"; (2) offer "prompt judicial review"; and (3) place the burden on the censor "of going to court to suppress the speech." *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003), *aff'd on reh'g in relevant part*, 372 F.3d 333 (5th Cir. 2004).

195.   But here, Plaintiffs' ban from the park is indefinite, no judicial review was offered, and this suit itself shows that speakers, not the censor, have the burden of going to court.

196.     Defendants can provide no compelling reason justifying censorship of Plaintiffs' expression in the space and sidewalks of Discovery Green, which Defendants admit is a public park.

197.     Defendants' imposition of a prior restraint, and the threatened enforcement of the same against Plaintiffs, violate the Free Speech Clause of the First Amendment of the United States Constitution, as applied through the Fourteenth Amendment.

198.     Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to their First Amendment rights from Defendants' unconstitutional acts, practices, and policies.

199.     Thus, Plaintiffs require immediate injunctive relief, permanent injunctive relief, and declaratory relief to protect their core expressive rights from ongoing irreparable harm.

200.     The prior restraint has chilled and continues to chill Plaintiffs' speech. But for the prior restraint, Dr. Harsini and Mr. Dubash would engage in expressive activity in Discovery Green, such as participating in Cubes of Truth.

201.     Yet Defendants have made clear, under the threat of arrest and prosecution, that Plaintiffs are not allowed at Discovery Green if they (1) show clips of the video *Dominion* or (2) wear Guy Fawkes masks.

202.     Because of that prior restraint, Plaintiffs are barred from sharing their message at the only public park in downtown Houston.

203.     Absent injunctive and declaratory relief upholding Plaintiffs' First Amendment rights, Defendants will continue to infringe on Plaintiffs' protected expression.

204.   Because a justiciable controversy exists over Defendants' ongoing restraint of and threat to Plaintiffs' protected expression, Plaintiffs also seek declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

## COUNT 3

**First Amendment Violation—*Monell* Claim for Policy, Practice, or Custom (Damages)**

**(All Plaintiffs Against Defendant City of Houston)**

205.   Plaintiffs re-allege and incorporate paragraphs 1 through 204 as though fully set forth herein.

206.   The content- and viewpoint-based prior restraint on Plaintiffs' wearing of Guy Fawkes masks and showing the video *Dominion* in a public park is a rule and policy created and maintained by a final policymaker, Discovery Green Conservancy, to which the City of Houston delegated final policymaking authority over use of Discovery Green park.

207.   City of Houston police will continue to enforce that prior restraint, including under threat of arrest.

208.   This prior restraint has caused and is continuing to cause Plaintiffs harm to their constitutional freedoms and their ability to share their message and pursue their mission.

209.   The City also created, maintained, and continues to maintain a policy of giving Discovery Green Conservancy authority to carry out the public function of maintaining rules of use for Discovery Green. The City has done so despite providing no narrow, objective, or definite criteria to ensure the Conservancy does not infringe the First Amendment.

210.   This policy has caused and continues to cause Plaintiffs harm to their constitutional freedoms and their ability to share their message and pursue their mission. It has also caused Mr. Dubash physical and emotional harm.

211.    In granting Discovery Green Conservancy authority to carry out the public function of maintaining rules of use for Discovery Green, the City provided no training to Discovery Green Conservancy and its staff (either directly or through the Park Corporation) about the First Amendment protections for speech at a public park like Discovery Green.

212.    That failure to provide training was a proximate cause for the violations of Plaintiffs' First Amendment rights, including the pattern of four incidents in which untrained Discovery Green Conservancy staff excluded Plaintiffs from speaking at Discovery Green because of the content and viewpoint they expressed.

213.    Administrators of public parks have a clear constitutional duty to avoid excluding speech or speakers from a public park based on content or viewpoint, as public parks have a long tradition of being public forums for expression on a wide range of content and viewpoints.

214.    Even now, the City has provided no training to Discovery Green Conservancy staff despite knowing of the past First Amendment violations (including Ms. Dubash's arrest) and the ongoing prior restraint against Plaintiffs' speech at Discovery Green park.

215.    By providing no training for Discovery Green Conservancy staff on First Amendment protections for speech at public parks, the City was deliberately indifferent to Plaintiffs' constitutional rights.

