**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DARAIUS DUBASH and | ) | |
| | ) | |
| DR. FARAZ HARSINI, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | CASE NO. 4:23-cv-03556 |
| | ) | |
| CITY OF HOUSTON, TEXAS; | ) | |
| | ) | |
| HOUSTON DOWNTOWN PARK | ) | |
| CORPORATION; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DISCOVERY GREEN CONSERVANCY | ) | |
| f/k/a HOUSTON DOWNTOWN PARK | ) | |
| CONSERVANCY; | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT ..................................... 1

SUMMARY OF THE ARGUMENT ................................................................................ 1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................. 2

FACTUAL BACKGROUND ........................................................................................... 3

    Discovery Green Is the Only Public Park Green Space in Downtown Houston. ............... 3

    Anonymous for the Voiceless Holds Public Educational Events, Titled "Cubes of Truth," to Persuade Others to Treat Animals Fairly. ................................................. 5

    Daraius Dubash Advocates *Ahimsa* (Non-Violence) to Animals as an Exercise of His Religion—the *Advaita Vedanta* Stream of Hinduism. ..................................... 7

    Dr. Faraz Harsini's Research as a Scientist Led Him to Educate Others on What He Believes Are the Dangers of Industrial Animal Consumption. ........................ 7

    Houston Police and Discovery Green Conservancy Staff Censor Mr. Dubash and Dr. Harsini on Three Occasions at Discovery Green Based on the Content of Their Speech. ..................................................... 8

    Houston Police Officers Expel Dr. Harsini and Arrest Mr. Dubash Because of the Content of Their Speech. ................................................. 10

    Defendants Impose a Content-Based Ban on Plaintiffs' Speech. .......................... 12

ARGUMENT ............................................................................................................ 13

    I.    Plaintiffs Are Substantially Likely to Succeed on the Merits. ............................. 13

        A.    Plaintiffs' expression is constitutionally protected speech. ...................... 13

        B.    Discovery Green is a public park and a traditional public forum, and Discovery Green Conservancy is a state actor. ................................. 15

        C.    Discovery Green Conservancy, exercising authority delegated by the City, has imposed an unconstitutional prior restraint upon Plaintiffs' speech. ................................................................. 18

        D.    Defendants' content- and viewpoint-based ban on speech fails strict scrutiny. ....................................................................... 19

        E.    Defendants' prohibition of Mr. Dubash's religious speech violates the Free Exercise Clause. ................................................................ 21

        F.    Defendants' actions violated the Texas Religious Freedom Restoration Act. ........................................................................ 23

    II.    Plaintiffs Have Suffered and Continue to Suffer Irreparable Harm. ................... 24

    III.    The Balance of Harms and The Public Interest Favor an Injunction. ................. 24

**TABLE OF CONTENTS**
(continued)

**Page**

IV.   The Court Should Excuse Plaintiffs from Posting Security. ...............................25

CONCLUSION ....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Alexander v. United States,*
   509 U.S. 544 (1993) ...................................................................................18

*Animal Legal Def. Fund v. Kelly,*
   142 S. Ct. 2647 (2022) ...............................................................................15

*Animal Legal Def. Fund v. Kelly,*
   9 F.4th 1219 (10th Cir. 2021) .....................................................................15

*Animal Legal Def. Fund v. Reynolds,*
   591 F. Supp. 3d 397 (S.D. Iowa 2022) .......................................................13

*Barr v. City of Sinton,*
   295 S.W.3d 287 (Tex. 2009) ................................................................23, 24

*Brown v. Entm't Merchants Ass'n,*
   564 U.S. 786 (2011) ...................................................................................20

*Burton v. Wilmington Parking Auth.,*
   365 U.S. 715 (1961) ...................................................................................16

*Byrum v. Landreth,*
   566 F.3d 442 (5th Cir. 2009) ........................................................................1

*Cath. Leadership Coal. of Tex. v. Reisman,*
   764 F.3d 409 (5th Cir. 2014) ......................................................................18

*Chiu v. Plano Indep. Sch. Dist.,*
   260 F.3d 330 (5th Cir. 2001) ..........................................................14, 15, 18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ..............................................................................21, 23

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,*
   636 F.2d 1084 (5th Cir. 1981) ....................................................................25

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.,*
   447 U.S. 530 (1980) ...................................................................................23

*Cornish v. Corr. Services Corp.,*
   402 F.3d 545 (5th Cir. 2005) ......................................................................16

*Dennis v. Sparks*,
    449 U.S. 24 (1980) ............................................................................................16

*Denton v. City of El Paso, Texas*,
    861 F. Appx. 836 (5th Cir. 2021) ...................................................................25

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................................24

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ........................................................................................20

*Evans v. Newton*,
    382 U.S. 296 (1966) ........................................................................................17

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ........................................................................................21

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ..............................................................................22, 23

*Hague v. Comm. for Indus. Org.*,
    307 U.S. 496 (1939) ....................................................................................2, 16

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) ....................................................................................19

*Jackson v. Metro. Edison Co.*,
    419 U.S. 345 (1974) ........................................................................................16

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) ............................................................................25

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022)....................................................................................22

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921, (2019) ..................................................................................16

*Matal v. Tam*,
    582 U.S. 218  (2017) .................................................................................14, 19

*McDonald v. Longley*,
    4 F.4th 229 (5th Cir. 2021) .............................................................................25

*Merced v. Kasson,*
  577 F.3d 578 (5th Cir. 2009) ........................................................................23

*Miller v. California,*
  414 U.S. 15 (1973) .......................................................................................15

*Minnesota Voters All. v. Mansky,*
  138 S. Ct. 1876 (2018)..................................................................................19

*Moussazadeh v. Tex. Dep't of Criminal Justice,*
  703 F.3d 781 (5th Cir. 2012) ........................................................................23

*N.W. Enters. Inc. v. City of Houston,*
  352 F.3d 162  (5th Cir. 2003 ........................................................................18

*N.W. Enters. Inc. v. City of Houston,*
  372 F.3d 333 (5th Cir. 2004) ........................................................................19

*NAACP v. Button,*
  371 U.S. 415 (1963) .....................................................................................21

*Nat'l Meat Ass'n v. Harris,*
  565 U.S. 452 (2012) .......................................................................................6

*Nken v. Holder,*
  556 U.S. 418 (2009) .....................................................................................25

*Org. for a Better Austin v. Keefe,*
  402 U.S. 415 (1971) .....................................................................................18

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983) ...........................................................................16, 20, 21

*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155 (2015) .....................................................................................19

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) .....................................................................................14

*Rundus v. City of Dallas, Tex.,*
   634 F.3d 309, (5th Cir. 2011).......................................................................17

*Serv. Emps. Int'l Union, Loc. 5 v. City of Houston,*
  595 F.3d 588 (5th Cir. 2010) ...................................................................18, 20

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ..................................................................15

*Texas v. Johnson*,
  491 U.S. 397 (1989) ..................................................................14

