IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **DARAIUS DUBASH, and DR. FARAZ HARSINI** § § § | | |
| **Plaintiffs,** § § | **CIVIL ACTION** | |
| § | **CASE NO. 4:23-cv-03556** | |
| **v.** § § | | |
| **CITY OF HOUSTON, TEXAS; HOUSTON DOWNTOWN PARK CORPORATION; OFFICER ROBERT DOUGLAS (# 7943), in his Individual capacity; OFFICER VERN WHITWORTH (# 7595), in his individual capacity; DISCOVERY GREEN CONSERVANCY f/k/a HOUSTON DOWNTOWN PARK CONSERVANCY; and BARRY MANDEL, in his individual capacity,** § § § § § § § § § § § § § | | |
| **Defendants.** § | | |

## DECLARATION OF BRIAN WILMER IN RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**BRIAN WILMER** declares as follows pursuant to 28 U.S.C. § 1746:

1. I am over 18 years of age, and am the Park Manager at Discovery Green, a position I have held since Discovery Green was initial constructed in 2008.

2. I submit this Declaration in response to Plaintiffs' motion for a preliminary injunction.

3. I am familiar with the allegations in this lawsuit based, in part, on my direct interactions with Plaintiffs and their fellow demonstrators, as well as multiple interactions with other patrons of Discovery Green.

1

4.      In my capacity as Park Manager, I am responsible for the day-to-day operation of Discovery Green. Prior to my position with Discovery Green, I was an employee of the City of Houston Department of Parks and Recreation.

5.      Generally, the parks within the City of Houston are what one typically considers as a public park: grass, trees, ballfields, bike paths, pavilions, etc. Discovery Green was designed to be different from a public park. The vision of Discovery Green has been for it to be a privately operated recreational space, providing amenities, dining, events, and activities.

6.      My responsibilities include ensuring the orderly use of Discovery Green, consistent with its purpose and function. This includes enforcing the Discovery Green Rules.

7.      While I have been with Discovery Green, we have supported and allowed robust expression and exchange of ideas. We have hosted a number of different demonstrations and protests by a variety of different groups. I have never curtailed any demonstrators' or protestors' activities based on their viewpoint, or the subject of their speech. Nor have I ever been directed to do so by the Conservancy or anyone else. While Discovery Green enforces its Rules, including ensuring that people do not disrupt the use of the park, or requiring that large groups obtain a permit prior to demonstrating, I have always enforced these Rules uniformly, without regard for the specific subject of one's demonstration or protest.

8.      I am familiar with Plaintiffs' demonstrations in Discovery Green. I have been made aware of them whenever they have demonstrated at Discovery Green over the years. I have also personally witnessed the demonstrators' conduct on multiple occasions. Each time, they would be engaging in their demonstration at a prominent pedestrian intersection where the promenade through the center of Discovery Green meets an adjoining walkway. The demonstrations typically involved several, sometimes as many as six, individuals standing in a square formation, each

wearing a mask and holding a television screen facing outward that was silently playing graphic violent videos of animals being tortured. Occasionally, when Discovery Green would hold events on Avenida de Los Americas, a roadway to the east of the property, they would set up on the Discovery Green-owned sidewalk adjacent to wherever those events were being held. The demonstrators would typically arrive at times that were busy because of events or activities in Discovery Green.

9. While I did not spend long watching the videos, my recollection of them is that the imagery shows animals being killed or living in cramped conditions. I recall such footage as small animals being put through meat grinding equipment.

10. One location commonly selected by the demonstrators was a busy pedestrian intersection near the entrance to the only public restrooms on the property, which is located on the main approach to the John P. McGovern Playground. This can be found on the map attached as **Exhibit B** as the intersection of the Stedman West Veranda and the Andrea and Bill White Promenade, with the restrooms in the Alkek Building. Another location where I would find them would be at the intersection of the Brown Foundation Promenade and the Andrea and Bill White Promenade, which was at a major entrance to Discovery Green commonly frequented by families with children. This location is also found on Exhibit B.

11. The demonstrators would often set up in or close to the center of whichever walkway or intersection they chose to use. While this would leave room for patrons to walk around them, it was difficult to do so without having to see their videos. It was likewise difficult or impossible, if one was walking with children, to keep those children from being exposed to the videos. In addition, the demonstrators would occasionally draw a crowd, making it impossible to pass them without walking off the promenade.

12. Each time the demonstrators would be in Discovery Green, I would field multiple complaints by patrons. Some would complain that the conduct, and more specifically, publicly displaying silent videos showing violence against animals, was disturbing to them as adults, and objected to being forced to see the videos as they walked through Discovery Green. Some would complaint that the groups of people they would attract were blocking the walkways. Most importantly, many parents were complaining that they objected to their children seeing the videos. Many reported that their children were scared by the videos, and the parents were afraid that the videos would give their children nightmares. The demonstrators would stand in locations where children walking to the restrooms or playground, or elsewhere, would be forcibly subjected to the videos, while the parents would have no options for keeping their children from viewing them other than avoiding that part of Discovery Green entirely.

13. When the demonstrations were reported to me, I would request that the demonstrators either stop showing the videos or move to the public sidewalk at the perimeter of Discovery Green near the closest entrance. The nearest public sidewalk was never far. The location to which I would direct them would typically be at a distance of fewer than 250 feet. I never told the demonstrators that there was an objection to their message or their viewpoint. In fact, I told them that they could continue to speak their message in Discovery Green, but simply could not show the disturbing videos. On one occasion, I told one of the demonstrators other than Plaintiffs that parents were afraid that the videos would give their children nightmares. She replied, in sum and substance, "we want to give children nightmares."

14. Unfortunately, the demonstrators' location made it impossible to avoid them. Discovery Green is small, and every time the demonstrators would set up, it would be in a central location. It is impossible to avoid them without completely avoiding that area of Discovery Green,

and since the conduct was the public broadcast of disturbing videos, they were being thrust upon an often unwilling audience. One of the reasons the Discovery Green Rules prohibit amplified sound by demonstrators is that it foists one's amplified sounds on all of the users of Discovery Green within hearing distance. Again, unlike at a large public park such as, for instance, Memorial Park, where one can escape offensive material without it being foisted upon him/her, patrons come to Discovery Green to use its amenities. The demonstrators would set up in front of the only restrooms, and near the only playgrounds, in the center of the only walkway through the middle of Discovery Green which is the walkway to the amenities and activities. The patrons would have no realistic options to use the amenities and avoid the violent videos without avoiding Discovery Green altogether.

15. I have never seen any other demonstrators or protestors use any videos, let alone videos that contain such graphic, disturbing footage of violence against animals. Had somebody done so, Discovery Green and I would have taken the same approach as we did with Plaintiffs: we would request that they either stop using the videos or move to the perimeter sidewalk that is not on Discovery Green property.

16. Plaintiffs have always been free to return (and still are today) to convey their message, so long as they do not publicly display their videos. As I told Plaintiffs, they are free to speak openly regarding their message against the inhumane treatment of animals, but as with any protestor or demonstrator at Discovery Green, they cannot publicly display disturbing videos of violence against animals, which directly impacts the ability of children, among other patrons, to enjoy the amenities of Discovery Green.

291164877v.1

17. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Houston, Texas, on December 26, 2023.

_____
BRIAN WILMER

291164877v.1