216.    These policies and rules were and remain the moving forces behind the past and ongoing deprivation of Plaintiffs' constitutional rights.

217.    Thus, Plaintiffs are entitled to compensatory and nominal damages against Defendant City of Houston for violating Plaintiffs' First Amendment rights.

## COUNT 4

**Direct and Retaliatory First Amendment Violation (Damages)**

**(All Plaintiffs Against Defendant Officers Douglas and Whitworth and Defendant Mandel, in their individual capacities)**

218.   Plaintiffs re-allege and incorporate paragraphs 1 through 217 as though fully set forth herein.

219.   The First Amendment protected Plaintiffs' expressive activity in Discovery Green, including peacefully showing the *Dominion* documentary and peacefully speaking with others about the treatment of animals.

220.   Defendants Mandel, Douglas, and Whitworth knew that Discovery Green is a public park.

221.   By excluding Plaintiffs from engaging in their protected expression at Discovery Green because of the content and viewpoint of their messaging, including under the threat of criminal trespass, Defendants Mandel, Douglas, and Whitworth directly deprived Plaintiffs of their First Amendment rights.

222.   By arresting Mr. Dubash, or willfully participating in or directing his arrest, solely because of the content and viewpoint of Mr. Dubash's messaging, Defendants Mandel, Douglas, and Whitworth directly deprived Mr. Dubash of his First Amendment rights.

223.   Mandel, Douglas, and Whitworth also retaliated against Plaintiffs because of the content and viewpoint conveyed in their protected expression.

224.   Plaintiffs violated no park rule during their attempts to speak at Discovery Green park, and neither park security nor any police officer identified a park rule they allegedly violated.

225.   The content and viewpoint of Plaintiffs' message was the motivating factor in Mandel's demands, made under the color of state law, that (a) Plaintiffs be excluded from

Discovery Green on several occasions, and (b) Plaintiffs ultimately be excluded from the park because of an alleged criminal trespass.

226.   The content and viewpoint of Plaintiffs' message was the motivating factor in Officers Douglas and Whitworth's arrest and detention of Mr. Dubash.

227.   Due to his personal opposition to Plaintiffs' messages, Mandel deliberately violated Plaintiffs' long-settled First Amendment rights to speak in public parks.

228.   Mandel, Douglas, and Whitworth's actions against Plaintiffs' speech were enough to deter a person of ordinary firmness from continuing to engage in expressive activity.

229.   Those actions have chilled Plaintiffs' speech. For instance, Plaintiffs fear returning to Discovery Green to display their silent videos, wear Guy Fawkes masks, and discuss the treatment of animals, and have not done so since Mr. Dubash's arrest.

230.   Mandel, Douglas, and Whitworth have not excluded others, threatened to arrest others for criminal trespass, or arrested others for trespass who peacefully gathered, demonstrated, or otherwise engaged in expressive activity at Discovery Green while conveying messages different from Plaintiffs.

231.   For example, individuals and groups have recently gathered at Discovery Green to protest the National Rifle Association Convention; to participate in a women's rights march; to urge people to register to vote; to protest racial injustice; and to march for abortion rights.

232.   Despite being aware of these other exercises of protected expression at Discovery Green, Mandel, Douglas, and Whitworth did not exclude, threaten to arrest for criminal trespass, or arrest any of those persons for criminal trespass based upon the content or viewpoint expressed while at Discovery Green.

233.   It is clearly established that the First Amendment prohibits an individual acting

under the color of state law from excluding speakers from a public park based on the content of their speech or the viewpoint the speech expresses.

234.    It is clearly established that an individual acting under the color of state law cannot censor speech based on its content or its viewpoint because they find it distasteful or offensive.

235.    It is clearly established that the First Amendment prohibits an individual acting under color of state law from retaliating against speakers based on their exercise of First Amendment rights.

236.    As it is clear that Discovery Green is a public park, no reasonable police officer or administrator of a public park would have censored and punished Plaintiffs' expression like Defendants Mandel, Douglas, and Whitworth did.

237.    A reasonable police officer and reasonable administrator of a public park would have understood it is an obvious First Amendment violation to exclude, threaten, or arrest speakers in a public park based on the content or viewpoint of their speech, even if some could find the speech disagreeable or offensive.