*United States v. Marcavage*,
  609 F.3d 264, 283 (3d Cir. 2010) .............................................20

*United States v. Salcedo*,
  924 F.3d 172 (5th Cir. 2019) ....................................................15

*United States v. Stevens*,
  559 U.S. 460, 472 (2010) .....................................................15, 23

*World Wide Street Preachers' Fellowship v. City of Owensboro*,
  342 F. Supp. 2d 634 (W.D. Ky. 2004)......................................15


**Statutes and Regulations**

Federal Meat Inspection Act of 1906 ..............................................6

Tex. Civ. Prac. & Rem. Code § 110.001(a)(1)..............................24

Tex. Civ. Prac. & Rem. Code § 110.003 ........................................23

Tex. Civ. Prac. & Rem. Code § 110.003(b)(1)...............................24

Texas Religious Freedom Restoration Act, Tex. Civ. Prac. & Rem. Code Ch. 110 .....3, 13, 23, 24

Discovery Green Conservancy, *Park Rules: Discovery Green*...................1, 3, 5, 16, 17, 18


**Other Authorities**

Ana Khan, *Día de los Muertos events and Wings Over Houston top family fun picks*,
  Houston Chronicle Preview (Oct. 27, 2022) ..............................4

Brooke Kroeger*, Undercover Reporting, The Truth About Deception*
  (2012)..........................................................................................6

Chaz Miller, *Houston Leaders Taking Safety Precautions As City Prepares for the NRA Convention and Protests,*  ABC 13 (May 26, 2022) ..................3

Joey Guerra, *Houston Pride Guide: Drag, baseball, dance parties and more to celebrate the LGBTQ+ community*, Houston Chronicle (Jun. 2, 2023)..........................................................4

Renée C. Lee, *Tea Party Society Sets Tax Day Protests Across Houston*, Houston Chronicle (Apr. 14, 2009)............................................................................................3

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

The issue is whether Plaintiffs are entitled to a preliminary injunction on Counts 1–2 and 5–6 of their Complaint. Plaintiffs meet the standard for a preliminary injunction, because (1) they show a substantial likelihood of success on the merits, as Defendants are infringing on Plaintiffs' right to free speech and Mr. Dubash's religious liberty; (2) infringement of First Amendment rights is always irreparable injury; and (3) Defendants' ongoing ban on Plaintiffs' expression serves no legitimate public interest, but hinders the public interest in ensuring public parks remain havens for free expression. *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (reversing and remanding for entry of preliminary injunction to protect the plaintiffs' First Amendment rights).

## SUMMARY OF THE ARGUMENT

Like it does for all Americans, the First Amendment guarantees Daraius Dubash and Dr. Faraz Harsini the right to speak at Discovery Green, "a dedicated public park"[1] in downtown Houston. But Defendants have scoffed at that fundamental right. Three times they forced Mr. Dubash and Dr. Harsini to leave Discovery Green for peacefully sharing their view that factory farming is wrong. And the fourth time, Houston police threw Mr. Dubash in handcuffs after he gently explained why the First Amendment protected his and Dr. Harsini's peaceful advocacy. And now the City of Houston, Houston Downtown Park Corporation (a local government corporation), and Discovery Green Conservancy, a non-profit corporation that manages the public park for the City, have imposed an arbitrary prior restraint on Mr. Dubash and Dr. Harsini: Don't come back unless you change the content of your message.

This ban offends the First Amendment. And those Defendants have no justification for it.

---

[1] Discovery Green Conservancy, *Park Rules: Discovery Green* § 1.2.2(p) (July 17, 2014), https://www.discoverygreen.com/wp-content/uploads/2023/06/Park-Rules.pdf (hereinafter "*Park Rules: Discovery Green*)

They object only to "the content of the videos" Plaintiffs show insisting that it is "offensive."[2] That is blatant viewpoint discrimination. Making matters worse is that according to Houston police, whether citizens have First Amendment rights in Discovery Green is "up to the management."[3] Ex. H, Harsini Decl., Ex. 3 at 00:11:57.

But in America, public parks belong to the people, not the subjective whims of "the management." And the First Amendment guarantees that remains the case. Even if a few passersby find accurate footage of industrial animal practices "offensive"— the exact practices Mr. Dubash and Dr. Harsini aim to persuade others to oppose—the Constitution bars the City of Houston and Discovery Green staff from denying Mr. Dubash and Dr. Harsini their core right to share their message in a public park, a space for all that has "immemorially been held in trust for the use of the public." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). In fact, many others have shared their message at Discovery Green—from Tea Party rallies to anti-NRA protests—without any trouble from Defendants, let alone handcuffs.

Plaintiffs' motivations may differ: Mr. Dubash is called to speak out by his religious beliefs while Dr. Harsini is motivated by his research as a biomedical scientist. But they both believe in peacefully educating the public about their views, and they both cherish the First Amendment principles that protect everyone's ability to advocate in public spaces. Thus, they ask this Court for preliminary injunctive relief to ensure they can speak freely in a public park without fear of arrest should police or park management deem their speech "offensive."

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This is a Section 1983 action for First Amendment violations and an action for a violation

---

[2] Harsini Decl., Ex. 1 at 00:07:20, Ex. 3 at 00:04:41.

[3] *Id.* at 00:18:47.

of the Texas Religious Freedom Restoration Act. Plaintiffs filed their complaint on September 20, 2023 (ECF 1). Defendants City of Houston, Houston Downtown Park Corporation, and Discovery Green Conservancy have waived service (ECF 10-12). Plaintiffs are working diligently to serve the individual capacity Defendants, who are not part of this motion.

## FACTUAL BACKGROUND

**Discovery Green Is the Only Public Park Green Space in Downtown Houston.**

Discovery Green is "a dedicated public park."[4]  In fact, it is the largest and only public green space in downtown Houston. The park has no ticketed entrance or exit, and is open to all for gatherings, recreations, and events. Ex. G, Dubash Decl. ¶ 36; Harsini Decl. ¶ 33.

Houstonians and others have long used the park for free expression, including to hold public protests. Within a year of opening, the park hosted hundreds of "Tea Partiers" protesting the policies of President Barack Obama.[5] Last year, thousands of protestors opposed the National Rifle Association's convention in Houston, with the Harris County Democratic Party "work[ing] with City of Houston officials to make sure everyone can express themselves freely" in Discovery Green.[6] The City, including the Mayor and the Houston Police Department, ensured that speakers could express their message in Discovery Green.[7]

But the park is used for more than just public protests. Recreational activities at the park in

---

[4] *Park Rules: Discovery Green* § 1.2.2(p).

[5] *See, e.g.*, Renée C. Lee, *Tea Party Society Sets Tax Day Protests Across Houston*, Houston Chronicle (Apr. 14, 2009), https://www.chron.com/neighborhood/pearland-news/article/tea-party-society-sets-tax-day-protests-across-1606559.php (describing hundreds of "Tea Parties" protesting the policies of President Barack Obama).