238.    Plaintiffs are entitled to compensatory and nominal damages against Defendants Mandel, Douglas, and Whitworth in their individual capacities for violating Plaintiffs' clearly established First Amendment rights.

## <u>COUNT 5</u>

**First Amendment Violation—Restricting the Free Exercise of Religion (Injunctive and Declaratory Relief and Damages)**

**(Plaintiff Mr. Dubash Against Defendants City of Houston, Houston Downtown Park Corporation, and Discovery Green Conservancy)**

239.    Plaintiffs re-allege and incorporate paragraphs 1 through 238 as though fully set forth herein.

240.    Mr. Dubash, as a tenet of his Vedanta religious practice, proselytizes the teaching

of *ahimsa* (non-violence) through his work organizing and participating in Cubes of Truth. Because of his religion, Mr. Dubash believes that he is compelled to spread the truth to others, and being silenced forces him to commit an act of violence. That coercion into violating his sincerely held beliefs, in addition to the inability to practice his religion at risk of arrest, constitutes a substantial burden on his religious exercise.

241.    Defendants' policy of unfettered discretion in deciding when to restrict speech is not a generally applicable rule because "it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," and "permit[s] the government to grant exemptions based on the circumstances." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (internal quotation marks omitted). If an otherwise across-the-board rule is not generally applicable because the government can possibly grant "an exception . . . in [its] sole discretion," *see id.* at 1878, then a policy of *complete* discretion fails *a fortiori* to be generally applicable.

242.    Under Defendants' standardless policy, the Conservancy has, and has exercised, final discretion to allow frightening masks for Halloween thrills and Dia de los Muertos[13] while banning the non-frightening and widely-understood masks Plaintiffs use at Cubes of Truth for promoting non-violence to animals or proselytizing religion.

243.    Defendants' substantial burden on Mr. Dubash's practice of proselytizing *ahimsa* does not further any compelling government interest.

244.    Defendants' inconsistent enforcement of its policies undermines any purported interest.

---

[13] *See* Discovery Green Conservancy, *Dia de los Muertos*, https://www.discoverygreen.com/signature-experiences/dia-de-los-muertos.

245.    Defendants' policy and enforcement is not the least religiously restrictive means of furthering any compelling interest.

246.    Mr. Dubash suffered physical, emotional, psychological, and monetary harm caused by his painful, humiliating, and unlawful arrest and the silencing of his religious speech, as well as the time and money he spent defending himself from the unconstitutional charges levied against him for practicing his religion in a public park.

247.    Mr. Dubash intends to spread the teaching of *ahimsa* by organizing a Cube of Truth as soon as he knows he will not be punished for that religious practice.

248.    Mr. Dubash is entitled to declaratory and injunctive relief, as well as compensatory and nominal damages.

### COUNT 6

**Texas Religious Freedom Restoration Act Violation —Restricting the Free Exercise of Religion (Injunctive and Declaratory Relief, Statutory and Compensatory Damages)**

**(Plaintiff Mr. Dubash Against Defendants City of Houston, Houston Downtown Park Corporation, and Discovery Green Conservancy)**

249.    Plaintiffs re-allege and incorporate paragraphs 1 through 248 as though fully set forth herein.

250.    Mr. Dubash, as a tenet of his Vedanta religious practice, proselytizes the teaching of *ahimsa* (non-violence) through his work organizing and participating in Cubes of Truth.

251.    Because Mr. Dubash believes Vedanta requires him to be effective in spreading *ahimsa*, and because he believes showing *Dominion* and organizing Cubes of Truth with team members wearing Guy Fawkes masks is the most effective way to spread *ahimsa*, Defendants' content-based speech restrictions place a substantial burden on his ability to practice his religion.

252.    Mr. Dubash served all Defendants statutory notice under TRFRA, in compliance with Tex. Civ. Prac. & Rem. Code § 110.006.

253.     Defendants' content- and viewpoint-based bans on speech do not further any compelling government interest.

254.     Defendants' inconsistent enforcement of its policies undermines any purported interest.

255.     Defendants' policy and enforcement is not the least religiously restrictive means of furthering any compelling interest.

256.     Mr. Dubash suffered physical, emotional, psychological, and monetary harm caused by his painful, humiliating, and unlawful arrest and the silencing of his religious speech, as well as the time and money he spent defending himself from the unconstitutional charges levied against him for practicing his religion in a public park.