[6] Chaz Miller, *Houston Leaders Taking Safety Precautions As City Prepares for the NRA Convention and Protests*, ABC 13 (May 26, 2022), https://abc13.com/national-rifle-association-nra-convention-houston-gun-meeting-protests/11897928.]

[7] *Id.*

the past have included residents dressing up (including in masks) for Halloween events,[8] social LGBTQ festivities featuring music performances by local drag queens,[9] and cultural Dia de los Muertos celebrations.[10]

The public nature of the park aligns with its founding. The City of Houston acquired the land for Discovery Green in 2002 and 2004, and provided most of the $125 million that went into developing the park.[11]  In late 2004, the City conveyed the land to the Houston Downtown Park Conservancy, now known as Defendant Discovery Green Conservancy.[12] That same day, the Conservancy deeded the property to Houston Downtown Park Corporation, a local government corporation "incorporated to aid and act on behalf of the City [of Houston] to accomplish the City's governmental purposes consisting of the acquisition, development, operation and maintenance of

---

[8] *Houston Halloween events and things to do this weekend, October 28 to 31,* Fox 26 Houston, (Oct. 27, 2022), https://www.fox26houston.com/news/houston-halloween-events-and-things-to-do-this-weekend-october-28-to-31 (describing various Halloween activities in Houston between Oct. 28, 2022 and Oct. 31, 2022, including Discovery Green's Scream on the Green. Scream on the Green is described as s a Halloween celebration featuring a costume contest with six different categories, music, a screening of the movie *Monster House,* roaming characters, and a Kona Ice truck).

[9] Joey Guerra, *Houston Pride Guide: Drag, baseball, dance parties and more to celebrate the LGBTQ+ community*, Houston Chronicle (Jun. 2, 2023), https://www.houstonchronicle.com/lifestyle/article/guide-houston-pride-month-events-june-calendar-18131784.php (describing LGBTQ+ events including Discovery Green's Rainbow on the Green).

[10] Ana Khan, *Día de los Muertos events and Wings Over Houston top family fun picks*, Houston Chronicle Preview (Oct. 27, 2022), https://preview.houstonchronicle.com/families/d-a-de-los-muertos-events-and-wing-over-houston-17533939 (describing Día de los Muertos events in and around Houston including Discovery Green's Día de los Muertos at Discovery Green).

[11] *Benchmark: Discovery Green*, Project for Public Spaces 2 (2011), https://uploads-ssl.webflow.com/5810e16fbe876cec6bcbd86e/5a6a292ce4ec1200018d0074_discovery-green_benchmark_aug-2011.pdf.

[12] *See* Ex. B, Special Warranty Deed from City of Houston to Houston Downtown Park Corporation, at 1, 7, A-1-1, A-1-3, A-2-1, A-2-3, A-3-1.

a new *public park* . . . ."[13] That deed contains a "Covenant[] as to Use," requiring that "[s]uch property shall be used solely as an *urban public park* of high quality."[14]

Today, Discovery Green Conservancy operates Discovery Green park on the City and the Park Corporation's behalf, on a contractual basis.[15] "Discovery Green Conservancy has been charged" by the City and Park Corporation "with developing rules and regulations governing the use of Discovery Green (Park Rules)."[16] The Conservancy, as it describes itself in IRS filings, "operates a public park, open year-round at no charge to residents and visitors of the Greater Houston area."[17] And because the Conservancy operates the park for the benefit of the City, the City enforces park rules and Conservancy decisions through the Houston Police Department. *See, e.g.*, Dubash Decl. ¶¶ 37–47, Harsini Decl. ¶¶ 34–43.

**Anonymous for the Voiceless Holds Public Educational Events, Titled "Cubes of Truth," to Persuade Others to Treat Animals Fairly.**

Mr. Dubash and Dr. Harsini aim to persuade the public through participation in Anonymous for the Voiceless, an international animal rights advocacy group. Dubash Decl. ¶ 17; Harsini Decl. ¶¶ 19–20. They are co-organizers for the Houston chapter, and have led events in Austin, San Marcos, Waco, and San Antonio without arrest or censorship. *Id.* Anonymous for the Voiceless's signature event is the "Cube of Truth." Cubes of Truth are public educational events that seek to persuade individuals through video images and one-on-one conversations. Dubash

---

[13] Ex. C, Special Warranty Deed from City of Houston to Houston Downtown Park Corporation; Ex. A, Houston Downtown Park Corporation, Articles of Incorporation, art. IV (emphasis added).

[14] Ex. C, *supra* note 13, § 2(b)(i) (emphasis added).

[15] *Park Rules*, Discovery Green § 1.2.2(p)

[16] *Park Rules*, Discovery Green § 0.1.

[17] Ex. D, Discovery Green Conservancy Form 990 for 2021, https://www.discoverygreen.com/wp-content/uploads/2023/06/2020-Form-990-for-Discovery-Green-Conservancy-Public-Copy-03-12-22.pdf

Decl. ¶¶ 17–19; Harsini Decl. ¶¶ 19–21.

A Cube of Truth consists of a "Cube Team," which displays a video, and an "Outreach Team," which interacts with interested passersby. Dubash Decl. ¶ 19. The Cube Team typically consists of one or two members, dressed in black and wearing the "Guy Fawkes mask" synonymous with anonymous protest, holding televisions that silently display the treatment of animals in industrial meat, egg, milk, and fish production. The masked members do not speak. Dubash Decl. ¶ 19; Harsini Decl. ¶ 21.

The silent video clips are from the documentary film *Dominion*, which depicts footage of industrial animal agriculture. The film features overhead shots of cramped pig stalls, pest-ridden duck living quarters, close-up shots of caged egg-laying chickens, and electrical prodding of cattle.[18] The videos are true depictions of common industry practices. Harsini Decl. ¶ 25. This content is key for both Mr. Dubash and Dr. Harsini's advocacy, as they want to show consumers the reality of what they are supporting with their money. Dubash Decl. ¶ 22; Harsini Decl. ¶¶ 25–26. This approach follows a long American tradition. For example, Upton Sinclair's *The Jungle* shocked the public with its graphic depictions of inhumane and unsanitary practices, which were gathered from the author's weeks spent undercover in Chicago's meatpacking plants. *See* Brooke Kroeger*, Undercover Reporting, The Truth About Deception* at 83–91 (2012).[19]

During a Cube, the Outreach Team only engages with passersby who display interest in the videos. Dubash Decl. ¶ 28; Harsini Decl. ¶ 22. Members do not hand out literature, unless a passerby has engaged in conversation, in which case the member may pass out a QR code that

---

[18] The full film is narrated by award-winning actors Joaquin Phoenix and Rooney Mara and is available in its entirety online for free. *Dominion: Watch the Film*, Farm Transparency Project (Oct. 10, 2018), https://www.dominionmovement.com/watch.