257.     Mr. Dubash intends to spread the teaching of *ahimsa* by organizing a Cube of Truth as soon as he knows he will not be punished for that religious practice.

258.     Mr. Dubash is entitled to declaratory and injunctive relief, as well as compensatory damages as per Tex. Civ. Prac. & Rem. Code § 110.006(a).

## **COUNT 7**

**Fourth Amendment Violation—False Arrest and Unconstitutional Seizure (Damages)**

**(Plaintiff Mr. Dubash Against Defendant Officers Douglas and Whitworth, in their individual capacities)**

259.     Plaintiffs re-allege and incorporate paragraphs 1 through 258 as though fully set forth herein.

260.     Defendant Officers Douglas and Whitworth arrested and detained Mr. Dubash, or knowingly acted to cause the same, against his will and without probable cause, depriving Mr. Dubash of his rights under the Fourth and Fourteenth Amendments.

261.    Defendant Officers Douglas and Whitworth understood that Discovery Green is a public park.

262.    Defendant Officers Douglas and Whitworth understood that the sole basis for arresting and detaining Mr. Dubash was the content of his speech.

263.    It is clearly established that protected expressive activity cannot be the sole basis for a probable cause determination.

264.    It is clearly established that government officials cannot punish speakers in a public park based on the content of their speech or the viewpoint the speech expresses.

265.    It is clearly established that censoring speech because it "offends" is viewpoint discrimination in violation of the First Amendment.

266.    A reasonable police officer would have understood that no probable cause existed to arrest and detain Mr. Dubash for trespassing.

267.    A reasonable police officer would have known that the First Amendment protected Mr. Dubash's expression, even if others disagreed with the expression's content or message.

268.    Being aware that Discovery Green is a public park, no reasonable police officer would have arrested and detained Mr. Dubash based on the content of his speech for trespassing in Discovery Green.

269.    A reasonable police officer would have understood that arresting and detaining Mr. Dubash based on the content of his speech in a public park would be an obvious constitutional violation.

270.    As a direct and proximate cause of Officers Douglas and Whitworth's unconstitutional arrest and detention, Mr. Dubash was deprived of his rights under the Fourth and Fourteenth Amendments.

271.     Mr. Dubash is entitled to compensatory and nominal damages against Officers Douglas and Whitworth for violating Mr. Dubash's clearly established Fourth Amendment rights.

## COUNT 8
### Unlawful Private Delegation (Declaratory Judgment)
### (All Plaintiffs Against Defendant City of Houston)

272.     Plaintiffs re-allege and incorporate paragraphs 1 through 271 as though fully set forth herein.

273.     The deprivations of Mr. Dubash and Dr. Harsini's speech rights, Mr. Dubash's religious rights, and Mr. Dubash's right to be free from unreasonable seizures, were violated due to the City of Houston's unlawful delegation of authority to Discovery Green Conservancy.

274.     The City of Houston unlawfully delegated rulemaking authority for safeguarding constitutional speech and religious rights in a public park to a private actor in violation of Texas law.

275.     Houston delegated to Discovery Green Conservancy the decision-making authority over rules for using a public park, and did so without specifying or requiring constitutional, objective, narrow criteria for restricting speech in a traditional public forum in content- and viewpoint-neutral ways as constitutionally required.

276.     But the City of Houston's delegation of the core legislative function of rulemaking for a public space (including with criminal penalties) multiplies the constitutional dangers. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

277.     Delegating that power to a *private* entity presents an error cubed: the Supreme Court of Texas has vigorously enforced the private nondelegation doctrine, recognizing that "the basic concept of democratic rule under a republican form of government is compromised when

public powers are abandoned to those who are neither elected by the people, appointed by a public official or entity, nor employed by the government." *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 469 (Tex. 1997), *as supplemented on denial of reh'g* (Oct. 9, 1997). The Conservancy is just such an unaccountable private organization in which the City purported to vest public powers.