[19] In response to Sinclair's revelations, Congress enacted the Meat Inspection Act of 1906. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012).

links to a website with more information about animal treatment. Dubash Decl. ¶ 29. As organizers, Mr. Dubash and Dr. Harsini strictly enforce Cube rules and protocols, such as prohibiting members from speaking to children under the age of twelve. Dubash Decl. ¶ 30; Harsini Decl. ¶ 23.  Mr. Dubash and Dr. Harsini would remove from the chapter any member who repeatedly broke protocol. Dubash Decl. ¶ 31, Harsini Decl. ¶ 23.

**Daraius Dubash Advocates *Ahimsa* (Non-Violence) to Animals as an Exercise of His Religion—the *Advaita Vedanta* Stream of Hinduism.**

Mr. Dubash is a follower of the *Advaita Vedanta* stream of Hinduism, in particular as taught by Acharya Prashant. Dubash Decl. ¶ 6. A key teaching of Vedanta scripture is the concept of *ahimsa* which can be understood as nonviolence. Mr. Dubash believes *ahimsa* extends to animals and requires him to protect animals from violence. *Id.* ¶¶ 7–8. Although Hindu scriptures have long promoted a vegetarian diet, Mr. Dubash believes that in today's world that teaching extends to a vegan lifestyle, which includes avoiding all animal products when non-animal substitutes are readily available. *Id.* ¶ 10.

Mr. Dubash's Vedantic beliefs impel him to proselytize in behalf of animals. Mr. Dubash believes that failing to speak out against animal abuse is itself an act of violence against animals. Dubash Decl. ¶¶ 15, 17. He traces this belief to the *Bhagavad Gita*, where Lord Krishna exhorts a reluctant Arjuna to fight a just war against Arjuna's own family, because to do nothing would be sinful and evil. *Id.* ¶ 15. The most effective way to convince others of the truth of the *ahimsa* principle, Mr. Dubash believes, is by having personal interactions with others through their free choice. *Id.* ¶ 17.

**Dr. Faraz Harsini's Research as a Scientist Led Him to Educate Others on What He Believes Are the Dangers of Industrial Animal Consumption.**

As a scientist who earned a doctorate in Cell Physiology and Molecular Biophysics, Dr. Harsini's research led him to believe that many public health threats and environmental issues are

the result of our industrial food system, concluding that plant-based diets preserve both the environment and human life better than omnivorous diets. Harsini Decl. ¶¶ 2, 5–7. That change in perspective led Dr. Harsini to leave his work developing therapeutics for pharmaceutical companies and begin researching and working towards producing lab-grown meat. *Id.* ¶ 12. It also led him to begin advocating for a vegan lifestyle, to found Allied Scholars for Animal Protection, a national education non-profit, and to participate in direct public outreach through Anonymous for the Voiceless. *Id.* ¶¶ 12–13, 19.

Dr. Harsini believes that the best way to teach others about what happens in industrial animal farming is to *show* them what happens. *Id.* ¶¶ 26–27. Accordingly, he typically incorporates scenes from the documentary film *Dominion* in his presentations because it shows true, accurate footage of common but little-known industry practices. *Id.* ¶ 28.

Dr. Harsini's background also led him to cherish his constitutional rights. A permanent resident who earned that status because of his scientific contributions towards discovering new therapeutics for infectious diseases, Dr. Harsini fled his native Iran. Harsini Decl. ¶¶ 4, 14. There, he faced the threat of capital punishment for his homosexuality and atheism. *Id.* ¶¶ 14–15. In 2009, the Iranian Revolutionary Guard targeted and nearly killed him due to his protests against the Iranian regime for violating human rights and freedom of speech. He will likely never be able to return to Iran or see his mother again. *Id.* ¶ 16.

**Houston Police and Discovery Green Conservancy Staff Censor Mr. Dubash and Dr. Harsini on Three Occasions at Discovery Green Based on the Content of Their Speech.**

Three times, Houston Police and Discovery Green Conservancy staff forced Mr. Dubash and Dr. Harsini to leave Discovery Green for peacefully sharing their view that industrial meat, egg, and milk production is wrong.

**November 13, 2021**. After researching Discovery Green as a public park in downtown Houston, Mr. Dubash led a group of Anonymous for the Voiceless volunteers in holding a Cube of Truth in Discovery Green. The park facilities manager William Flowers and uniformed Houston Police Officer R. Stanfield ordered Mr. Dubash to leave Discovery Green under threat of arrest, claiming it was a "private park" and Conservancy management wanted them gone. Dubash Decl. ¶ 37. The Conservancy's basis was the content of Mr. Dubash's speech: the *Dominion* documentary. Flowers asserted that he spoke for the park and ordered, "I am telling you to turn these TVs off. And leave." *Id.*

Mr. Dubash said that they did not want to get arrested. Officer Stanfield responded by flashing his handcuffs and threatening, "You're about to get arrested." *Id.* Neither Flowers nor Officer Stanfield identified any park rule or city ordinance Mr. Dubash purportedly violated. *Id.* Still, Mr. Dubash and his group left the public park to avoid arrest. *Id.*

**April 16, 2022**. Mr. Dubash and Dr. Harsini organized a second Cube of Truth at Discovery Green. A park security officer, accompanied by uniformed Officer Richard Douglass of the Houston Police Department, quickly ordered the Cube teams out of the park, which the security officer asserted was private property. Dubash Decl. ¶ 38; Harsini Decl. ¶ 34.

The security officer told Mr. Dubash that the Conservancy was silencing the speech because it does not "want to continue to get complaints." *Id.* It is unclear if there were any complaints from park guests. Mr. Dubash responded, "I don't think that's a legitimate reason not to have a peaceful protest." *Id.* Still, the security officer pointed the finger at Conservancy management: "I wouldn't bother you if they wouldn't ask me." *Id.* Again, the management's only objection was the viewpoint of the speech, as park security invoked no park rule or city ordinance. *Id.*

**June 18, 2022.** This time, Discovery Green park manager Brian Wilmer ordered Mr. Dubash, Dr. Harsini, and other Cube participants off the public sidewalk bordering the park. He told Mr. Dubash that the sidewalk "is not public property." Dubash Decl. ¶ 39; *see also* Harsini Decl. ¶ 35. Wilmer reiterated that park management disapproved of the Cube's protected speech. *See* Dubash Decl. ¶ 40; Harsini Decl. ¶ 35. For a third time, park staff invoked no park rules or city ordinances, instead objecting only to the content of Plaintiffs' speech. *Id.* And again, Mr. Dubash and Dr. Harsini complied and moved off the public sidewalk. *Id.*

**Houston Police Officers Expel Dr. Harsini and Arrest Mr. Dubash Because of the Content of Their Speech.**

On July 23, 2022, Mr. Dubash and Dr. Harsini organized a fourth Cube of Truth in Discovery Green. Dubash Decl. ¶ 41; Harsini Decl. ¶ 36. They set up near another group that exercised its First Amendment rights by encouraging people to register to vote. Dubash Decl. ¶ 41. That group was allowed to stay and speak. *Id.* Not so for Mr. Dubash and Dr. Harsini.