278.    Under *Texas Boll Weevil*'s eight-factor test, *id.* at 472, Discovery Green Conservancy's rulemaking authority is unlawful:

a.    Discovery Green Conservancy's actions were not "subject to meaningful review by a state agency or other branch of government";

b.    Affected speakers were completely "[un]represented in the decision making process";

c.    Discovery Green Conservancy enforces its diktats against "particular individuals," and Houston Police officers execute those diktats without conducting independent investigations;

d.    Discovery Green Conservancy management placed its own vision of what the park should be over the constitutionally mandated requirements for a public park;

e.    Discovery Green Conservancy "define[s] criminal acts" by creating park rules and enforcing criminal trespass laws through Houston police based on the Conservancy's subjective speech predilections;

f.    The City has delegated this authority to Discovery Green Conservancy for the entirety of the park's existence, and there is no indication the delegation will end;

g.    Discovery Green Conservancy has no "special qualifications or training" for adjudicating speech as outside the protection of the constitution;

h.    No City agency or authority has "provided sufficient standards to guide" Discovery Green Conservancy in its unconstitutional administration of Discovery Green.

279.    A declaration of the unlawfulness of the City of Houston's unbounded delegation to Discovery Green Conservancy would remedy Plaintiffs' prospective injuries by ensuring that Discovery Green would be operated in accordance with applicable law rather than personal whim.

## DEMAND FOR JURY TRIAL

Under Fed. R. Civ. P. 38, Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully ask this Court to:

a)      Enter a judgment declaring that the actions taken by Defendants prohibiting Mr. Dubash and Dr. Harsini from speaking and engaging in expressive activity, and prohibiting Mr. Dubash from exercising his religion, on public sidewalks and in a public park violated their rights.

b)      Enter a judgment declaring that Discovery Green is a public park, governed by the protections due to public parks under the United States Constitution.

c)      Enter a judgment declaring as unconstitutional Defendants' policy and practice of controlling expression based on content-based restrictions and discretionary employee decisions unguided by objective guidelines on their face and as applied to Plaintiffs' speech.

d)      Enter a judgment declaring as unconstitutional the prior restraint on Plaintiffs' ability to peacefully advocate in Discovery Green, including their right to wear Guy Fawkes masks and show the *Dominion* documentary.

e)      Enter a judgment declaring the City of Houston's delegation of rulemaking for a public park to Discovery Green Conservancy an unlawful private delegation in violation of the Texas Constitution.

f)      Enter a preliminary and permanent injunction enjoining Discovery Green Conservancy, Houston Downtown Park Corporation, and the City of Houston (including the Houston Police Department), and their agents, officials, servants, employees, and persons acting in concert with them, from imposing content-based or viewpoint-based restrictions,

rules, or restraints (including those based on speech being "offensive") against images of industrial animal practices and other protected images of animal treatment, masks worn by those engaged in expressive lawful activity, and speech concerning the treatment of animals, in Discovery Green and the public areas around Discovery Green.

g)      Enter a judgment holding Defendants liable for their unlawful conduct.

h)      Award actual damages in an amount to be proved at trial.

i)      Award compensatory damages in such amount as may be found, or otherwise permitted by law.

j)      Award statutory damages under the Texas Religious Freedom Restoration Act, as well as otherwise permitted by law.

k)      Award nominal damages for Defendants' unconstitutional actions.

l)      Award attorneys' fees, statutory fees, and costs under 42 U.S.C. § 1988 and Tex. Civ. Prac. & Rem. Code § 110.005.

m)      Grant such other and further relief as the Court may deem just and proper.

Dated: September 20, 2023                          Respectfully submitted,

                                                                        /s/ John Greil
John Greil (TX 24110856)
Steven T. Collis (TX 24122632)
Law and Religion Clinic
University of Texas School of Law
727 E. Dean Keaton St.
Austin, TX 78705
(512) 475-9090
john.greil@law.utexas.edu
steven.collis@law.utexas.edu

JT Morris (TX 24094444)
Gabe Walters
*pro hac vice motion forthcoming*
Foundation for Individual Rights and
   Expression

(215) 717-3473
700 Pennsylvania Ave., Suite 340
Washington, D.C. 20003
jt.morris@thefire.org
gabe.walters@thefire.org

Daniel Ortner
*pro hac vice motion forthcoming*
Foundation for Individual Rights and
  Expression
510 Walnut St., Suite 1250
Philadelphia, PA 19106
daniel.ortner@thefire.org

**Attorneys for Plaintiffs
Daraius Dubash and
Dr. Faraz Harsini**