Shortly after arriving in the park, Discovery Green security approached Mr. Dubash and Dr. Harsini, claiming that Discovery Green "is a privately owned park." Harsini Decl., Ex. 1 at 00:00:36. Security explained that whether speech is permitted is "a case by case" determination, so his "manager is going to come and look at it." *Id.* at 00:03:30.

When the manager, Floyd Willis, arrived, he made clear that "the problem before is . . . the content of the videos." Harsini Decl., Ex. 1 at 00:07:20. Park security agreed, "The problem before was the content of the videos . . . So that's the only problem that Discovery Green has." *Id.* at 00:07:23. For the fourth time, the Conservancy objected only to the content of Plaintiffs' speech: "[W]e're not comfortable with the TVs . . . the content on those." Harsini Decl., Ex. 2 at 00:00:02. Yet it is precisely that discomforting effect that Mr. Dubash and Dr. Harsini have found so effective in persuading others. Dubash Decl. ¶ 22; Harsini Decl. ¶¶ 25–26.

Mr. Dubash respectfully reminded Willis that "you still have to abide by the First Amendment because it's publicly owned." Harsini Decl., Ex. 2 at 00:01:23. Willis responded with a chilling rejection of the First Amendment: "Right. But we also choose, and we don't feel the content is appropriate." *Id*. at 00:01:28.

Officer Douglas asserted that because Discovery Green Conservancy manages the park, "they have the right to say who should be in the property or not." Harsini Decl., Ex. 3 at 00:03:04. He continued: "We are all aware of" the First Amendment's protections, but "if you are showing offensive material [Discovery Green management] does not like, you can't be here." *Id*. at 00:04:41. The problem, again, was the content of the video, because it "seems offensive." *Id.* at 00:05:55.

Shortly after, Barry Mandel, then-president of Discovery Green, issued an edict through Willis: "So I just talked to Barry, and we are officially asking you to leave the property." *Id.* at 00:10:25. Willis did not identify any park rule or city ordinance that Plaintiffs purportedly violated.

When Mr. Dubash asked the police officers if he must leave, Officer Whitworth stated that it is "up to the management." Harsini Decl., Ex. 3 at 00:11:57. Mr. Dubash stated he would follow the police officer's orders, and that he did not want to be arrested. When he again asked Officer Whitworth if he could stay in the park, Officer Whitworth responded, "Whatever management wants." *Id.* at 00:13:05.

What management wanted was Mr. Dubash arrested. And Houston police obliged. Despite Mr. Dubash asking "why are you arresting me?" Officer Douglas handcuffed him without identifying any park rule or city ordinance that Mr. Dubash had violated. *Id.* at 00:14:54. Dr. Harsini videotaped the interactions between the officers and Mr. Dubash, including Mr. Dubash's arrest. Harsini Decl. ¶ 41. Neither officer interviewed witnesses in the area, and neither conducted

any type of investigation beyond listening to Conservancy management (and ignoring Mr. Dubash's proof that Discovery Green is a public park). Dubash Decl. ¶ 45. Officer Douglas then walked Mr. Dubash—handcuffed—to a park office, where he was forced to sit in a chair with his arms behind his back for two to three hours. *Id.* at ¶ 47.

Seeking clarification after the arrest, Dr. Harsini asked Officer Whitworth, "We have First Amendment rights, right?" Harsini Decl., Ex. 3 at 00:18:43. "It's up to the management," Whitworth replied. *Id*. at 00:18:47.

Police transported Mr. Dubash to a detention center, where he spent the night and the next afternoon, for a total of over sixteen hours. Dubash Decl. ¶¶ 47, 49. The arrest caused him abrasions and injuries on his wrist that took four months to heal, caused him anxiety, and exacerbated his heart rate and fatigue, which compounded his post-acute sequelae of COVID-19. *Id.* ¶¶ 52–53.

**Defendants Impose a Content-Based Ban on Plaintiffs' Speech.**

After Mr. Dubash and Dr. Harsini obtained legal counsel, the Conservancy, acting on the City's behalf, confirmed it was restricting Plaintiffs speech in Discovery Green: They may advocate for animal rights in the park only if (1) they do not show clips of *Dominion* and (2) they do not wear Guy Fawkes masks. Ex. F, Email of Aaron Roffwarg dated May 24, 2023. Mr. Dubash sent each Defendant a notice under the Texas Religious Freedom Restoration Act, complaining of this censorship on the basis of his constitutionally protected speech and religious rights, and his statutory religious rights.  Ex. E, Copies of Letters to Arturo G. Michel and Aaron Roffwarg and Proofs of Receipt. While the City and Park Corporation did not respond, the Conservancy did, reiterating its ban on *Dominion*'s content and masks, confirming that Mr. Dubash and Dr. Harsini must use an "alternate method" of speech at Discovery Green. Ex. F, Email of Aaron Roffwarg dated May 24, 2023.

Because of this ongoing ban, Mr. Dubash and Dr. Harsini are suffering irreparable harm. The City, the Park Corporation, and the Conservancy have explicitly forbidden them from sharing their message in the only major public park in downtown Houston. Dubash Decl. ¶ 54. And both men reasonably fear arrest if they attempt to hold another Cube of Truth in Discovery Green. *Id.* ¶ 51; Harsini Decl. ¶ 43.

## ARGUMENT

### I.    Plaintiffs Are Substantially Likely to Succeed on the Merits.

Plaintiffs are substantially likely to succeed on their claims that Defendants have unlawfully prohibited speech in a traditional public forum (Count I) and have enforced an unlawful prior restraint on their protected speech (Count II), as both violate the First Amendment's Free Speech Clause. Mr. Dubash is further likely to succeed on his claim that Defendants' suppression of his religious practice of proselytization violates the Free Exercise Clause of the First Amendment (Count V) and the Texas Religious Freedom Restoration Act (Count VI).[20]

### A.    Plaintiffs' expression is constitutionally protected speech.

Mr. Dubash and Dr. Harsini's expression in a public park—the peaceful display of silent videos about the treatment of animals, wearing of Guy Fawkes masks, and discussions about the treatment of animals—constitute protected speech. As they have on many other occasions, Plaintiffs wish to peacefully convey information and engage in discussion on an issue of public concern: The treatment of animals in industrial agriculture. *See, e.g.*, *Animal Legal Def. Fund v. Reynolds*, 591 F. Supp. 3d 397, 417 (S.D. Iowa 2022) ("Plaintiffs . . . seek to shine a light on issues such as animal abuse, food safety, and agricultural working conditions, which are all fairly in the public sphere and issues of public concern."). "[A]ctivities such as speaking, distributing literature,

---

[20] Plaintiffs' claims for damages for past violations of their rights are not at issue in this motion.

displaying signs, petitioning for change, and disseminating information concerning issues of public concern are central to the protections of the First Amendment." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001).

Defendants censored Mr. Dubash and Dr. Harsini's protected speech only because they found it "offensive" and not "appropriate." Harsini Decl., Ex. 3 at 00:04:41, Ex. 2 at 00:01:28. Plaintiffs' silent videos, displayed on hand-held monitors, portrayed true, unembellished practices of industrial animal production that aim to persuade passersby on a matter of moral and public importance. At the same time, Defendants have permitted the expression of other viewpoints at Discovery Green—including the promotion of voter registration on the same day that Mr. Dubash was arrested, and large public protests.[21] Dubash Decl. ¶ 41. Silencing speech because of the viewpoint it expresses is anathema to the First Amendment and an "egregious" form of censorship. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Giving offense is a viewpoint," and "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Matal v. Tam*, 582 U.S. 218, 243–44 (2017) (plurality opinion); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

But Plaintiffs' speech does not receive less protection because some observers may find it disturbing. In fact, this is precisely the point that Mr. Dubash and Dr. Harsini wish to make. By silently portraying standard industry practices that some observers may find grotesque, they encourage the public to reconsider their consumption choices. The portrayal of lawful animal

---

[21] *See, e.g.*, Chaz Miller, *Houston leaders taking safety precautions as city prepares for NRA convention and protests*, ABC 13 (May 26, 2022), https://abc13.com/national-rifle-association-nra-convention-houston-gun-meeting-protests/11897928/.

production practices does not fall into any category of unprotected speech, such as obscenity. *See United States v. Salcedo*, 924 F.3d 172, 177 (5th Cir. 2019) (restating the *Miller v. California*, 414 U.S. 15, 24 (1973), test for obscenity).

Just as the First Amendment protects certain depictions of "animal cruelty," *United States v. Stevens*, 559 U.S. 460, 472 (2010), so too does it protect accurate depictions of industrial animal production. Indeed, how the animal products we consume are produced is a matter of public concern. *See Animal Legal Def. Fund v. Kelly,* 9 F.4th 1219, 1235 (10th Cir. 2021), cert. denied, 142 S. Ct. 2647 (2022) (finding law that prohibited undercover investigations at animal facilities unconstitutional, as it targeted speech on matter of public concern). And where speech involves matters of public concern, it "is entitled to special protection," even if others find it disturbing or upsetting. *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (First Amendment protected picketers' anti-gay protest on public land next to a military funeral). The First Amendment likewise protects speech "calculated to challenge people, to unsettle them, and even to anger them," just as Mr. Dubash and Dr. Harsini's speech is calculated, and even when it includes images that passersby may find unsettling. *World Wide Street Preachers' Fellowship v. City of Owensboro*, 342 F. Supp. 2d 634, 638–39 (W.D. Ky. 2004) (rejecting argument that pro-life protestors' sign showing an image of an aborted fetus was unprotected speech).

**B.** **Discovery Green is a public park and a traditional public forum, and Discovery Green Conservancy is a state actor.**

"Traditional public forums are places that by long tradition or by government fiat have been devoted to assembly or debate." *Chiu*, 260 F.3d at 344 (internal quotations omitted). Public parks are classic traditional public forums, as they have "immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local*

*Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

The City of Houston has chosen to operate Discovery Green through a non-profit Conservancy. "Discovery Green Conservancy has been charged" by the City and Park Corporation "with developing rules and regulations governing the use of Discovery Green (Park Rules)."[22] The Conservancy itself defines Discovery Green Park as "*a dedicated public park* owned by the Houston Downtown Park Corporation and operated under contract by the Conservancy."[23] The Park Corporation, a local government corporation, exists "to aid and act on behalf of the City [of Houston] to accomplish the City's governmental purposes consisting of the acquisition, development, operation and maintenance of a new *public park* . . . ."[24] And the land Discovery Green sits on is restricted by its deed to "be used solely as an *urban public park* of high quality."[25]

A private actor's conduct represents state action when the State has entered "a position of interdependence with the [private actor, such] that it was a joint participant in the enterprise." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357–58 (1974) (discussing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)). Similarly, "under the 'joint action test,' private actors will be considered state actors where they are 'willful participant[s] in joint action with the State or its agents.'" *Cornish v. Corr. Services Corp.*, 402 F.3d 545, 550 (5th Cir. 2005) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)); *accord Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("Under this Court's cases, a private entity can qualify as a state actor . . . when the government acts jointly with the private entity[.]") Here, that joint action is plain on the face

---

[22] *Park Rules: Discovery Green* § 0.1.

[23] *Park Rules: Discovery Green* § 1.2.2(p) (emphasis added).

[24] Ex. A, Houston Downtown Park Corporation, Articles of Incorporation, art. IV (emphasis added).

[25] Ex. C, Special Warranty Deed, § 2(b)(i) (emphasis added).

of Defendants' own legal documents. The Park Corporation exists to operate and maintain a "public park;" its deed is restricted to the use of a "public park;" the City and Park Corporation have "charged" the Conservancy "with developing rules and regulations" for that "public park;" and the Conservancy exists to "operate[] a public park." And Plaintiffs were victims of a practice of Houston police working with Conservancy management to censor and ban Plaintiffs without regard to city ordinances or even posted park rules. Plaintiffs' constitutional injuries were caused by a joint effort between the City, Conservancy, and Park Corporation.

This case presents a sharp contrast from *Rundus v. City of Dallas, Tex.* where a plaintiff unsuccessfully argued that the private non-profit that operated the Texas State Fair was a state actor. *See* 634 F.3d 309, 311 (5th Cir. 2011). Here, unlike in *Rundus*, the formal legal relationship between the Conservancy and the Park Corporation specifies that Discovery Green is a "public park," (Ex. C, Special Warranty Deed from Houston Downtown Park Conservancy to Houston Downtown Park Corporation § 2(b)(i)) and Discovery Green holds itself out to the public as a "public park."[26] In *Rundus*, by contrast, "A ticket [was] required for admission to the Fair, and ticket prices [were] within [the non-profit defendant's] sole discretion." *Rundus*, 634 F.3d at 312. And while the defendant in *Rundus* "[did] not receive any payments from the City," *id.* at 311, the Conservancy derives substantial funding from public sources, including the majority of its revenues in tax year 2020, Ex. D, Discovery Green Conservancy Form 990 for 2020 at pt. VIII(e).

Discovery Green was founded as a public park and serves as one today. Public parks are prototypical traditional public fora. And the Conservancy is a state actor managing that forum.[27] Thus, the First Amendment protects Plaintiffs' speech in Discovery Green and the Conservancy is

---

[26] *Park Rules: Discovery Green* § 1.2.2(p).

[27] Indeed, public parks serve an exclusive public function. "Mass recreation through the use of parks is plainly in the public domain." *Evans v. Newton*, 382 U.S. 296 (1966).

liable for its First Amendment violations.

**C.      Discovery Green Conservancy, exercising authority delegated by the City, has imposed an unconstitutional prior restraint upon Plaintiffs' speech.**

A prior restraint is a governmental edict "forbidding certain communications when issued in advance of the time that such communications are to occur." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). Here, the prior restraint is the park management's ban on Plaintiffs showing silent clips *Dominion* or wearing Guy Fawkes masks in a public park, forcing Plaintiffs instead to use an "alternate method" of expressing their speech. Ex. F, Email of Aaron Roffwarg dated May 24, 2023. In addition, the City of Houston's treatment of speech rights in Discovery Green Park is a prior restraint because it makes "speech contingent on the will of an official"—namely, Discovery Green Conservancy, to which the City delegated final decision-making power of Discovery Green Park rules. *Chiu,* 339 F.3d at 280–81; *see also Park Rules: Discovery Green* § 0.1.

Prior restraints must be confined by "narrow, objective, and definite standards," and there is a "heavy presumption of invalidity" for prior restraints which grant broad authority to the government actor engaging in the restraint. *Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010). But in Discovery Green, speech is tolerated (or not) on a "case by case" basis that requires the "manager [] to come and come look at it." Harsini Decl., Ex. 1 at 00:03:31.

Prior restraints are presumptively unconstitutional. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). And Defendants cannot clear that high bar here. Prior restraints must (1) "be imposed only for a specified brief period during which the status quo must be maintained"; (2) offer "prompt judicial review"; and (3) place the burden on the censor "of going to court to suppress the speech." *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003),

18

*aff'd on reh'g in relevant part*, 372 F.3d 333 (5th Cir. 2004). But Plaintiffs' ban from expressing specific messages is indefinite, no judicial review was offered, and the fact that Plaintiffs must bring this suit itself shows that speakers, and not the censor, have the burden of going to court.

### D. Defendants' content- and viewpoint-based ban on speech fails strict scrutiny.

"In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). Defendants' ban on Plaintiffs' expression because they deem it "offensive" and not "appropriate",[28] is content- and viewpoint-based, and fails strict scrutiny.

Defendants' action against Mr. Dubash and Dr. Harsini's speech distinguishes between offensive and non-offensive speech. As the Supreme Court has made clear, "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) (quoting *Tam*, 137 S. Ct. at 1751 (opinion of Alito, J.)). That is precisely what Defendants did here. In the words of Officer Douglas, "[I]f you are showing offensive material he does not like, you can't be here."[29]

Even if Defendants' ban were not viewpoint-based, but instead content-based, a content-based ban is "presumptively unconstitutional" and "justified only if the government proves [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (cleaned up). Defendants' ban against Mr. Dubash and Dr. Harsini's speech plainly fails strict scrutiny. First, the City does not have a compelling interest in censoring that protected

---

[28] Harsini Decl., Ex. 3 at 00:04.41, Ex. 2 at 00:01:28.

[29] Harsini Decl., Ex. 3 at 00:04:41.

speech on a matter of public concern in a public park. Public parks, as traditional public forums, have long hosted the expression of viewpoints intended to challenge public sentiments on a particular issue. Protecting parkgoers from subjectively unpleasant but fully protected images cannot be a legitimate interest in a public space "which by long tradition [has] been devoted to assembly or debate." *Serv. Emps. Int'l Union, Loc. 5*, 595 F.3d at 595 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *United States v. Marcavage*, 609 F.3d 264, 283, 290–91 (3d Cir. 2010) (finding no compelling interest in censoring "vivid depictions of mutilated fetuses" that were "jarring, their shock value unmistakable"). Nor does the First Amendment allow censorship in order to prevent children from being exposed to graphic or disturbing images. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975) (invalidating a city ordinance that banned drive-ins from showing films with nudity); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 795, 805 (2011) (invalidating a ban on the sale of violent video games to youth and emphasizing that there is no constitutional tradition of "restricting children's access to depictions of violence").

Second, Defendants' ban on Plaintiffs' expression is not narrowly tailored. Defendants censored Mr. Dubash and Dr. Harsini's speech because they deemed it "offensive" and not "appropriate." But Defendants did not censor other demonstrations at Discovery Green that some members of the public may find objectionable—such as the NRA convention protests. Park officials do not refer to any objective criteria in determining which viewpoints qualify as offensive, which is "just a case by case" determination (Harsini Decl., Ex. 1 at 00:03:31), that is "up to the management." Harsini Decl., Ex. 3 at 00:11:57.

Nor is Defendants' ban on Plaintiffs' speech a permissible time, place, and manner restriction, which must be "content-neutral, [ ] narrowly tailored to serve a significant government

interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45. The ban on Plaintiffs' speech is not content-neutral; it was based on the content of the images displayed and the masks worn. Additionally, the government has no compelling interest in banning Plaintiffs' speech; the only reason offered by park officials was the "offensiveness" of the speech. Even if a compelling interest did exist, it would not be narrowly served through the imposition of a flat ban on the content of Plaintiffs' speech or Mr. Dubash's religious practice. Defendants cannot justify a total ban unless "each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). If Plaintiffs impeded traffic (which he did not), Defendants could require him to let passersby through; if their speech were disruptively loud (which it wasn't), Defendants could require a reasonable volume. But a complete ban on Plaintiffs advocating for animal welfare or on Mr. Dubash speaking about *ahimsa* in a public park is the opposite of a narrowly tailored restriction.

Defendants' blanket ban lacks the "[p]recision of regulation" that must be the "touchstone" of speech restrictions. *NAACP v. Button*, 371 U.S. 415, 438 (1963). Because Defendants' ban is viewpoint- and content-based, and is not narrowly tailored to serve a compelling government interest, it is unconstitutional.

### E. Defendants' prohibition of Mr. Dubash's religious speech violates the Free Exercise Clause.

Under the Free Exercise Clause, laws burdening religious exercise are subject to the "most rigorous of scrutiny" if they are not neutral and generally applicable. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). As just described, the City of Houston and Houston Downtown Park Corporation confer unbridled discretion on park management to allow or forbid speech.  Discovery Green Conservancy applied that discretion by proclaiming, based on a "case by case" determination by park management, that Mr. Dubash's speech was unacceptable.

Harsini Decl., Ex. 1 at 00:03:31. It then prospectively banned him from spreading the message of *ahimsa* through his chosen means – a Cube of Truth that employed silent clips from the *Dominion* documentary and Guy Fawkes masks.

A rule is not generally applicable if "it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," and "permit[s] the government to grant exemptions based on the circumstances." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (internal quotations omitted). Defendants' approach to speech in Discovery Green is such a system. Moreover, the Conservancy's ban on Mr. Dubash's speech is not generally applicable because it is not applied "in an evenhanded, across-the-board way." *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022). The Conservancy has allowed large public-protests while barring the Cube of Truth. *See supra* notes 5 and 6. And while the Conservancy has forbidden Mr. Dubash from wearing a Guy Fawkes mask in Discovery Green due to its supposedly frightening appearance, the Conservancy allows frightening masks for its preferred events, such as Halloween and Dia de los Muertos celebrations. *See supra* note 10.  For each reason, strict scrutiny applies, and Defendants cannot satisfy that stringent test.

Defendants substantially burdened Mr. Dubash's sincerely held religious beliefs. As a Hindu Vedantin Mr. Dubash believes that he is compelled to practice *ahimsa* (non-violence) toward animals and failing to spread awareness of the harms of violence against animals is itself a violation of his faith. Dubash Decl. ¶¶ 7–8, 15. Mr. Dubash understands his discussion of the principles of *ahimsa* with others, including through conducting Cubes of Truth, as a core part of his religious practice. *Id.* ¶¶ 15–17. While Mr. Dubash peacefully conducted a Cube of Truth in Discovery Green, Defendant Officers Douglas and Whitworth harassed and subsequently arrested him. *See* Harsini Decl., Ex. 3 at 00:10:25-00:19:15. Combined with the prior restraint on his speech

in Discovery Green, Defendants have forced him to choose between following a government dictate and following his faith, a substantial burden on his religious exercise. *See Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 793 (5th Cir. 2012), as corrected (Feb. 20, 2013).

"[T]he strictest scrutiny" is required. *Fulton*, 141 S. Ct. at 1881. The Conservancy's restrictions on Mr. Dubash's religious speech must "advance interests of the highest order and must be narrowly tailored" to those interests. *Church of Lukumi*, 508 U.S. at 546 (internal quotation marks omitted). Indeed, proffered interests "at a high level of generality" must be rejected, as "the First Amendment demands a more precise analysis." *Fulton*, 141 S. Ct. at 1881.

As explained, Defendants fail both prongs of the strict scrutiny analysis. They have no compelling interest in prohibiting Mr. Dubash's religious speech. Banning speech because of its "offensive character" is an "impermissible justification." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 548 (1980) (Stevens, J., concurring in the judgment). Nor is the ban on Mr. Dubash's speech narrowly tailored. *Supra* I.D. Thus, Defendants' restrictions on Mr. Dubash's religious exercise are substantially likely to violate the First Amendment.

### F.     Defendants' actions violated the Texas Religious Freedom Restoration Act.

The Texas Religious Freedom Restoration Act prevents the state and local Texas governments from substantially burdening a person's free exercise of religion unless doing so furthers a compelling governmental interest in the least restrictive manner. Tex. Civ. Prac. & Rem. Code Ch. 110, § 110.003. The four-part test to prove a claim under TRFRA is: "(1) whether the government's regulations burden the plaintiff's free exercise of religion; (2) whether the burden is substantial; (3) whether the regulations further a compelling governmental interest; and (4) whether the regulations are the least restrictive means of furthering that interest." *Merced v. Kasson*, 577 F.3d 578, 588 (5th Cir. 2009). TRFRA places the burden of proving a substantial burden on the claimant, but the government must prove a compelling state interest. *Barr v. City of*

23

*Sinton*, 295 S.W.3d 287, 307 (Tex. 2009).

TRFRA defines "free exercise of religion" as "an act or refusal to act that is substantially motivated by sincere religious belief." Tex. Civ. Prac. & Rem. Code § 110.001(a)(1). There can be little dispute that Mr. Dubash's advocacy is "substantially motivated" by his Vedantic religious practice. Dubash Decl. ¶ 15–17. And as described above, the threat of criminal prosecution is a substantial burden.

Because Defendants have imposed a substantial burden on Mr. Dubash's exercise of religion, Defendants bear the burden of proving that the "application of the burden to the person" in this particular instance "is in furtherance of a compelling government interest." Tex. Civ. Prac. & Rem. Code § 110.003(b)(1); *Barr*, 295 S.W.3d at 307. As explained above, there is no compelling interest in censoring protected speech, *supra* I.D., and a complete ban is not the least restrictive means of pursuing *any* relevant interest. *Id.* Defendants' ban fails the First Amendment's strict scrutiny requirements; so too TRFRA.

## II.     Plaintiffs Have Suffered and Continue to Suffer Irreparable Harm.

Plaintiffs have suffered and continue to suffer irreparable harm due to the loss of their First Amendment right to engage in constitutionally protected speech in a public park. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). That loss of freedom here is anything but minimal, as Mr. Dubash and Dr. Harsini continue to suffer the loss of their expressive freedom at the hands of Defendants' ongoing ban of their peacefully displaying silent videos of animal treatment and wearing Guy Fawkes masks in a public park. That ongoing ban "unquestionably constitutes irreparable injury." *Id.* at 373.

## III.    The Balance of Harms and The Public Interest Favor an Injunction.

The balance of the harms and the public interest "merge when the Government is the

opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Injunctions protecting First Amendment freedoms are always in the public interest." *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021). Because Plaintiffs' expression is a core First Amendment right, granting the preliminary injunction will best serve the public interest. What's more, Defendants cannot "present powerful evidence of harm to its interests" that outweighs the ongoing irreparable harm to Plaintiffs and the public. *Denton v. City of El Paso, Texas*, 861 F. Appx. 836, 841 (5th Cir. 2021).

## IV.    The Court Should Excuse Plaintiffs from Posting Security.

The amount of security for a bond under Federal Rule of Civil Procedure 65 is within the Court's discretion, meaning it may waive the bond requirement. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Because Plaintiffs are engaging in public-interest litigation to protect First Amendment rights, the Court should waive the security requirement here. *See, e.g.*, *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (explaining that "public-interest litigation" is "an area in which the courts have recognized an exception to the Rule 65 security requirement").

## CONCLUSION

Americans' rights to free speech and religious liberty are not "up to the management." They are protected by the United States Constitution and by Texas statute. Mr. Dubash and Dr. Harsini respectfully request that this court grant their motion for a preliminary injunction.

Dated: October 20, 2023                    Respectfully submitted,


/s/ John Greil

John Greil (TX 24110856)
Steven T. Collis (TX 24122632)
Law and Religion Clinic
University of Texas School of Law
727 E. Dean Keaton St.
Austin, TX 78705
(512) 475-9090
John.greil@law.utexas.edu
Steven.collis@law.utexas.edu

JT Morris (TX 24094444)
Gabe Walters
*pro hac vice motion forthcoming*
Foundation for Individual Rights and
Expression
(215) 717-3473
700 Pennsylvania Ave., SE
Suite 340
Washington, DC 20003
jt.morris@thefire.org
gabe.walters@thefire.org


Daniel Ortner
*pro hac vice motion forthcoming*
Foundation for Individual Rights and
Expression
(215) 717-3473
510 Walnut St.
Suite 1250
Philadelphia, PA 19106
daniel.ortner@thefire.org

**Attorneys for Plaintiffs**
**Daraius Dubash and**
**Dr. Faraz Harsini**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 20, 2023, I electronically filed the foregoing Plaintiffs'

Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction with the Clerk

of the United States District Court for the Southern District of Texas using the CM/ECF system.

I also served copies by email on the same date to the following:

        Melissa Azadeh
        City of Houston Legal Department
        melissa.azadeh@houstontx.gov

        Richard  Whiteley
        Bracewell, LLP
        Richard.whiteley@bracewell.com


        <u>/s/ John Greil</u>
        John Greil