EXHIBIT A

# OPERATING AGREEMENT

between

## HOUSTON DOWNTOWN PARK CORPORATION

### AND

## HOUSTON DOWNTOWN PARK CONSERVANCY

**Dated Effective as of August 29, 2006**

## TABLE OF CONTENTS

**Page**

1.  DEFINED TERMS ................................................................................................1

2.  ENGAGEMENT OF THE CONSERVANCY AS INDEPENDENT
    CONTRACTOR .................................................................................................1

3.  TERM ...............................................................................................................1

    3.1.    Initial Term ...........................................................................................1

    3.2.    Extension Options .................................................................................2

4.  OPERATION AND MANAGEMENT ...............................................................2

    4.1.    Compliance with Use, Operating, and Maintenance Standards ...........2

    4.2.    Compliance with Applicable Laws Generally .....................................2

    4.3.    Rules and Regulations ..........................................................................2

    4.4.    Scheduling; Traffic; Noise ..................................................................2

    4.5.    User Fees; Amenities Fees ...................................................................3

    4.6.    Consent to Encroachment .....................................................................4

5.  COMPENSATION; PAYMENT OF EXPENSES ..............................................4

    5.1.    Annual Management Fee .......................................................................4

    5.2.    Credits Against Annual Management Fee .............................................5

    5.3.    Direction to City ...................................................................................5

    5.4.    Invoicing ...............................................................................................5

    5.5.    Park Operating Expenses ......................................................................5

6.  MARKETING RIGHTS ....................................................................................6

    6.1.    Promotions ............................................................................................6

    6.2.    Corporate Sponsorships ........................................................................6

7.  FURTHER DEVELOPMENT ...........................................................................6

8.  REPORTING .....................................................................................................6

    8.1.    Annual Operating Plan .........................................................................6

    8.2.    Year-End Report ...................................................................................7

    8.3.    Audits ....................................................................................................7

9.  SUBCONTRACTING ........................................................................................7

    9.1     Right to Subcontract .............................................................................7

    9.2     Assumption of Contracts ......................................................................7

| | | |
|---|---|---|
| 10. | CONSERVANCY TERMINATION RIGHTS | 8 |
| 11. | DEFAULT AND REMEDIES | 8 |
| | 11.1. Event of Default by the Conservancy | 8 |
| | 11.2. Remedies Upon Event of Default by The Conservancy | 8 |
| | 11.3. Event of Default by the Corporation | 8 |
| | 11.4. Remedies Upon Event of Default by the Corporation | 9 |
| | 11.5. Cumulative Remedies | 9 |
| | 11.6. No Waivers | 9 |
| | 11.7. Effect of Termination | 9 |
| | 11.8. Court Proceedings | 9 |
| 12. | INDEMNIFICATION | 10 |
| | 12.1. Indemnification | 10 |
| | 12.2. Indemnity Procedures | 10 |
| | 12.3. Survival; Other Rights | 11 |
| 13. | INSURANCE TO BE CARRIED BY THE CONSERVANCY | 11 |
| | 13.1. Insurance to be Carried by The Conservancy | 11 |
| | 13.2. Waiver of Right of Recovery | 12 |
| 14. | PARKING RIGHTS | 12 |
| | 14.1. Garage Parking Rights | 12 |
| | 14.2. Surface Parking Rights | 14 |
| | 14.3. Survival | 14 |
| 15. | MISCELLANEOUS TERMS | 15 |
| | 15.1. Approvals and Consents | 15 |
| | 15.2. Open Records Act | 15 |
| | 15.3. Time of the Essence/Force Majeure | 15 |
| | 15.4. Relationship of the Parties | 16 |
| | 15.5. Notices | 16 |
| | 15.6. Severability | 18 |
| | 15.7. Entire Agreement, Amendment and Waiver | 18 |
| | 15.8. Table of Contents; Headings | 19 |
| | 15.9. Parties in Interest; Limitation on Rights of Others | 19 |
| | 15.10. Counterparts | 19 |
| | 15.11. Governing Law | 19 |

15.12. Interpretation and Reliance...............................................................19

15.13. Exhibits.........................................................................................19

15.14. Anti-Discrimination .......................................................................19

15.15. Capacity of Persons Acting on Behalf of the Corporation.................20

15.16. Limitations to Capacity Under This Agreement................................20

15.17. Non-liability of Board and Employees .............................................20

16.   DESIGNATION OF AMENITIES EASEMENT; ACKNOWLEDGEMENT OF
      GREENSCAPE ...................................................................................20

16.1.  Amenities Easement.........................................................................20

16.2.  Green Space.....................................................................................20

| Exhibit A | -- | Legal Description of the Property |
| Exhibit B | -- | Definitions and Rules of Usage |
| Exhibit C | -- | Use, Operating and Maintenance Standards |
| Exhibit D | -- | Procedures |
| Exhibit E | -- | Baseline Operating Expenses |
| Exhibit F | -- | Reviews and Approvals |
| Exhibit G | -- | Delineation of Amenities Easement and Open Space |

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (this "Agreement") is entered into to be effective for all purposes as of August 29, 2006 (the "Effective Date"), by and between HOUSTON DOWNTOWN PARK CORPORATION, a local government corporation created by the City of Houston (the "City") pursuant to Chapter 431 of the Texas Transportation Code, as amended (the "Corporation"), and HOUSTON DOWNTOWN PARK CONSERVANCY, a Texas nonprofit corporation (the "Conservancy").  The Corporation and the Conservancy are sometimes referred to herein collectively as the "Parties" and each individually is sometimes referred to as a "Party."

## RECITALS

A.    The Parties desire to provide for the operation, management and maintenance of a high quality urban park and open space and related amenities (the "Park"), for the use and enjoyment of residents and visitors of Houston for recreational and educational purposes, and the beautification of the Central Business District of Houston on those certain tracts of land known as Blocks 122, 123, 124, 125, 127, 248 and 249, S.S.B.B., as more particularly described on Exhibit A attached hereto (collectively, the "Property").

B.    The Corporation desires to engage the Conservancy as an independent contractor to operate, manage, and maintain the Park in accordance with the terms of this Agreement.

C.    The Conservancy desires to be engaged as an independent contractor to operate and manage the Park in accordance with the terms of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties, each intending to be legally bound, do hereby agree as follows:

1.    **DEFINED TERMS**.  All capitalized terms and phrases used in this Agreement shall have the meanings that are set forth herein or in Exhibit B attached hereto.  The "rules as to usage" applicable to this Agreement are also set out in Exhibit B.

2.    **ENGAGEMENT OF THE CONSERVANCY AS INDEPENDENT CONTRACTOR**.  The Corporation hereby exclusively engages the Conservancy as an independent contractor to operate, manage, maintain, and repair the Park pursuant to, and subject to, the terms of this Agreement.  During the Term, the Corporation shall not engage any other Person to perform the services that the Conservancy is required and permitted to perform under this Agreement.

3.    **TERM**.

3.1.    Initial Term.  The initial term (as it may be extended as hereinafter provided, the "Term") of this Agreement shall commence on the date of the Park Dedication, and shall continue until the date immediately preceding the fiftieth (50th) anniversary of the date of the Park Dedication.

      3.2.   <u>Extension Options</u>.   Provided there is no Event of Default by the Conservancy then existing under this Agreement, the Conservancy shall have the right to extend the initial Term on the same terms and conditions set forth in this Agreement for two (2) consecutive terms (each, an "<u>Extension Term</u>") of twenty-five (25) years each by delivering written notice to the Corporation at least thirty (30) days before the expiration of the initial Term or the first Extension Term, as the case may be.

4.      **OPERATION AND MANAGEMENT**.

      4.1.   <u>Compliance with Use, Operating, and Maintenance Standards</u>.   The Conservancy shall operate, manage, maintain, and preserve the Park in a manner that discharges the Corporation's obligations under Section 5.2 of the Joint Development Agreement, and otherwise in accordance with the restrictions, covenants, and limitations relating to use and maintenance standards set forth on <u>Exhibit C</u> attached to this Agreement (the "<u>Use, Operating and Maintenance Standards</u>").

      4.2.   <u>Compliance with Applicable Laws Generally</u>.   The Conservancy will comply with all Applicable Laws in connection with performance of its duties, responsibilities, and obligations under this Agreement.  Nothing in this Agreement shall require the Conservancy to perform services in violation of Applicable Laws.

      4.3.   <u>Rules and Regulations</u>.  The Conservancy shall have the exclusive right to establish such reasonable rules and regulations as it may deem necessary or desirable for the Park from time to time, including, without limitation, rules and regulations relating to the use of, and types and sizes of activities and events in, the Park (collectively, the "<u>Park Rules</u>").  The Park Rules shall comply with all Applicable Laws, including, without limitation, the Noise and Sound Level standards set forth in Chapter 30 of the City's Code of Ordinances (as the same may be amended from time to time) and shall be non-discriminatory to the full extent required by Applicable Laws.  The initial Park Rules shall be effective as of the Park Dedication Date (and prior thereto, if applicable), and any subsequent modifications, deletions or additions to the Park Rules that materially adversely affect the public's access and rights to use and enjoy the Park shall be subject to the Mayor's Approval.  The Conservancy shall provide copies of all Park Rules and modifications, deletions, or additions thereto to the City in accordance with the notice provisions of <u>Section 15.5</u> below.

      4.4.   <u>Scheduling; Traffic; Noise</u>.

      (a)   Attached to this Agreement as <u>Exhibit D</u> are the procedures (the "<u>Procedures</u>") to be followed for the advance scheduling of activities and events in the Park and for advance bookings of the right to use or occupy particular Improvements or areas of Greenscape for such activities and events in the Park, including:

      (i)   Use of any portion of the Park for public or private events;

      (ii)   Procedures to accommodate reasonable requests by C&EF for bookings and reservations from time to time for activities and events for tourists and convention visitors and their families, as well as residents of the City; and

(iii)     In light of the proximity to the City's Convention Center, two of the City's major sports facilities, and the Convention Center Hotel, procedures for coordinating with C&EF with regard to facilitating traffic flow and parking needs in the area of and controlling excessive noise in the Park after 10:00 PM for residents of such Hotel.

(b)     The Conservancy shall have the right to schedule, organize, promote and conduct activities and uses in the Park on its own initiative in accordance with its annual operating plans and annual budgets, consistent, however, with the development, maintenance and use of the Park as an urban park with high standards of natural beauty.

(c)     All use of the Park (including all C&EF events) shall at all times and in all respects be consistent, however, with the development, maintenance and use of the Project as an urban park with high standards of cleanliness, safety and natural beauty and with all Park Rules.

(d)     The Procedures shall be effective as of the Park Dedication Date (and prior thereto, if applicable), and any subsequent modifications, deletions or additions to such portion of the Procedures that relate to coordinating with C&EF that materially adversely affect either (i) such bookings and reservations by C&EF or (ii) the traffic, parking or noise levels for residents of the Convention Center Hotel, shall be subject to the Mayor's Approval.  No other modifications, additions, or deletions to the Procedures shall be subject to the Mayor's Approval. Notwithstanding anything in this Agreement to the contrary, the ability of any of the Corporation, C&EF or the City to enforce the benefits, privileges and rights granted to C&EF in the Procedures shall be conditioned upon C&EF's compliance with the terms and conditions of the Procedures and the Corporation and the City's compliance with the increased number of Amenities Reserved Spaces and Additional Amenities Reserved Spaces to be made available to the Conservancy during the term of this Agreement pursuant to the provisos contained in Sections 14.1 and 14.2 hereof (the "Additional Spaces").  As such, C&EF shall not be entitled to enforce the benefits, privileges or rights granted to it in the Procedures, either on its own or through the Corporation or the City, unless C&EF has complied with the terms and conditions of the Procedures and the Additional Spaces are made available to the Conservancy pursuant to the terms of this Agreement; *provided, however,* that C&EF's failure to comply with the Procedures shall not relieve the Conservancy, any Amenities Tenant or any Park Licensee from paying for the Amenities Reserved Spaces, the Additional Reserved Spaces or the Special Event Spaces in accordance with terms and conditions of Section 14 hereof.

(e)     The Conservancy shall provide copies of any revisions to the Procedures to the City in accordance with the notice provisions of Section 15.5 below.

4.5.   User Fees; Amenities Fees.   (a)     Subject to the following sentence, the Conservancy shall have the exclusive right to establish non-discriminatory fee structures and/or rate schedules from time to time, and to charge such fees and rates according to such structures and schedules ("User Fees"), for uses of and activities and events in the Park occurring after the Park Dedication, including use of any portion of the Park for public or private events. The initial User Fees established by the Conservancy to become effective as of the date of the Park Dedication shall be subject to the approval of the Corporation.   Following the Park Dedication the Conservancy shall have the right to adjust such User Fees from time to time to

rates no less than amounts reasonably estimated by the Conservancy to be necessary to meet the portion of the annual budget of the Park that would not be covered by the Annual Management Fee and private donations. In no event shall the Conservancy impose any general admission fee or other charge for entry into the Park as a whole. The Conservancy shall provide copies of all schedules or rate structures for User Fees and any revisions thereto to the City in accordance with the notice provisions of <u>Section 15.5</u> below. Notwithstanding the foregoing or anything in this Agreement to the contrary, the Conservancy shall have the exclusive right to establish fees, rental rates, lease payments and any other charges of any kind for the use or lease of space in the Amenities Easement (the "<u>Amenities Fees</u>") consistent with the purposes of the Amenities Easement, and the Amenities Fees shall not be considered User Fees.

(b)     The Conservancy shall have the exclusive right and duty to collect all revenues generated from the Park, including User Fees and rentals charged for any of the foregoing and Amenities Fees; *provided, however*, that all such revenues shall be applied by the Conservancy to Baseline Operating Expenses and other Park Costs in excess of the Annual Management Fee.

(c)     So long as the City fully and timely pays the Annual Management Fee directly to the Conservancy and C&EF complies with all of the terms and conditions of the Procedures, C&EF shall have the right to schedule and conduct activities or events in the Park without payment of User Fees (but C&EF shall pay all setup and breakdown costs and other direct, non-standard expenses relating to such activities or events; *provided, however*, that C&EF shall have the right to provide such services for itself, at its expense), on twelve (12) days per calendar year, subject to (i) any reservations or bookings previously scheduled or subject to hold according to the Procedures and (ii) the Park Rules.

4.6.     <u>Consent to Encroachment</u>.  The Corporation has or will enter into that certain Consent to Encroachment over City Easement (the "<u>Consent to Encroachment</u>") regarding the encroachment of the Encroaching Improvements (as defined in the Consent to Encroachment) into the Easement Area (as defined in the City Deed) for the Utility Easement (as defined in the City Deed).  The Conservancy covenants and agrees that, during the Term, the Conservancy shall comply with the terms and condition of the Consent to Encroachment and perform all of the obligations and pay all of the expenses of the Corporation thereunder, the cost of all of which shall constitute Park Costs.

5.     **COMPENSATION; PAYMENT OF EXPENSES.**

5.1.     <u>Annual Management Fee</u>.     (a)     For and in consideration of the Conservancy's performance of its obligations under this Agreement, the Corporation shall pay (or shall cause the City to pay as hereinafter provided) to the Conservancy or its designated subcontractor, in equal monthly installments on the last business day of each month or partial month during the Term, the Annual Management Fee (as such Annual Management Fee may be adjusted pursuant to Section 5.1(b) of the Joint Development Agreement, and including the pro-rated amount if the Park Dedication occurs on other than the first day of a Fiscal Year for the City) payable by the City to the Corporation pursuant to Section 5.1(b) of the Joint Development Agreement, excluding, however, the amount the Corporation has the right to retain from the first

monthly installment of the Annual Management Fee for each Fiscal Year for the Corporation's Expenses.

(b)     If the entire amount of the Annual Management Fee paid to the Conservancy in any Fiscal Year exceeds the Baseline Operating Expenses for such Fiscal Year (including amounts paid into the maintenance and replacement reserves described in Paragraph (a)(9) of Exhibit E attached hereto), the excess amount of the Annual Management Fee for such Fiscal Year shall be held by the Conservancy in a maintenance and sinking fund for the benefit of the Park as a public park.  Such sums deposited in such fund (and all interest accruing thereon) shall be held separately and not commingled with the reserves contemplated under Section (a)(9) of Exhibit E attached hereto or any other funds or accounts of the Conservancy, and any monies in such maintenance and sinking fund in excess of $2,000,000 shall be promptly refunded to the City by the Conservancy.

5.2.    Credits Against Annual Management Fee.    The City has agreed, pursuant to the Joint Development Agreement, to furnish, at the request of the Corporation (or the Conservancy during the Term of this Agreement) all water, sewer, drainage, electricity and gas required for the Park at the City's actual cost therefor, in order to allow the Park to benefit from the City's bulk purchase rates for such utilities.  The City shall be entitled to a credit against each monthly installment of the Annual Management Fee in the amount of the City's cost for such utilities provided in the prior month.  Additionally, the cost of utilities, if any, provided by the City after the effective date of the termination of the temporary occupancy rights provided for in Section 3.1 of the Joint Development Agreement (which termination date shall be evidenced in the termination notice to be recorded in the Real Property Records of Harris County, Texas, as provided in Section 3.1 of the Joint Development Agreement) shall be accrued and applied in equal amounts as a credit against the monthly installments of Annual Management Fee payable in the first twelve (12) months following the Park Dedication.

5.3.    Direction to City.  At least ten (10) days prior to the Park Dedication Date, the Corporation shall deliver to the City, in accordance with the notice provisions of Section 15.5 of this Agreement, a written request that all such payments of the monthly installments of the Annual Management Fee be paid directly by the City to the Conservancy or its designated subcontractor.

5.4.    Invoicing.  No later than the fifteenth (15th) day of each month or partial month during the Term of this Agreement, the Corporation shall deliver to the City, in accordance with the notice provisions of Section 15.5 of this Agreement, an invoice for the monthly installment of the Annual Management Fee for the immediately succeeding month or partial month.

5.5.    Park Operating Expenses.    The Conservancy shall use the Annual Management Fee to pay the Baseline Operating Expenses.  The Conservancy shall timely pay (i) all Baseline Operating Expenses in excess of the Annual Management Fee, and (ii) all other operating expenses and capital costs incurred in connection with the operation, management, maintenance, repair and improvement of the Park following the Park Dedication Date.

6.      **MARKETING RIGHTS**.

6.1.    Promotions.  The Conservancy shall have the exclusive right and duty to market and promote the Park and the events and activities organized or sponsored by the Conservancy or any tenants or licensees of the Amenities Easement, and the exclusive right to establish a development program to raise private donations and obtain grants for the portion of the Park Costs not covered by either the Annual Management Fee or income generated by User Fees and Amenities Fees.

6.2.    Corporate Sponsorships.  The Conservancy shall have the exclusive right to obtain corporate sponsorships of events; to develop signage regulations for the Park, including within the Amenities Easement (and the Conservancy and the Corporation acknowledge that the Parties and the City [acting in its capacity as a party to the Joint Development Agreement but not in its regulatory capacity] stipulated in Section 5.3(k) of the Joint Development Agreement that the Easement Area (as defined in the City Deed) for the underground Convention Center Parking Easement, constitutes the site of "convention center facilities" under Applicable Laws and therefore any signage permitted by the Conservancy on the surface of such Easement Area relating to events and convention business in the Convention Center shall be deemed to be "on premises" signs under Applicable Laws); to conduct capital campaigns with naming rights for specific Improvements and facilities in the Park; and to name the Park as a whole, but the name of the Park shall be subject to the Mayor's Approval.  In accordance with the Procedures, C&EF and the Conservancy will work together to avoid market competitive event sponsors from simultaneously holding events at the Convention Center and in the Park.

7.      **FURTHER DEVELOPMENT**.     The Conservancy shall have the exclusive right, following the first adjustment in the Annual Management Fee pursuant to Section 5.1(b) of the Joint Development Agreement, to design, construct and install other or additional Improvements and Greenscape not previously included in the Approved Project Design; to remove or alter the Improvements or Greenscape originally contemplated in the Approved Project Design; or to modify or replace the Approved Project Design; provided, however, that none of the costs for any of the foregoing alterations that are capital improvements shall be included in Baseline Operating Expenses; and provided, further, that any of the foregoing alterations or capital improvements costing more than $500,000 (which number shall be increased by $100,000 on every tenth (10th) anniversary of December 15, 2004, but in no event more than $1,000,000) in hard construction costs shall be subject to the prior approval of the Corporation.

8.      **REPORTING**.

8.1.    Annual Operating Plan.  Each year during the Term, the Conservancy shall deliver to the Corporation and the City a copy of its annual operating plan and budget for its next succeeding Fiscal Year at least thirty (30) days prior to the Conservancy's Fiscal Year-end on June 30.

8.2.   Year-End Report.   Each year during the Term, the Conservancy shall deliver to the Corporation and the City a copy of its annual year-end report and audited financials within 120 days after the Conservancy's Fiscal Year-end.

8.3.   Audits.   Upon at least fifteen (15) business days advance notice to the Conservancy, the City and the Controller of the City will have the right, directly or through its duly authorized representatives, during normal business hours and at its expense, to audit and obtain copies of the books and records of the Conservancy.   Any such audit shall be performed in the offices of the Conservatory, at a time mutually agreed upon by the Conservancy and the auditing entity.

9.   **SUBCONTRACTING**.

9.1   Right to Subcontract.   The Conservancy shall have the right to subcontract and/or delegate all or any part of its rights and obligations under this Agreement as the Conservancy deems necessary or desirable for the efficient and cost-effective performance of such rights and obligations; provided, however, that the Conservancy shall contractually require all of such consultants, contractors and subcontractors under material contracts who actually perform services on the Property to indemnify, defend and hold harmless the Conservancy, the Corporation, the members of their respective Boards of Directors, and the City against all Claims for bodily injury or death of any person or damage to any property arising, directly or indirectly, out of the entry on the Property or the performance of any work relating to the Park. Notwithstanding the foregoing, the Conservancy, at its sole election, may elect to waive the requirement of such indemnity.

9.2   Assumption of Contracts.   In connection with the performance of its duties under this Agreement, the Conservancy has or will be entering into certain contracts with third parties related to the Park (collectively, the "Third Party Contracts").   In the event the Conservancy elects to subcontract and/or delegate all or any part of its rights and obligations under this Agreement, the Conservancy will include C&EF in any request for proposal for such services, and C&EF may submit proposals on the same basis as any third party vendor; *provided*, that the foregoing shall not apply to the initial agreement related to the operation of the food, beverage and restaurant facilities in the Park or any renewals of such agreement.   In the event the Conservancy desires to enter into a material Third Party Contract which burdens a portion of the Property outside of the Amenities Easements in a material manner, the Conservancy will give the Corporation written notice of the material terms of such contract, and the Corporation will have ten (10) business days thereafter within which to provide the Conservancy with either written objections to such contract, or written acknowledgement of such contract.   If the Corporation does not deliver such objections or such acknowledgement prior to the end of such ten (10) day period, the Corporation shall be deemed to have acknowledged such contract without objection. In the event of a termination of this Agreement for any reason, the Third Party Contracts and all such acknowledged or deemed acknowledged contracts (collectively, the "Assumed Contracts") will remain in full force and effect between the Corporation (or any successor to the Conservancy's obligations under this Agreement pursuant to an agreement between the Corporation and such successor) with the Corporation or such successor, as the case may be, being liable and responsible for all obligations of the Conservancy under the Assumed Contracts.

10.     **CONSERVANCY TERMINATION RIGHTS**.   The   Conservancy   may terminate this Agreement and exercise its reversionary rights provided for in the Conservancy Deed with respect to that portion of the Property described in Section 2(d) of the Conservancy Deed (the "Reversion Property") if the City fails, within thirty (30) days after receipt of notice from the Conservancy in accordance with Section 15.5 of this Agreement, to fully and timely pay any part of the Annual Management Fee (whether or not appropriated); provided that upon any reversion of title, under this Agreement or otherwise as provided in the Conservancy Deed, the Reversion Property shall revert to the Conservancy free and clear of any restrictive covenants arising under the Crescent Deed, the City Deed or the Conservancy Deed and any obligations arising under the Project Documents; however, to the extent such Reversion Property contains any part of the Easement Area, the reversion shall be subject to the Convention Center Parking Easement (which shall continue notwithstanding such reversion).     Notwithstanding the foregoing, the Conservancy shall not have the right to exercise its reversionary rights in the Conservancy Deed on grounds of failure to comply with the covenants contained in this Agreement relating to the use and maintenance of the Property so long as the Conservancy is a Party to this Agreement.

11.     **DEFAULT AND REMEDIES**.

11.1.   Event of Default by the Conservancy.   It shall be an "Event of Default" by the Conservancy hereunder if, and only if, the Conservancy breaches or fails to perform any covenant, agreement or obligation made or undertaken by the Conservancy hereunder, and such breach or failure (a) is not cured within thirty (30) days after the Conservancy receives written notice thereof from the Corporation, or (b), if not reasonably capable of being cured within such thirty (30)-day period, the Conservancy fails to commence the cure thereof within such thirty (30)-day period or fails thereafter to diligently pursue such cure and complete same as soon as is reasonably possible.

11.2.   Remedies Upon Event of Default by The Conservancy.   Upon the occurrence of an Event of Default by the Conservancy and while such Event of Default remains uncured after receipt of notice as provided in this Agreement (and provided that the Conservancy is not diligently pursuing the cure as provided in Section 11.1(b) above), the Corporation, as its sole and exclusive remedy, may, upon thirty (30) days additional written notice to the Conservancy, terminate this Agreement.

11.3.   Event of Default by the Corporation.   It shall be an "Event of Default" by the Corporation hereunder if, and only if, the Corporation breaches or fails to perform any covenant, agreement or obligation made or undertaken by the Corporation hereunder and (a) in the event of a monetary default (including a failure by the City to fully and timely pay any part of the Annual Management Fee to the Conservancy and the Corporation's failure to direct the City to pay the same to the Conservancy), such breach or failure is not cured within thirty (30) days after the Corporation receives written notice thereof from the Conservancy, or (b), in the event of a non-monetary default, such breach or failure is not cured within thirty (30) days after the Corporation receives written notice thereof from the Conservancy, or, if not capable of being cured within such thirty (30)-day period, the Corporation fails to commence the cure thereof within such thirty (30)-day period or fails thereafter to diligently pursue such cure and complete

same as soon as is reasonably possible, but no later than one hundred twenty (120) days after the breach or failure.

      11.4.  <u>Remedies Upon Event of Default by the Corporation</u>.  Upon the occurrence of an Event of Default by the Corporation and while such Event of Default remains uncured after receipt of notice as provided in this Agreement (and provided that the Corporation is not diligently pursuing the cure as provided in <u>Section 11.3(b)</u> above), the Conservancy may (in addition to the Conservancy's right to terminate this Agreement set forth in <u>Section 10</u> of this Agreement), upon thirty (30) days additional written notice to the Corporation, terminate this Agreement by delivering written notice to the Corporation, in which event the Corporation shall be liable to pay to the Conservancy, immediately upon demand, an amount equal to the actual costs incurred and owing pursuant to the Contracts as of the date of such termination.<u>Cumulative Remedies</u>.  Except as otherwise provided in this Agreement, each right or remedy of the Parties provided for in this Agreement shall be cumulative of and shall be in addition to every other right or remedy of the Parties provided for in this Agreement, and, except as otherwise provided in this Agreement, the exercise or the beginning of the exercise by the Parties of any one or more of the rights or remedies provided for in this Agreement shall not preclude the simultaneous or later exercise by the Parties of any or all other rights or remedies provided for in this Agreement.

      11.6.  <u>No Waivers</u>.  No failure or delay of any Party in any one or more instances (a) in exercising any power, right or remedy under this Agreement or (b) in insisting upon the strict performance by any other Party of such other Party's covenants, obligations or agreements under this Agreement shall operate as a waiver, discharge or invalidation thereof, nor shall any single or partial exercise of any such right, power or remedy or insistence on strict performance, or any abandonment or discontinuance of steps to enforce such a right, power or remedy or to enforce strict performance, preclude any other or future exercise thereof or insistence thereupon or the exercise of any other right, power or remedy.  The covenants, obligations, and agreements of a defaulting Party and the rights and remedies of the other Parties upon a default shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.

      11.7.  <u>Effect of Termination</u>.  If the Corporation or the Conservancy elects to terminate this Agreement pursuant to the terms of this Agreement, this Agreement shall, on the effective date of such termination, terminate with respect to all future rights and obligations of performance hereunder by the Parties (except for the rights and obligations herein that expressly are to survive termination hereof).  Termination of this Agreement shall not alter the then-existing claims, if any, of any Party for breaches of this Agreement occurring prior to such termination, and the obligations of the Parties hereto with respect thereto shall survive termination.

      11.8.  <u>Court Proceedings</u>.  Any suit, action or proceeding, which is permitted to be brought by a Party against any other Party arising out of or relating to this Agreement or any transaction contemplated hereby or any judgment entered by any court in respect thereof may be brought in any federal or state court located in the City of Houston, Texas, and each Party hereby submits to the nonexclusive jurisdiction of such courts for the purpose of any such suit, action or proceeding.  To the extent that service of process by mail is permitted by Applicable Laws, each Party irrevocably consent to the service of process in any such suit, action or proceeding in such

courts by the mailing of such process by registered or certified mail, postage prepaid, at its address for notice provided for pursuant to this Agreement. Each Party irrevocably agrees not to assert any objection that it may ever have to the laying of venue of any such suit, action or proceeding in any federal or state court located in the City of Houston, Texas or any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Each Party agrees not to bring any action, suit or proceeding against the other Party arising out of or relating to this Agreement or any transaction contemplated hereby except in a federal or state court located in the City of Houston, Texas.

12.   **INDEMNIFICATION**.

12.1.   **INDEMNIFICATION.  SUBJECT TO SECTIONS 13.2 AND 14.1(F) THE CONSERVANCY HEREBY INDEMNIFIES, DEFENDS AND HOLDS HARMLESS THE CITY (INCLUDING THE MAYOR, ALL OTHER ELECTED OFFICIALS AND ALL EMPLOYEES) AND THE CORPORATION (INCLUDING EACH BOARD MEMBER AND ALL EMPLOYEES) AGAINST ALL CLAIMS FOR BODILY INJURY TO OR DEATH OF ANY PERSON OR DAMAGE TO ANY PROPERTY, PERSONAL INJURY, DISCRIMINATORY DENIAL OF ACCESS, OR OTHERWISE, ARISING, DIRECTLY OR INDIRECTLY, OUT OF THE USE, OPERATION, MANAGEMENT OR MAINTENANCE OF THE PROJECT AS A PUBLIC PARK, TO THE EXTENT THAT ANY OF SUCH CLAIMS ARE NOT COVERED BY LIABILITY INSURANCE AND, WITH RESPECT TO ANY INDEMNITY OF THE CITY, TO THE EXTENT THAT THE CITY CANNOT EXERCISE AN IMMUNITY DEFENSE; EVEN IF THE INJURY, DEATH, DAMAGE OR LOSS IS CAUSED BY THE CITY'S OR THE CORPORATION'S JOINT OR CONCURRENT NEGLIGENCE (BUT NOT THE SOLE NEGLIGENCE OR GROSS NEGLIGENCE) AND/OR THE CITY'S OR THE CORPORATION'S STRICT PRODUCTS LIABILITY OR STRICT STATUTORY LIABILITY.**

12.2.   Indemnity Procedures.  Any Party entitled to indemnification hereunder (the "Indemnified Party") shall, reasonably promptly after the receipt of notice of any Claim against such Indemnified Party in respect of which indemnification may be sought pursuant to Section 12.1 of this Agreement, notify the Party who is obligated to indemnify the Indemnified Party (the "Indemnifying Party") of such Claim, but in no event later than forty-five (45) days after receipt of such notice.  The Indemnifying Party shall not be obligated to indemnify the Indemnified Party with respect to any such Claim if the Indemnified Party fails to notify the Indemnifying Party thereof in accordance with the provisions of this Section 12.2 within such 45-day period or such shorter period as is necessary to permit the Indemnifying Party to defend against such matter and to make a timely response thereto, including any responsive motion or answer to a complaint, petition, notice or other legal, equitable or administrative process relating to the Claim, but only insofar, and only to the extent that, such failure to notify the Indemnifying Party has actually resulted in prejudice to the Indemnifying Party.  In case any such Claim shall be made or brought against the Indemnified Party, the Indemnifying Party may, or if so requested by the Indemnified Party shall, assume the defense thereof with counsel of its selection reasonably acceptable to the Indemnified Party and which shall be reasonably acceptable to the Corporation and competent and experienced to defend the Indemnified Party.   In such circumstances, the Indemnified Party shall (a) at no cost or expense to the Indemnified Party, cooperate with the Indemnifying Party and provide the Indemnifying Party with such

information and assistance as the Indemnifying Party shall reasonably request in connection with such Claim and (b) at its own expense, have the right to participate and be represented by counsel of its own choice in any such action or with respect to any such Claim.  If the Indemnifying Party assumes the defense of the relevant Claim, (i) the Indemnifying Party shall not be liable for any settlement thereof which is made without its consent and (ii) the Indemnifying Party shall control the settlement of such Claim; provided, however, that the Indemnifying Party shall not conclude any settlement which requires any action or forbearance from action or payment or admission by the Indemnified Party or any of its affiliates without the prior approval of the Indemnified Party.  The obligations of an Indemnifying Party shall not extend to any loss, damage and expense of whatever kind and nature (including all related costs and expenses) to the extent the same results from the taking by the Indemnified Party of any action (unless required by Applicable Law or applicable legal process) after the assertion of the Claim in question which prejudices the successful defense of the Claim, without, in any such case, the prior written consent of the Indemnifying Party (such consent not to be required in a case where the Indemnifying Party has not assumed the defense of the Claim).  The Indemnified Party agrees to afford the Indemnifying Party and its counsel the opportunity to be present at, and to participate in, conferences with all Persons, asserting any Claim against the Indemnified Party covered by the indemnity contained in <u>Section 12.1</u> or conferences with representatives of or counsel for such Person.

> 12.3.  <u>Survival; Other Rights</u>.  The provisions of this <u>Section 12</u> shall survive the expiration or earlier termination of this Agreement, but only insofar as such indemnities relate to any Claims that arose prior to the expiration or earlier termination of this Agreement.

> 13.  **INSURANCE TO BE CARRIED BY THE CONSERVANCY**<u>Insurance to be Carried by The Conservancy</u>.  The Conservancy shall carry the following insurance during the Term of this Agreement:

> > (a)  Causes of loss-"special form" policy of property insurance against risk of direct physical loss, as limited by typical exclusions and limitations contained in standard "special form" policies for facilities similar to the Park, from such causes as are included within the meaning of "special form coverage," insuring the Project (exclusive of land, excavations, foundations and other items usually excluded from such coverage) for the full replacement cost thereof, and naming the Corporation as an insured and naming the Conservancy as the loss payee;

> > (b)  Commercial general public liability insurance, including all-written contractual liability insurance (including any contractual liability arising under <u>Section 12.1</u> of this Agreement) at all times during the term of this Agreement, in such limits as Conservancy and the Corporation may reasonably determine (but in no event less than $1,000,000 per occurrence and $2,000,000 in the aggregate per 12-month term policy) and insuring the Conservancy, the Corporation, the members of their respective Boards of Directors, and the City against liability to the public arising out of or incident to the ownership and use of the Property. Such insurance may be considered secondary to liability coverage provided by insurance actually carried by the Conservancy's contractors and subcontractors; and

(c)     Such other insurance as the Conservancy and the Corporation mutually determine to be reasonable and appropriate for projects comparable to the Park, and naming the Conservancy, the Corporation, the members of their respective Boards of Directors, and the City as named insureds.

13.2.   **Waiver of Right of Recovery**.  NOTWITHSTANDING THE PROVISIONS OF SECTION 12 OF THIS AGREEMENT TO THE CONTRARY, TO THE EXTENT PERMITTED BY APPLICABLE LAWS, AND WITHOUT AFFECTING THE INSURANCE COVERAGE REQUIRED TO BE MAINTAINED BY THE PARTIES UNDER THIS AGREEMENT, THE PARTIES HERETO EACH WAIVE ALL RIGHTS OF RECOVERY, CLAIM, ACTION OR CAUSE OF ACTION AGAINST THE OTHER PARTIES FOR ANY DAMAGE TO THE PROPERTY (INCLUDING THE PROJECT), TO THE EXTENT THAT SUCH DAMAGE (A) IS COVERED BY INSURANCE ACTUALLY CARRIED BY THE PARTY HOLDING OR ASSERTING SUCH RIGHT OF RECOVERY, CLAIM, ACTION OR CAUSE OF ACTION OR (B) WOULD HAVE BEEN INSURED AGAINST UNDER THE TERMS OF ANY INSURANCE REQUIRED TO BE CARRIED UNDER THIS AGREEMENT BY THE PARTY HOLDING OR ASSERTING SUCH RIGHT OF RECOVERY, CLAIM, ACTION OR CAUSE OF ACTION IN THE EVENT OF A PARTY'S FAILURE TO COMPLY WITH THE TERMS HEREOF.  THIS PROVISION IS INTENDED TO (I) RESTRICT EACH PARTY TO RECOVERY AGAINST INSURANCE CARRIERS TO THE EXTENT OF SUCH COVERAGE AND TO WAIVE (TO THE EXTENT OF SUCH COVERAGE), FOR THE BENEFIT OF EACH PARTY, RIGHTS OR CLAIMS WHICH MIGHT GIVE RISE TO A RIGHT OF SUBROGATION IN ANY INSURANCE CARRIER AND (II) GIVE EACH PARTY THE BENEFIT OF THE FOREGOING NOTWITHSTANDING ANY FAILURE BY THE OTHER PARTY TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS AGREEMENT.  THE PROVISIONS OF THIS SECTION 13.2 ARE NOT INTENDED TO LIMIT THE CLAIMS OF THE PARTIES TO THE FACE AMOUNT OR COVERAGE OF THE INSURANCE POLICIES HEREIN PROVIDED FOR OR TO EVIDENCE THE WAIVER BY ANY PARTY OR ANY CLAIM FOR DAMAGES IN EXCESS OF THE FACE AMOUNT OR COVERAGE OF ANY OF SUCH INSURANCE POLICIES.  EXCEPT AS EXPRESSLY SET OUT IN THIS AGREEMENT, NEITHER THE ISSUANCE OF ANY INSURANCE POLICY REQUIRED UNDER, OR THE MINIMUM LIMITS SPECIFIED IN, THIS AGREEMENT SHALL BE DEEMED TO LIMIT OR RESTRICT IN ANY WAY THE PARTIES' LIABILITY ARISING UNDER OR OUT OF THIS AGREEMENT, INCLUDING THE OBLIGATION TO INDEMNIFY UNDER SECTION 12.1 OF THIS AGREEMENT.

14.   **PARKING RIGHTS**

14.1.   Garage Parking Rights.   If the Garage contemplated by the Garage Development Agreement is actually constructed, the Conservancy shall be entitled to the following for the benefit of the Park, the Property and the Amenities Easement:

(a)     Twenty (20) parking spaces in the Garage (the "Amenities Reserved Spaces") shall be reserved twenty-four (24) hours a day, seven (7) days a week, for use as valet parking related to use of the Park; *provided*, that for so long as this Agreement is in effect and only for so long, the number of Amenities Reserved Spaces shall be fifty (50) parking spaces (as opposed to twenty [20]).

(b)     In addition to the Amenities Reserved Spaces, thirty (30) additional parking spaces in the Garage (the "Additional Amenities Reserved Spaces") shall be reserved for use as valet parking related to use of the Park between the hours of 6:00 p.m. and

8:00 a.m. Monday through Friday, and twenty-four (24) hours a day on each Saturday, Sunday, and Legal Holiday; *provided*, that for so long as this Agreement is in effect, the number of Additional Amenities Reserved Spaces shall be thirty-five (35) parking spaces (as opposed to thirty [30]).

(c)     In addition to the Amenities Reserved Spaces and the Additional Amenities Reserved Spaces, and (i) subject to the advance payment requirement as outlined in Section 14.1(d) below and the scheduling of events pursuant to the Procedures and (ii) subordinate to the needs of operation of the Convention Center for events scheduled at the Convention Center, the tenants and licensees of improvements located within the Amenities Easement (the "Amenities Tenants") and the Conservancy, on behalf of parties booking events at the Park through the Conservancy ("Park Licensees") or in connection with events being held in the Park by the Conservancy, shall have the right to reserve up to two hundred (200) spaces (the "Special Events Spaces") for special events conducted by the Amenities Tenants or Park Licensees in the Park. Notwithstanding anything in this Section 14.1(c), none of the Amenities Tenants, the Park Licensees nor the Conservancy may exercise rights under this Section 14.1(c) earlier than 120 days or later than 5 days prior to a scheduled event.

(d)     The party arranging for the use of the Amenities Reserved Spaces or the Additional Amenities Reserved Spaces shall be charged for the Amenities Reserved Spaces and the Additional Amenities Reserved Spaces at a rate that is $1.00 less than the rate that is, at the time in question, charged to the general public for spaces generally in the Garage. The Amenities Tenants, Park Licensees and the Conservancy, as applicable, shall be charged for the Special Events Spaces at the rate that is, at the time in question, charged to the general public for spaces in the Garage. In the case of Amenities Reserved Spaces and Additional Amenities Reserved Spaces, charges will be assessed on a vehicle-by-vehicle basis, and no charge shall be assessed for unused spaces. In the case of the Special Events Spaces, charges will be paid ten (10) days in advance of the event in question for all such spaces reserved and regardless of whether the same are used. If any Amenities Tenant or Park Licensee fails to pay the applicable charges or if any third party arranging for the use of the Amenities Reserved Spaces, the Additional Amenities Reserved Spaces or the Special Events Spaces fails to pay the charges, the Corporation or its designated Garage operator shall provide notice thereof to the Conservancy, and if the Conservancy does not pay the same within ninety (90) days following the request therefor from the Corporation or its designated Garage operator, as the case may be (which the Conservancy shall have no obligation to do), the Corporation or its designated Garage operator, as the case may be, may, in addition to all other rights available at law against such Amenities Tenant, Park Licensee, or other party, deny further use of any Amenities Reserved Space, Additional Amenities Reserved Spaces or Special Events Spaces by such Amenities Tenant, Park Licensee or other third party who has failed to pay. The Corporation agrees to include the notice provisions set forth in the preceding sentence in any contract the Corporation enters into with any Garage operator for the operation of the Garage.

(e)     Parking validation privileges will be made available to the Amenities Tenants, Park Licensees and the Conservancy for the Amenities Reserved Spaces, the Additional Amenities Reserved Spaces, and the Special Events Spaces. Parking validation privileges shall also be made available for other businesses in the Park designated by the Conservancy and at the rate that is charged to the general public for spaces generally in the

Garage. The Corporation does not, however, guarantee that spaces will be available at any time, other than as provided in <u>Section 14.1(a)</u> and <u>(b)</u> above, and, subject to the conditions contained in <u>Section 14.1(c)</u> and <u>(d)</u>, <u>Section 14.1(c)</u> above.

(f)     The Parties acknowledge (and the City has acknowledged in the Garage Development Agreement) that the design of the Garage may include a dewatering system and that operation of such dewatering system may draw to points under the Property groundwater from sites outside the Property. Such dewatering system may also require monitoring equipment. The Parties agree (and the City has agreed in the Garage Development Agreement) that the costs to monitor the dewatering system is a cost of operation of the Garage for which the Conservancy shall have no responsibility or obligation. The costs to monitor the dewatering system and the costs to remediate any environmental contamination of the groundwater under the Property from groundwater drawn under the Property by the dewatering system shall be the sole responsibility of the Corporation or the City. In no event shall the Conservancy's indemnification obligations under this Agreement or the Garage Development Agreement ever be construed to extend to any such contamination or costs or claims resulting therefrom.

(g)     The Parties acknowledge that the Corporation or its designated Garage operator shall have the right to close the Garage; provided, however, that the Amenities Reserved Spaces and the Additional Amenities Reserved Spaces shall continue to be made available as provided in Sections 14.1(a) and 14.1(b), and in no event shall any such closure affect the Conservancy's rights to the Amenities Reserved Spaces and the Additional Amenities Reserved Spaces.

14.2.     <u>Surface Parking Rights</u>. The City has agreed in Section 10.2(a) of the Garage Development Agreement that, upon completion of the Park by the Conservancy and thereafter so long as this Agreement is in effect and the City has not exercised its reversionary rights to the Property as provided in Paragraph 3(c)(i) of the City Deed, the Director will permit parallel parking along the western right-of-way line on Avenida de las Americas twenty-four (24) hours a day, seven (7) days a week; provided, however, the Mayor and the Director shall have the right to suspend such parking from time to time in connection with events at the Convention Center located adjacent to the Park. The Director will provide the Conservancy written notice of any such suspension in the manner and within the time period provided for in the Procedures set forth in <u>Exhibit D</u>.

14.3.     <u>Survival</u>. The Parties covenant and agree, and the City has covenanted and agreed in Section 10 of the Garage Development Agreement (but as to the Amenities Reserved Spaces and the Additional Amenities Reserved Spaces, with respect to the original twenty [20] Amenities Reserved Spaces and the original thirty [30] Additional Reserved Spaces only), that all of the covenants, agreements, rights, privileges, obligations and duties contained in <u>Section 14.1</u> of this Agreement shall be construed as covenants running with the Easement Area and the Garage, which shall extend to, and inure to the benefit of, the Property and the Amenities Easement, and shall bind the Parties and the City (but as to the City and as to the Amenities Reserved Spaces and the Additional Amenities Reserved Spaces, with respect to the original twenty [20] Amenities Reserved Spaces and the original thirty [30] Additional Reserved Spaces only) and their respective permitted successors and assigns to the same extent as if such

successors and assigns were named as original parties to this Agreement and the Garage Development Agreement.   Accordingly, the provisions of Section 14.1 shall survive the expiration or termination of this Agreement (except as provided in this Section 14.3) and will run with the Amenities Easement in the event of any exercise of reversionary rights by any party pursuant to this Agreement and as provided in the Conservancy Deed and/or the City Deed, except upon an exercise by the City of its reversionary rights pursuant Paragraph 3(c)(i) of the City Deed upon which Section 14.1 (other than Section 14.1(f)) shall expire.

15.    **MISCELLANEOUS TERMS**

15.1.   Approvals and Consents.  The Parties have agreed to the procedures set out on Exhibit F regarding the rights of the Parties to approve matters provided for in this Agreement; provided, that only the procedures applicable to "resubmissions" shall apply to the Mayor's Approval.

15.2.   Open Records Act.  If any Person requests the Corporation to disclose any information of a confidential, proprietary or trade secret nature with respect to the Project or the Conservancy under the Texas Public Information Act (Tex. Gov't. Code Ann. Sec.552.001 et seq.) or any equivalent or successor statute (the "Open Records Act") and such information is subject to, or potentially subject to, an exception under the Open Records Act, then prior to making any such disclosure and to the extent permitted under Applicable Laws, the Corporation shall send notice to the Conservancy of such request within five (5) business days of the Corporation's receipt of such request.  Within three (3) business days of the Conservancy's receipt of such notice from the Corporation, the Conservancy shall notify the Corporation in writing whether the Conservancy desires the Corporation to request a determination from the Texas Attorney General (an "Opinion Request") as to whether the requested information must be disclosed pursuant to the Open Records Act.  Upon receipt of a request from the Conservancy for the Corporation to make an Opinion Request, the Corporation, at the Conservancy's sole cost and expense, shall provide all commercially reasonable assistance to the Conservancy necessary to draft the Opinion Request so that it may be completed and filed within the time period prescribed by the Open Records Act on behalf of the Corporation; provided, however, that the Corporation shall only be required to comply with the foregoing to the extent that the Corporation, in good faith, believes that there is a reasonable basis for deeming an exception under the Open Records Act and the Open Records Act permits the Corporation to make an Opinion Request.  After the Opinion Request is so filed, each Party shall cooperate with each other Party in preparing appropriate responses or filings to the Texas Attorney General and to any other Person with respect to the information request and the Opinion Request, including any commercially reasonable appeals involved with respect thereto, to prevent the disclosure of such information. Each Party shall also cooperate with each other Party and use reasonable efforts to promptly identify any possible third Person whose privacy or property interests may be compromised by any such information request in order to enable the Corporation to timely furnish to any such third Person any statutory notice required by the Open Records Act and to seek any applicable exceptions from disclosure under the Open Records Act.

15.3.   Time of the Essence/Force Majeure.  The times set forth in this Agreement for the performance of obligations shall be strictly construed, time being of the essence in this Agreement.  All provisions in this Agreement that specify or provide a method to compute a

number of days for the performance, delivery, completion or observance by a Party hereto of any action, covenant, agreement, obligation or notice hereunder shall mean and refer to calendar days, unless otherwise expressly provided. However, in the event the date specified or computed under this Agreement for the performance, delivery, completion or observance of a covenant, agreement, obligation or notice by either Party hereto, or for the occurrence of any event provided for herein, is a Saturday, Sunday or Legal Holiday, then the date for such performance, delivery, completion, observance or occurrence shall automatically be extended to the next calendar day that is not a Saturday, Sunday or Legal Holiday. In addition, any deadline or obligation imposed on either Party pursuant to this Agreement shall be adjusted as appropriate to reflect the delay in the achievement thereof by the appropriate Permitted Delay Period resulting from each occurrence of Permitted Delay, but only to the extent such Party complies with its obligations below with respect to such Permitted Delay. Upon the occurrence of any Permitted Delay, the Parties shall endeavor to continue to perform their respective obligations under this Agreement so far as reasonably practicable. Toward that end, the Parties hereby agree that (a) they shall make all reasonable efforts to prevent and reduce to a minimum and mitigate the effect of the event or circumstance giving rise to any Permitted Delay, (b) they shall use reasonable efforts to ensure resumption of performance of their obligations under this Agreement after the occurrence of the event or circumstance giving rise to any Permitted Delay, and (c) they shall give notice to the other Party as soon as reasonably practicable after the occurrence of the event giving rise to the Permitted Delay. The applicable Party shall use and continue to use all commercially reasonable efforts to prevent, avoid, overcome and minimize any Permitted Delay. No Permitted Delay shall excuse, or constitute a basis for, failure or refusal by either Party to pay any amount required to be paid in accordance with this Agreement.

15.4.   Relationship of the Parties.   The relationship of the Parties under this Agreement is that of independent parties, each acting in its own best interests, and notwithstanding anything in this Agreement to the contrary, no partnership, joint venture or other business relationship is established or intended hereby between the Parties.

15.5.   Notices.   Any notice, consent, approval or other communication required or permitted to be given under this Agreement, in order to be effective, must be in writing and must be served by delivering such notice addressed to the party to be notified (i) effective two (2) days after depositing the notice with the U.S. Postal Service, postage prepaid, sent certified, return receipt requested; (ii) effective upon receipt if delivered in person, by commercial messenger or by reputable overnight courier to the office of such Party to be notified; (iii) effective upon receipt if sent by facsimile with electronic confirmation of receipt. Each Party hereto shall have the right at any time and from time to time to specify additional parties ("Additional Addressees") to whom notice thereunder must be given, by delivering to the other Party ten (10) days notice thereof setting forth a single address for each such Additional Addressee; provided, however, that no Party hereto shall have the right to designate more than two (2) such Additional Addressees. The notice addresses for the Parties shall be as follows:

If to the Corporation:      Houston Downtown Park Corporation
P. O. Box 130776
Houston, Texas 77219-0776
Attention: President
Facsimile: (713) 529-0946

| | |
|---|---|
| With a copy to (but which shall not constitute notice): | City of Houston, Texas<br>901 Bagby, 3rd Floor<br>Houston, Texas  77002<br>Attention:  Mayor<br>Facsimile:  (713) 247-1067 |
| | The City of Houston, Texas<br>900 Bagby, 4th Floor<br>Houston, Texas  77002<br>Attention:  City Attorney<br>Facsimile:  (713) 247-1017 |
| | Department of Convention and<br>Entertainment Facilities<br>1001 Avenida de las Americas<br>Houston, Texas  77010<br>Attention:  Director<br>Facsimile:  (713) 853-8091 |
| If to the Conservancy: | Houston Downtown Park the Conservancy<br>P.O. Box 130646<br>Houston, Texas  77019-0646<br>Attention:  Chair<br>Facsimile: (713) 529-0946 |
| With a copy to (but which shall not constitute notice): | Vinson & Elkins, L.L.P.<br>1001 Fannin, Suite 2300<br>Houston, Texas  77002-6760<br>Attention:  Glenn Pinkerton<br>Facsimile: (713) 615-5755 |
| | Bracewell & Giuliani LLP<br>1177 Avenue of the Americas, 19th Floor<br>New York, New York 10036<br>Attention:  Ron Erlichman<br>Facsimile:  (212) 938-3813 |
| If to the City or the Mayor: | City of Houston, Texas<br>901 Bagby, 3rd Floor<br>Houston, Texas  77002<br>Attention:  Mayor<br>Facsimile:  (713) 247-1067 |
| With a copy to (but which | The City of Houston, Texas |

|                        |                                    |
|------------------------|------------------------------------|
| shall not constitute notice): | 900 Bagby, 4th Floor |
|                        | Houston, Texas  77002              |
|                        | Attention:  City Attorney          |
|                        | Facsimile:  (713) 247-1017         |
|                        |                                    |
| And a copy to          | Department of Convention and       |
| (but which shall not   | Entertainment Facilities           |
| constitute notice):    | 1001 Avenida de las Americas       |
|                        | Houston, Texas  77010              |
|                        | Attention:  Director               |
|                        | Facsimile:  (713) 853-8091         |

      15.6.  <u>Severability</u>.   If any term or provision of this Agreement, or the application thereof to any Person or circumstances, shall to any extent be invalid or unenforceable in any jurisdiction, as to such jurisdiction, the remainder of this Agreement, or the application of such term or provision to the Persons or circumstances other than those as to which such term or provision is held invalid or unenforceable in such jurisdiction, shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by Applicable Laws and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by Applicable Laws, the Parties to this Agreement hereby waive any provision of law that renders any provision hereof prohibited or unenforceable in any respect.

      15.7.  <u>Entire Agreement, Amendment and Waiver</u>.   The Project Documents constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior written and oral agreements and understandings with respect to such subject matter.  Notwithstanding the foregoing, to the extent the of any conflict between the terms and provisions of this Agreement, the Park Development Agreement, the Garage Development Agreement and the Joint Development Agreement, (1) the terms and provisions of the Park Development Agreement shall supersede and control such conflicting terms and provisions of the Garage Development Agreement, the Joint Development Agreement and this Agreement with respect to the development of the Park; (2) the terms and provisions of the Garage Development Agreement shall supersede and control such conflicting terms and provisions of the Joint Development Agreement, the Park Development Agreement and this Agreement (except with respect to the parking rights provided for in <u>Section 14</u> of this Agreement, which shall control) with respect to the development of the Garage; and (3) the terms and provisions of this Agreement shall supersede and control such conflicting terms and provisions of the Park Development Agreement, the Garage Development Agreement and the Joint Development Agreement with respect to the operation, management, maintenance and repair of the Park. Neither this Agreement nor any of the terms hereof, including this <u>Section 15.7</u>, may be amended, supplemented, waived or modified orally, but may only be amended, supplemented, waived or modified by an instrument in writing signed by the Party against which the enforcement of the amendment, supplement, waiver or modification shall be sought.

15.8.   Table of Contents; Headings.  The table of contents, if any, and headings, if any, of the various articles, sections and other subdivisions of this Agreement are for convenience of reference only and shall not modify, define or limit any of the terms or provisions hereof.

15.9.   Parties in Interest; Limitation on Rights of Others.   The terms of this Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties and their permitted successors and assigns.  Except as otherwise provided below, nothing in this Agreement, whether express or implied, shall be construed to give any Person (other than the Parties and their respective permitted successors and assigns) any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenants, conditions or provisions contained herein or any standing or authority to enforce the terms and provisions hereof.  No Person shall be a third-party beneficiary of this Agreement or have the right to enforce this Agreement or any provision hereof.

15.10.  Counterparts.  This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same Agreement. All signatures need not be on the same counterpart.

15.11.  GOVERNING LAW.  THIS AGREEMENT AND THE ACTIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS).

15.12.  Interpretation and Reliance.  No presumption will apply in favor of any Party in the interpretation of this Agreement or in the resolution of any ambiguity of any provisions hereof.

15.13.  Exhibits.   The exhibits attached hereto are as follows and are hereby incorporated in their entirety into this Agreement by reference and are hereby made a part hereof for all purposes:

| | | |
|---|---|---|
| Exhibit A | -- | Legal Description of the Property |
| Exhibit B | -- | Definitions and Rules of Usage |
| Exhibit C | -- | Use, Operating, and Maintenance Standards |
| Exhibit D | -- | Procedures |
| Exhibit E | -- | Baseline Operating Expenses |
| Exhibit F | -- | Reviews and Approvals |
| Exhibit G | -- | Delineation of Amenities Easement  and Open Space |

15.14.  Anti-Discrimination.  In accordance with Applicable Laws, the Parties, in performing their respective obligations hereunder will not discriminate based on race, sex, religion, national or ethnic origin, age or disability.  It is the intent of the Parties to encourage local participation, community involvement and diversity in the management and operation of the Project.  In addition, the Conservancy agrees to use its reasonable good faith efforts to

provide for participation by minority, women-owned and local business enterprises in the management and operation of the Project.

15.15. <u>Capacity of Persons Acting on Behalf of the Corporation.</u> Notwithstanding anything to the contrary in this Agreement, all references in this Agreement to employees, agents, representatives, contractors and the like of the Corporation shall refer only to Persons acting in the Corporation's capacity as a Party to this Agreement and thus all such references specifically exclude any employees, agents, representatives, contractors and the like acting in connection with the performance of the Governmental Functions.

15.16. <u>Limitations to Capacity Under This Agreement</u>. The term "Corporation" and the duties and obligations assigned to it under this Agreement refer to the Corporation in its capacity as a Party to this Agreement and thus exclude any action, omission or duty of the Corporation or the City when performing their Governmental Functions.

15.17. <u>Non-liability of Board and Employees</u>. Notwithstanding anything herein to the contrary, in no circumstance shall any member of the Board of Directors of the Corporation or the Conservancy or any employee, counsel or consultant of the Corporation have any personal liability under this Agreement.

16.   **DESIGNATION OF AMENITIES EASEMENT; ACKNOWLEDGEMENT OF GREENSCAPE**

16.1. <u>Amenities Easement</u>.   The Corporation and the Conservancy hereby designate the portion of the Property delineated or described on <u>Exhibit G</u> attached to this Agreement as the initial Amenities Easement containing approximately 2.5 acres; provided, however, the Parties recognize and acknowledge that the Amenities Easement may be relocated in accordance with the provisions of the Project Documents.

16.2. <u>Green Space</u>. The Corporation and the Conservancy hereby acknowledge that the portions of the Property designated or described as open space on <u>Exhibit G</u> attached to this Agreement and the applicable equipment related thereto constitute open green space that can reasonably be used by C&EF for activities and events for tourist and convention visitors and their families, as well as residents of the City, consistent, however, with the development, maintenance and use of the Project as a high quality urban park with high standards of natural beauty and consistent with all Park Rules and Procedures. The Parties hereby agree that such open green space designated or described on <u>Exhibit G</u> contains approximately 3.0 acres in the aggregate, and satisfies the requirements relating to open space set forth in Section 3(a)(i) of the City Deed and Section 2(a)(i) of the Conservancy Deed, and the requirement relating to Greenscape set forth in Section 3.3(a)(i) of the Joint Development Agreement.

SIGNATURE PAGES FOLLOW

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HOUSTON DOWNTOWN PARK CORPORATION,** a Texas local government corporation

By: _____
Nancy G. Kinder, Chair

**HOUSTON DOWNTOWN PARK CONSERVANCY,** a Texas nonprofit corporation

By: _____
Nancy G. Kinder, Chair

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE PROPERTY**

The Property conveyed under that certain Special Warranty Deed dated December 15, 2004 from by the Conservancy, as grantor, to the Corporation, as grantee, filed of record in the Official Public Records of Real Property of Harris County, Texas on December 17, 2004 under Clerk's File No. Y136657, and re-filed on April 18, 2005 under Clerk's File No. Y401160, and being more particularly described therein on Exhibits A-1, A-2 and A-3, a copy of such Exhibits being attached hereto.

# EXHIBIT A-1

## PROPERTY DESCRIPTION

Tract 1 of 3

> DESCRIPTION OF A PORTION OF
> BLOCKS 122 AND 125
> SOUTH SIDE BUFFALO BAYOU (S.S.B.B.)
> AND A PORTION OF McKINNEY AVENUE
> AND JACKSON STREETS (ABANDONED)
> IN THE CITY OF HOUSTON
> HARRIS COUNTY, TEXAS

Being a 3.138 acre tract (136,705 square feet) tract of land being a portion of Blocks 122 and 125 South Side Buffalo Bayou, a recognized unrecorded subdivision map of the downtown area of the City of Houston, and a portion of McKinney Avenue, abandoned, recorded under Clerk's File No. K380306 of the Official Public Records of Real Property of Harris County, Texas (O.P.R.R.P.H.C.), and a portion of Jackson Street, abandoned, recorded under said Clerk's File No. K380306 O.P.R.R.P.H.C., being a portion of that certain residue tract conveyed by deed executed September 22, 1988 to Crescent Real Estate Equities Limited Partnership, recorded under Clerk's File No. S653086, Film Code No. 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 O.P.R.R.P.H.C., said 3.138 acre tract being more particularly described by metes and bounds as follows, all bearings recited herein are referenced to the City of Houston Monumentation System, all called bearings and called distances recited herein are referenced to various maps obtained from the City of Houston File Room:

COMMENCING from City of Houston Engineering Department Reference Rod No. 311, being a 3/4-inch iron rod marking the centerline intersection of Polk Avenue (80-foot width) and Crawford Street (80-foot width), from which City of Houston Engineering Department Reference Rod No. 601, being a 3/4-inch iron rod found, marking the centerline intersection of said Polk Avenue and Chartres Street (80-foot width) bears South 57°08'43" East, along the City of Houston Engineering Department Reference Line (centerline) of said Polk Avenue, a distance of 1,320.35 feet;

> Thence, North 32°52'08" East, along the City of Houston Engineering Department Reference Line (centerline) of said Crawford Street, a distance of 950.53 feet to a point on said centerline of Crawford Street;

> Thence, South 57°08'44" East, departing said City of Houston Engineering Department Reference Line (centerline), a distance of 40.00 feet to an "X" chiseled in concrete set, for corner, being on the southeasterly right-of-way line of said Crawford Street for the POINT OF BEGINNING of the herein described tract, from which a 60d nail with shiner found, bears South 32°52'08" West, 432.30 feet;

A-1-1

Tract 1 of 3

Thence North 32°52'08" E, along said southeasterly right of way line of said Crawford Street, a distance of 178.87 feet to a 5/8-inch iron rod with "TSC Surveying & Engineering Company cap set marking the intersection of said southeasterly right of way line of Crawford Street and the southerly right-of-way line of McKinney Avenue (80-foot width), from which a 5/8-inch iron with a Cotton Surveying cap found bears South 29°13' West, 0.5', for the northwesterly corner of the herein described tract,

Thence, North 81°07'28" East, along said southerly right-of-way line of said McKinney Avenue, a distance of 127.76 feet to a "mag" nail with shiner set marking the point of curvature of a curve to the right and being an interior corner of the herein described tract;

Thence, in a southeasterly direction curving to the right along said southerly right-of-way line of Walker Avenue, an arc length of 189.36 feet, having a radius of 260.00 feet, a central angle of 41°43'48", and a chord that bears South 78°00'38" East, 185.21 feet to a point on the southerly right-of-way line of Walker Avenue (width varies), from which a 5/8 inch iron rod found bears South 03°24' East, 0.3 feet and a 5/8 inch iron found bears South 41°53' East, 0.5 feet for the point of tangency of said curve;

Thence, South 57°08'44" East, along said southerly right-of-way line of Walker Avenue, a distance of 164.22 feet to a point marking the northerly cut back corner of the intersection of the southerly right of way line of said Walker Avenue and the northwesterly right-of-way line of Avenida De Las Americas (120 foot width) recorded under Clerk's File No(s). J723283, J723282 and J180167 O.P.R.R.P.H.C., from which an "X" in concrete found bears North 08°50' West, 0.2 feet, and an "X" in concrete found bears North 84°55' East, 0.2 feet;

Thence, South 12°08'18" East, along said cut back line, a distance of 35.35 feet to a chiseled "X" in concrete set, marking the southeasterly corner of said cutback for the southeasterly corner of the herein described tract;

Thence, South 32°52'08" West, along said northwesterly right-of-way line of said Avenida De Las Americas, a distance of 304.87 feet to a chiseled "X" in concrete set for the southerly corner of the herein described tract, from which an "X" in concrete found bears South 32°52'08" West, 555.35 feet;

Thence, North 57°08'44" West, a distance of 457.59 feet to the **POINT OF BEGINNING** and containing a computed area of 3.138 acres (136,705 square feet) of land.

City of Houston Engineering Department Reference Rods, No. 20 (LaBranch at Capitol), No. 22 (Chartres at Capitol), No. 44 (Polk at Chenevert), No. 311 (Polk at Crawford) and No. 601 (Polk at Chartres) were found on the ground and were used as the controlling Monumentation to calculate all right of way lines, property lines, etc. related to the proposed extension of Avenida De Las Americas.

A-1-2

Tract 2 of 3

DESCRIPTION OF A PORTION OF
BLOCKS 248 AND 249
SOUTH SIDE BUFFALO BAYOU (S.S.B.B.)
AND A PORTION OF JACKSON STREET
(ABANDONED) IN THE CITY OF HOUSTON
HARRIS COUNTY, TEXAS

Being a 2.320 acre tract (101,069 square feet) tract of land, being a portion of Blocks 248 and 249 of South Side Buffalo Bayou, a recognized unrecorded subdivision map of the downtown area of the City of Houston and being a portion of Jackson Street, abandoned, recorded under Clerk's File No. K380306 O.P.R.R.P.H.C., being a portion of that certain residue tract conveyed by deed executed September 22, 1988 to Crescent Real Estate Equities Limited Partnership (herein after referred to as Crescent Tract), recorded under Clerk's File No. S653086, Film Code No. 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 O.P.R.R.P.H.C., said 2.320 acre tract being more particularly described by metes and bounds as follows, all bearings recited herein are referenced to the City of Houston Monumentation System, all called bearings and called distances recited herein are referenced to various maps obtained from the City of Houston File Room:

COMMENCING from City of Houston Engineering Department Reference Rod No. 311, being a 3/4-inch iron rod marking the centerline intersection of Polk Avenue (80-foot width) and Crawford Street (80-foot width), from which City of Houston Engineering Department Reference Rod No. 601, being a 3/4-inch iron rod found, marking the centerline intersection of said Polk Avenue and Chartres Street (80-foot width) bears South 57°08'43" East, along the City of Houston Engineering Department Reference Line (centerline) of said Polk Avenue, a distance of 1,320.35 feet;

Thence North 32°52'08" East along the City of Houston Engineering Department Reference Line (centerline) of said Crawford Street, a distance of 518.23 feet to a point on said centerline of Crawford Street;

Thence South 57°08'44" East departing said City of Houston Engineering Department Reference Line (centerline), a distance of 40.00 feet to a 60D nail with shiner found marking the intersection between the southeasterly right-of-way line of said Crawford Street and the northeasterly line of Lamar Avenue (80-foot width), being the most westerly corner of aforesaid Crescent Tract, and being the most westerly corner and **POINT OF BEGINNING** of the herein described tract;

A-1-3

Tract 2 of 3

Thence North 32°52'08" E along said southeasterly right-of-way line of said Crawford Street, a distance of 102.12 feet to a chiseled "X" in concrete set for the most northerly corner of the herein described tract;

Thence South 57°08'44" East departing said southeasterly right-of-way line of said Crawford Street, being along the former southwesterly right-of-way line of abandoned Lamar Avenue, a distance of 457.59 feet to a chiseled "X" in concrete set for corner, being on the northwesterly right-of-way line of Avenida De Las Americas (120 - foot width) recorded under Clerk's File No(s). J723283, J723282 and J180167 O.P.R.R.P.H.C., and being the most easterly corner of the herein described tract;

Thence South 32°52'08" West along said northwesterly right-of-way line of said Avenida De Las Americas, a distance of 225.17 feet to a chiseled "X" in concrete found marking the northeasterly cut back corner and being the easterly most southerly corner of the herein described tract;

Thence South 77°51'42" West along said cut back line, a distance of 35.36 feet to a chiseled "X" in concrete set marking the southwesterly cut back corner, being on the northeasterly right-of-way line of Dallas Avenue (width varies), and being the westerly most southerly corner of the herein described tract;

Thence North 57°08'43" West along said northeasterly right-of-way line of said Dallas Avenue, a distance of 170.64 feet to a chiseled "X" in concrete found marking the point of curvature for a tangent curve to the right, and being an interior corner of the herein described tract;

Thence in a northwesterly direction curving to the right departing said northeasterly right-of-way line of Dallas Avenue and being along aforesaid northeasterly right-of-way line of aforesaid Lamar Avenue, an arc length of 194.02 feet, having a radius of 260.00 feet, a central angle of 42°45'18", and a chord that bears North 35°46'05" West, 189.55 feet to a 5/8-inch iron rod with TSC cap found marking the point of tangency of said curve, and being an interior corner of the herein described tract;

Tract 2 of 3

Thence North 14°23'26" West along said northeasterly right-of-way line of said Lamar Avenue, a distance of 116.31 feet to the **POINT OF BEGINNING** and containing a computed area of 2.320 acres (101,069 square feet) of land.

City of Houston Engineering Department Reference Rods, No. 20 (LaBranch at Capitol), No. 22 (Chartres at Capitol), No. 44 (Polk at Chenevert), No. 311 (Polk at Crawford) and No. 601 (Polk at Chartres) were found on the ground and were used as the controlling Monumentation to calculate all right of way lines, property lines, etc. related to the proposed extension of Avenida De Las Americas.

**Tract 3 of 3 -- Air Rights**

All those air rights, as hereinafter defined, being a portion of those rights conveyed by the City of Houston to Houston Center Corporation by Quitclaim Deed dated August 26, 1971, recorded under Harris County Clerk's File Number(s) D404337 of the Real Property Records of Harris County, Texas, such deed being authorized by City of Houston Ordinance No. 70-1881 passed on October 28, 1970, and a portion of those rights reserved by Houston Center Corporation and CFHC-2 Texas, Inc. under that certain Declaration of Easement made effective as of September 24, 1984, from Houston Center Corporation and CFHC-2 Texas, Inc., as Grantors, to the City of Houston, Texas, as grantee, and filed for record under Harris County Clerk's File Number(s) J723283 of the Real Property Records of Harris County, Texas, the air rights conveyed by said Quitclaim Deed and reserved under said Declaration of Easement being the City of Houston easement rights between a plane 20 feet above the crowns of the existing streets and a plane 500 feet above such street crowns:

1.      The following air rights over the streets set out below, which were reserved by Houston Center Corporation and CFHC-2 Texas, Inc. under that certain Declaration of Easement made effective as of September 24, 1984, from Houston Center Corporation and CFHC-2 Texas, Inc., as Grantors, to the City of Houston, Texas, as Grantee, and filed under Harris County Clerk's File Number(s) J723283 and Film Code No. 096-831138:

(i)      the Avenida de las Americas adjacent to Blocks 248 and 122 (part of Tr. 9);

(ii)     Lamar Avenue between the east line of Crawford Street and the west line of abandoned Jackson Street (Tr. 12);

(iii)    McKinney Avenue between the east line of Crawford Street and the west line of abandoned Jackson Street (Tr. 13);

(iv)     Two triangular parcels of land, (1) out of Block 248 (corner of Dallas Avenue and the Avenida de las Americas) and (2) Block 122 (corner of Walker Avenue and the Avenida de las Americas) (part of Tr. 15).

2.      The following air rights over the streets set out below, which were quitclaimed by the City of Houston to Houston Center Corporation in numbered paragraph 10 of that certain Quitclaim Deed dated August 26, 1971, recorded under Harris County Clerk's File Number D404337, of the Real Property Records of Harris County, Texas:

(i)      the east half of Crawford Street between the northerly line of Lamar Avenue and to a line parallel thereto and extending from the northern boundary line of Tract II; and

(ii)     the east half of Crawford Street from the southerly line of McKinney Avenue and to a line parallel thereto and extending from the southern boundary of Tract I.

# EXHIBIT A-2

<u>TRACT I:</u>

Being a 3.468 acre tract (151.085 square feet) tract of land, being a portion of Blocks 123 and 124 South Side Buffalo Bayou, a recognized unrecorded subdivision map of the downtown area of the City of Houston, and a portion of Lamar Avenue abandoned by deed filed under Clerk's File No. K380306 of the Official Public Records of Real Property (O.P.R.O.R.P.) of Harris County, Texas and a portion of Jackson Street, abandoned, recorded under said Clerk's File No. K380306 O.P.R.R.P.H.C., being a portion of that certain residue tract conveyed to Crescent Real Estate Equities Limited Partnership (herein after referred as Crescent) by deed filed under Clerk's File No. S653086 (Film Code No. 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) of the O.P.R.O.R.P. of Harris County, Texas ,dated September 22, 1998 and being all of a called 1.4712 acre tract of land conveyed to said Crescent by deed filed under Clerk's File Number W444308 (Film Code Number 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) of the O.P.R.O.R.P. of Harris County, Texas ,dated February 14, 2003, said 3.468 acre tract being more particularly described by metes and bounds as follows, all bearings recited herein are referenced to the City of Houston Monumentation System, all called bearings and called distances recited herein are referenced to various maps obtained from the City of Houston File Room:

**COMMENCING** from City of Houston Engineering Department Reference Rod No. 311, being a 3/4-inch iron rod marking the centerline intersection of Polk Avenue (80-foot width) and Crawford Street (80-foot width), from which City of Houston Engineering Department Reference Rod No. 601, being a 3/4-inch iron rod found, marking the centerline intersection of said Polk Avenue and Chartres Street (80-foot width) bears South 57°08'43'' East, along the City of Houston Engineering Department Reference Line (centerline) of said Polk Avenue, a distance of 1,320.35 feet;

Thence North 32°52'08'' East along the City of Houston Engineering Department Reference Line (centerline) of said Crawford Street, a distance of 620.36 feet to a point on said centerline of Crawford Street;

Thence South 57°08'44'' East departing said City of Houston Engineering Department Reference Line (centerline), a distance of 40.00 feet to a found "X" chiseled in concrete set for corner, being on the southeasterly right-of-way line of said Crawford Street, being the most northerly corner of a called 2.320 acre tract of land as described by deed filed under Clerk's File Number W324576 (Film Code Number 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) of the Official Public Records of Real Property of Harris County, Texas, dated December 30, 2002 and being the most westerly corner and **POINT OF BEGINNING** of the herein described tract, from which a 60d nail with shiner found, bears South 32°52'08'' West, 102.12 feet;

Thence North 32°52'08'' East along said southeasterly right-of-way line of said Crawford Street, a distance of 330.17 feet to a found "X" chiseled in concrete for corner, being the most westerly corner of a called 3.138 acre tract of land as described in said deed filed under Clerk's File Number W324576 and being the most northerly corner of the herein described tract;

Thence South 57°08'44" East departing said southeasterly right-of-way line of said Crawford Street, being along the common line with said called 3.138 acre tract, same being along the former southwesterly right-of-way line of abandoned McKinney Street, a distance of 457.59 feet to a found chiseled "X" in concrete for corner, being on the northwesterly right-of-way line of Avenida De Las Americas (120 - foot width) recorded under Clerk's File No(s). J723283, J723282 and J180167 O.P.R.R.P.H.C., being the most southerly corner of said called 3.168 acre tract and being the most easterly corner of the herein described tract;

Thence South 32°52'08" West along said northwesterly right-of-way line of said Avenida De Las Americas, a distance of 330.17 feet to a found chiseled "X" in concrete for corner, being the easterly corner of aforementioned called 2.320 acre tract and being the most southerly corner of the herein described tract, from which a found "X" in concrete found bears South 32°52'08" West, 225.17 feet;

Thence North 57°08'44" West departing said northwesterly right-of-way line of said Avenida De Las Americas, being along the common line with said called 2.320 acre tract, same being along the former southwesterly right-of-way line of abandoned Lamar Street, a distance of 457.59 feet to the **POINT OF BEGINNING** and containing a computed area of 3.468 acres (151,085 square feet) of land.

City of Houston Engineering Department Reference Rods, No. 20 (LaBranch at Capitol), No. 22 (Chartres at Capitol), No. 44 (Polk at Chenevert), No. 311 (Polk at Crawford) and No. 601 (Polk at Chartres) were found on the ground and were used as the controlling Monumentation to calculate all right of way lines, property lines, etc. related to the proposed extension of Avenida De Las Americas.

Together with:

All those air rights, as hereinafter defined, in that portion of Crawford Street lying between the northwest line of Tract 1 and the centerline of Crawford Street, and that portion of Avenida De Las Americas lying between the southwesterly 80 feet of the southeast line of Tract 1 and the centerline of Avenida De Las Americas, being a portion of those rights conveyed by the City of Houston to Houston Center Corporation by Quitclaim Deed dated August 26, 1971, recorded under Harris County Clerk's File Number(s) D404337, of the Real Property Records of Harris County, Texas, such deed being authorized by City of Houston Ordinance No. 70-1881, passed on October 28, 1970, the air rights conveyed by said Quitclaim Deed being the City of Houston Easement rights between a plane 20 feet above the crowns of the existing streets and a plane 500 feet above such street crowns; and

All those air rights in that portion of Avenida De Las Americas lying between the ~~northwesterly~~ northeasterly *JML* 250 feet of the southeast line of Tract 1, and the centerline of Avenida De Las Americas, as reserved by Houston Center Corporation and CFHC-2 Texas, Inc. under that certain Declaration of Easement made effective as of September 24, 1984, from Houston Center Corporation and CFHC-2 Texas, Inc., as Grantors, to the City of Houston, Texas, as grantee, and filed for record under Harris County Clerk's File No.(s) J723283, of the Real Property Records of Harris County, Texas.

A-2-2

Also:

TRACT II:

Being a 1.872 acre tract (81.550 square feet) tract of land, being all of Block 127, a portion of Blocks 126 and 250 South Side Buffalo Bayou, a recognized unrecorded subdivision map of the downtown area of the City of Houston conveyed to Crescent Real Estate Equities Limited Partnership by deed filed under Clerk's File No. S653086 (Film Code No. 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) of the Official Public Records of Real Property (O.P.R.O.R.P.) of Harris County, Texas ,dated September 22, 1998 and a portion of Lamar Avenue described as Tract 18 and a portion of McKinney Avenue described as Tract 19 by deed filed under Clerk's File No. K372514 (Film Code Number 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) of the O.P.R.O.R.P. of Harris County, Texas dated January 3, 1985, said 1.872 acre tract being more particularly described by metes and bounds as follows, all bearings recited herein are referenced to the City of Houston Monumentation System, all called bearings and called distances recited herein are referenced to various maps obtained from the City of Houston File Room:

**COMMENCING** from City of Houston Engineering Department Reference Rod No. 311, being a 3/4-inch iron rod marking the centerline intersection of Polk Avenue (80-foot width) and Crawford Street (80-foot width), from which City of Houston Engineering Department Reference Rod No. 601, being a 3/4-inch iron rod found, marking the centerline intersection of said Polk Avenue and Chartres Street (80-foot width) bears South 57°08'43" East, along the City of Houston Engineering Department Reference Line (centerline) of said Polk Avenue, a distance of 1,320.35 feet;

Thence North 32°52'08" East along the City of Houston Engineering Department Reference Line (centerline) of said Crawford Street, a distance of 592.16 feet to a point on said centerline of Crawford Street;

Thence North 57°07'42" West departing said City of Houston Engineering Department Reference Line (centerline), a distance of 40.00 feet to a found 5/8-inch iron rod with cap for corner, being on the northwesterly right-of-way line of said Crawford Street, being on the northeasterly right-of-way line of Lamar (80-foot width, H.C.C.F. Number J723283) and being the most southerly corner and **POINT OF BEGINNING** of the herein described tract;

Thence North 14°23'26" West along said northeasterly right-of-way line of said Lamar Avenue, a distance of 26.26 feet to a found "5/8-inch iron rod with cap for corner marking a point of curvature for a tangent curve to the left, and being an interior corner of the herein described tract;

Thence in a northwesterly direction curving to left along said curve along said northeasterly right-of-way line of Lamar Avenue, an arc distance of 253.70 feet (radius = 340.00 feet, delta = 42°45'12", chord bears = North 35°46'02" West, 247.86 feet) to a found chiseled "X" in concrete for corner, being on the southeasterly right-of-way line of La Branch Street (80-foot width) and being the most westerly corner of the herein described tract;

Thence North 32°52'08" East along said southeasterly right-of-way line of La Branch Street, a distance of 250.17 feet to a found chiseled "X" in concrete for corner, being on the southwesterly

A-2-3

right-of-way of McKinney Avenue (80-foot width, H.C.C.F. Number J723283) and being the most northerly corner of the herein described tract;

Thence in a southeasterly direction curving to left along a non-tangent curve to the left along said southwesterly right-of-way line of McKinney Avenue, an arc distance of 247.64 feet (radius = 340.00 feet, delta = 41°43'54", chord bears = South 78°00'35" East, 242.20 feet) to a found 1-inch iron pipe with cap for corner marking the point of tangency of said curve and being an interior corner of the herein described tract;

Thence North 81°07'28" East along said southwesterly right-of-way line of McKinney Avenue, a distance of 31.91 feet to a found chiseled "X" in concrete for corner, being on aforementioned northwesterly right-of-way line of Crawford Street and being the most easterly corner of the herein described tract;

Thence in the southwesterly direction along said northwesterly right-of-way line of Crawford Street the following courses and distances to interior corners of the herein described tract:

South 32°52'08" West, 107.50 feet to a set 5/8-inch iron rod with TSC cap;

South 57°08'44" East, 9.70 feet to a found chiseled "X" in concrete;

South 32°52'08" West, 90.06 feet to a found chiseled "X" in concrete;

North 57°07'52" West, 9.70 feet to a set 5/8-inch iron rod with TSC cap;

South 32°52'08" West, 35.03 feet to a set 5/8-inch iron rod with TSC cap;

South 57°07'52" East, 9.70 feet to a found chiseled "X" in concrete;

South 32°52'08" West, 125.09 feet to a found chiseled "X" in concrete;

North 57°08'44" West, 9.70 feet to a set 5/8-inch iron rod with TSC cap;

South 32°52'08" West, 108.17 feet to the **POINT OF BEGINNING** and containing a computed area of 1.872 acres (81,550 square feet) of land.

City of Houston Engineering Department Reference Rods, No. 20 (LaBranch at Capitol), No. 22 (Chartres at Capitol), No. 44 (Polk at Chenevert), No. 311 (Polk at Crawford) and No. 601 (Polk at Chartres) were found on the ground and were used as the controlling Monumentation to calculate all right of way lines, property lines, etc. related to the proposed extension of Avenida De Las Americas.

Together with:

All those air rights, as hereinafter defined, in those portions of Crawford Street, Lamar Avenue, LaBranch Street and McKinney Avenue, lying between the boundary lines of Tract II and the centerlines of such streets, being a portion of those rights conveyed by the City of Houston to Houston Center Corporation and Mike Persia Chevrolet Corp., respectively by the following two

Quitclaim Deeds, the first dated August 26, 1971, recorded under Harris County Clerk's File Number (s) D404337, of the Real Property Records of Harris County, Texas and the second dated August 26, 1971, recorded under Harris County Clerk's File Number(s) D410360, of the Real Property Records of Harris County, Texas, both such deeds being authorized by City of Houston Ordinance No. 70-1881, passed on October 28, 1970, and a portion of those rights reserved by Houston Center Corporation and CFHC-2 Texas, Inc., under that certain Declaration of Easement made effective as of September 24, 1984, from Houston Center Corporation and CFHC-2 Texas, Inc., as Grantors, to the City of Houston, Texas, as grantee, and filed for record under Harris County Clerk's File No. J723283, of the Real Property Records of Harris County, Texas, the air rights conveyed by said Quitclaim Deeds and reserved under said Declaration of Easement being the City of Houston easement rights between a plane 20 feet above the crowns of the existing streets and a plane 500 feet above such street crowns.

**EXHIBIT A-3**

DESCRIPTION OF A CALCULATED 0.9411 OF ONE
ACRE TRACT OF LAND, BEING ALL OF CRAWFORD
STREET BETWEEN LAMAR AVENUE AND McKINNEY
AVENUE OF SOUTH SIDE BUFFALO BAYOU (S.S.B.B.)
IN THE CITY OF HOUSTON, HARRIS COUNTY, TEXAS

Being a 0.9411 of one acre tract (40,994 square feet) tract of land, being all of Crawford Street that is located between Lamar Avenue (southerly side) and McKinney Avenue (northerly side) said 0.9411 of one acre tract being more particularly described by metes and bounds as follows, all bearings recited herein are referenced to the City of Houston Monumentation System, all called bearings and called distances recited herein are referenced to various maps obtained from the City of Houston File Room:

**COMMENCING** from City of Houston Engineering Department Reference Rod No. 311, being a 3/4-inch iron rod marking the centerline intersection of  Polk Avenue (80-foot width) and Crawford Street (80-foot width), from which City of Houston Engineering Department Reference Rod No. 601, being a 3/4-inch iron rod found, marking the centerline intersection of said Polk Avenue and Chartres Street (80-foot width) bears South 57°08'43" East, along the City of Houston Engineering Department Reference Line (centerline) of said Polk Avenue, a distance of 1,320.35 feet:

Thence North 32°52'08" East along the City of Houston Engineering Department Reference Line (centerline) of said Crawford Street, a distance of 518.24 feet to a point on said centerline of Crawford Street;

Thence South 57°07'52" East departing said City of Houston Engineering Department Reference Line (centerline), a distance of 40.00 feet to a found 60D nail with shiner for corner, being on the southeasterly right-of-way line of said Crawford Street, being on the northeasterly right-of-way line of Lamar (80-foot width, H.C.C.F. Number J723283) and being the most southerly corner and **POINT OF BEGINNING** of the herein described tract;

Thence North 14°23'26" West  along the projection of said northeasterly right-of-way line of said Lamar Avenue, a distance of 108.93 feet to a found 1-inch iron rod with cap for corner, being on the northwesterly right-of-way line of Crawford Street and being the most  westerly corner of the herein described tract;

Thence in the northeasterly direction along said northwesterly right-of-way line of Crawford Street the following courses and distances to interior corners of the herein described tract:

North 32°52'08" East, 108.17 to a set 5/8-inch iron rod with TSC cap;

South 57°08'44" East, 9.70 feet to a found chiseled "X" in concrete;

North 32°52'08" East, 125.09 feet to a found chiseled "X" in concrete;

North 57°07'52" West, 9.70 feet to a set 5/8-inch iron rod with TSC cap;

North 32°52'08" East, 35.03 feet to a set 5/8-inch iron rod with TSC cap;

South 57°07'52" East, 9.70 feet to a found chiseled "X" in concrete;

North 32°52'08" East, 90.06 feet to a found chiseled "X" in concrete;

North 57°08'44" West, 9.70 feet to a set 5/8-inch iron rod with TSC cap;

North 32°52'08" East, 107.50 feet to a set chiseled "X" in concrete for corner, being on the southwesterly right-of-way of McKinney Avenue (80-foot width, H.C.C.F. Number J723283) and being the most northerly corner of the herein described tract;

Thence North 81°07'28" East  along the projection of said southwesterly right-of-way line of said McKinney Avenue, a distance of 107.22 feet to a set chiseled "X" in concrete for corner, being on aforementioned southeasterly right-of-way line of Crawford Street and being the most easterly corner of the herein described tract;

Thence South 32°52'08" West along said southeasterly right-of-way line of Crawford Street, a distance of 611.17 feet to the **POINT OF BEGINNING** and containing a computed area of 0.9411 of one acre (40,994 square feet) of land.

City of Houston Engineering Department Reference Rods, No. 20 (LaBranch at Capitol), No. 22 (Chartres at Capitol), No. 44 (Polk at Chenevert), No. 311 (Polk at Crawford) and No. 601 (Polk at Chartres) were found on the ground and were used as the controlling Monumentation to calculate all right of way lines, property lines, etc. related to the proposed extension of Avenida De Las Americas.

**EXHIBIT B**

**MASTER DEFINITIONS AND RULES OF USAGE**

<u>Additional Addressees</u> shall have the meaning assigned to it in <u>Section 15.5</u> of this Agreement.

<u>Additional Amenities Reserved Spaces</u> shall have the meaning assigned to it in <u>Section 14.1(b)</u> of this Agreement.

<u>Agreement</u> shall have the meaning assigned to it in the preamble of this Agreement.

<u>Amenities Easement</u> shall mean the exclusive, easement on the Property containing approximately 2.5 acres, retained by the Conservancy in the Conservancy Deed for purposes of light retail, restaurant, entertainment and other commercial, non-residential uses and structures (including parking facilities to support such uses and structures), in the nature of attractions to, or amenities for or related to and supporting the use of the balance of the Property for purposes of park and open space.  The initial location of the Amenities Easement is set forth in <u>Exhibit G</u> attached to this Agreement; provided, however, the Parties recognize and acknowledge that the Amenities Easement may be relocated in accordance with the provisions of the Project Documents.

<u>Amenities Fees</u> shall have the meaning assigned to it in <u>Section 4.5(a)</u> of this Agreement.

<u>Amenities Reserved Spaces</u> shall have the meaning assigned to it in <u>Section 14.1(a)</u> of this Agreement.

<u>Amenities Tenants</u> shall have the meaning assigned to it in <u>Section 14.1(c)</u> of this Agreement.

<u>Annual Management Fee</u> shall mean the annual management fee payable by the City during each Fiscal Year of the City following the Park Dedication, the first annual management fee being calculated as described in Section 5.1(b) of the Joint Development Agreement (subject to pro-ration as set forth therein), and as such first annual management fee (without regard to such pro-ration) may be increased or decreased (but in no event decreased below $750,000 per year) in subsequent Fiscal Years by the Index Escalator, as set forth in the Joint Development Agreement.

<u>Applicable Laws</u> shall mean all laws, statutes, acts, ordinances, rules, regulations, permits, licenses, authorizations, directives, orders, writs, rulings, injunctions, interpretations, permits and requirements of any Governmental Authority that now or hereafter may be applicable to the Project or any aspect thereof, including the planning, designing, engineering, constructing, developing, maintaining, operating, managing and using the Project, including those relating to employees, zoning, building, health, safety and environmental matters and accessibility of public facilities.

Approved Project Design shall have the meaning assigned to it in Section 3.3(b)(iii) of the Park Development Agreement.

Assumed Contracts shall have the meaning assigned to it in Section 9.2 of this Agreement.

Baseline Operating Expenses shall have the meaning assigned to it in Exhibit E to this Agreement.

Block 127 shall mean that certain parcel of real property referred to as Tract II on Exhibit A-2 of the Conservancy Deed.

C&EF shall mean the City's Convention and Entertainment Facilities Department, or other department of the City that is the successor to the functions of such department.

City shall have the meaning assigned to it in the preamble of this Agreement.

City Deed shall mean that certain Special Warranty Deed, as amended in accordance with the Garage Development Agreement, from the City, as grantor, to the Conservancy, as grantee, dated as of December 15, 2004, recorded in the Real Property Records of Harris County, Texas, under Clerk's File No. Y136653 (and re-recorded under Clerk's File No. Y401157) covering the Property.

Claims shall mean costs, expenses (including reasonable attorneys fees, expenses and court costs), liabilities, damages, claims, actions, suits, causes of action, disputes, controversies, debts, losses or demands.

Conservancy shall have the meaning assigned to it in the preamble of this Agreement.

Conservancy Deed shall mean that certain Special Warranty Deed, as amended in accordance with the Garage Development Agreement, from the Conservancy, as grantor, to the Corporation, as grantee, dated as of December 15, 2004, recorded in the Real Property Records of Harris County, Texas, under Clerk's File No. Y136657 (and re-recorded under Clerk's File No. Y401160) covering the Property.

Contracts shall mean any and all contracts and agreements entered into by the Conservancy in connection with the performance of any of its obligations under this Agreement relating to the operation, management, maintenance and repair of the Park, including the Third Party Contracts.

Convention Center shall mean the City's George R. Brown Convention Center located at 1001 Avenida de las Americas, across the Avenida de las Americas from the Park.

Convention Center Hotel shall mean the convention center hotel located across Lamar from the Park and currently known as the Hilton Americas.

Convention Center Parking Easement shall mean that certain easement reserved by the City in the City Deed under and across Blocks 125 and 249 (as defined in the City Deed) as modified by the Garage Development Agreement.

Corporation shall have the meaning assigned to it in the preamble of this Agreement.

Corporation's Expenses shall mean the reasonable annual operating expenses of the Corporation for the annual meeting of its board of directors and for the cost of audited financial statement required under Section 5.2(c) of the Joint Development Agreement, not to exceed $4,000 per Fiscal Year, as may be adjusted in accordance with the Index Escalator pursuant to Section 5.2(c) of the Joint Development Agreement.

Crescent Deed shall mean that certain Special warranty Deed from Crescent Real Estate Equities Limited Partnership, as grantor, to the City, as grantee, dated December 15, 2004, recorded in the Real Property Records of Harris County, Texas, under Clerk's File No. Y136649, covering the Property and re-recorded under Clerk's File No. Y401155.

Director shall mean the Director of C&EF or his or her designee of which the Conservancy has been given written notice in accordance with Section 15.5 of this Agreement.

Easement Area shall mean the area subject to the Convention Center Parking Easement pursuant to the City Deed, as amended pursuant to Section 6 of the Garage Development Agreement.

Effective Date shall have the meaning assigned to it in the preamble of this Agreement.

Event of Default shall mean any of the events defined as a default under Section 11.1 or Section 11.3 of this Agreement.

Extension Term shall have the meaning assigned to it in Section 3.2 of this Agreement.

Fiscal Year shall mean the fiscal year of the applicable Party, as may be modified from time to time.

Force Majeure shall mean any period or periods of delay caused by strikes, lockouts or other labor disputes; fire or other casualty; storms, floods or other inclement weather; terrorism, riots, insurrection or demonstrations; delay, failure or refusal of Governmental Authorities to grant Permits for the performance of the Work (except for failure of submitted plans, specifications and applications to comply with Applicable Laws); or any other causes (other than financial) beyond the reasonable control of the party obligated to perform the task.

Garage shall mean the underground parking structure for vehicles to be constructed pursuant to the Garage Development Agreement.

Garage Development Agreement shall mean that certain Garage Development Management Agreement dated January 30, 2006, between the Corporation, the Conservancy, and the City, for the management of the development of the Garage.

Governmental Authority shall mean any federal, state, local or foreign governmental entity, authority or agency, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive, or any quasi-governmental authority, agency or entity (or a combination or permutation thereof), and any arbitrator to whom a dispute has been presented under Applicable Laws.  For purposes of the use of this term, the Corporation, in its capacity as a Party to this Agreement, shall not be considered a Governmental Authority, and the City in its capacity as a party to the Joint Development Agreement, shall not be considered a Governmental Authority, but in the exercise of its taxing or other governmental or quasi-governmental powers and authority, the City shall be considered a Governmental Authority.

Governmental Authorizations shall mean all approvals, consents, decisions, authorizations, certificates, confirmations, exemptions, applications, notifications, concessions, acknowledgments, agreements, licenses, permits, import permits, employee visas, environmental permits, decisions, right-of-ways, and similar items from any Governmental Authority.

Governmental Functions shall mean any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Corporation is authorized or required to perform in its capacity as a Governmental Authority in accordance with Applicable Laws.  Notwithstanding the foregoing, the entering into this Agreement and the performance by the Corporation of its obligations under this Agreement shall not be considered a "Governmental Function."

Greenscape shall mean all sod, flowers, shrubbery, trees, and other plants and plantings, and any irrigation systems and equipment serving or relating thereto; and all ponds, lakes, streams and similar water features, any and all drains, filters, aerators, pumps, pipes, temperature controls, and other systems and equipment serving or relating thereto on the Property.  Such term does not include paths, walks, steps, walls, bridges, structures or other hardscape.  The Greenscape contains approximately 3.0 acres in the aggregate, and is located as set forth in Exhibit G to this Agreement.

Improvements shall mean all infrastructure, structures, lighting, pavement, parking facilities, paths, walks, steps, walls, bridges, fountains, waterwalls, waterfalls, fixtures, furnishings, equipment and other systems and facilities comprising the Park, including all grading, contouring, excavating and other earthwork in preparation for the Greenscape, but not including the Greenscape.

Indemnified Party shall have the meaning assigned to it in Section 12.2 of this Agreement.

Indemnifying Party shall have the meaning assigned to it in Section 12.2 of this Agreement.

Joint Development Agreement shall mean that Joint Development Agreement dated effective as of December 7, 2004, by and among the City, the Conservancy and the Corporation.

Legal Holiday shall mean any day, other than a Saturday or Sunday, on which the City's administrative offices are closed for business.

Mayor shall mean the Mayor of the City from time to time.

Mayor's Approval shall mean the Mayor's approval given within thirty (30) days after the date of submittal of the item to be so approved, which approval shall not be unreasonably withheld and any disapproval shall indicate the Mayor's specific objections and recommended revisions to the proposed item to be approved.  If the Mayor does not act within such 30-day period, the proposed matter shall be deemed approved by the Mayor.

Open Records Act shall have the meaning assigned to it in Section 15.2 of this Agreement.

Opinion Request shall have the meaning assigned to it in Section 15.2 of this Agreement.

Park shall have the meaning assigned to it in Recital A of this Agreement.

Park Costs shall mean all Baseline Operating Expenses and all other operating expenses and capital costs incurred in connection with the operation, management, maintenance, repair and improvement of the Park after the Park Dedication.

Park Dedication shall mean the formal and official dedication by the Conservancy and the Corporation (by duly adopted resolution of its Board of Directors) of the Park as a public park.

Park Development Agreement shall mean that certain Development Management Agreement dated December 15, 2004, between the Conservancy and the Corporation regarding development of the Project.

Park Licensees shall have the meaning assigned to it in Section 14.1(c) of this Agreement.

Park Rules shall have the meaning assigned to it in Section 4.3 of this Agreement.

Party or Parties shall have the meaning assigned to it in the preamble of this Agreement.

Permits shall mean all permits, licenses, approvals or other actions of or by Governmental Authorities required for the design, construction, ownership or operation of the Project or any part thereof.

Permitted Delay shall mean any delay in performance of a Party's obligation by reason of (i) Force Majeure; or (ii) inability to perform such Party's obligation as a result of the default by another Person in the performance by that Person of its obligations under the Project Documents.

Permitted Delay Period shall mean, with respect to any particular occurrence of an Permitted Delay, that number of days of delay in the performance by such Party of its obligations hereunder actually resulting from such occurrence of Permitted Delay.

Person shall mean any natural person, corporation, company, partnership, business trust, Governmental Authority or other entity.

Project shall mean the Property, Improvements, and Greenscape as developed pursuant to the Joint Development Agreement and the Park Development Agreement, excluding the Garage.

Project Documents shall mean the Joint Development Agreement, the Park Development Agreement, the Garage Development Agreement, and this Agreement, as amended from time to time in accordance with the terms thereof.

Property shall have the meaning assigned to it in Recital A of this Agreement.

Reversion Property shall have the meaning assigned to it in Section 10 of this Agreement.

Review and Approval or Consent Rights shall have the meaning assigned to it in Section 1 of Exhibit F to this Agreement.

Reviewing Party shall have the meaning assigned to it in Section 1 of Exhibit F to this Agreement.

Procedures shall have the meaning assigned to it in Section 4.4(a) of this Agreement and set out in Exhibit D attached to this Agreement.

Special Events Spaces shall have the meaning assigned to it in Section 14.1(c) of this Agreement.

Submitting Party shall have the meaning assigned to it in Section 1 of Exhibit F to this Agreement.

Term shall have the meaning assigned to it in Section 3.1 of this Agreement.

Third Party Contracts shall have the meaning assigned to it in Section 9.2 of this Agreement.

Use, Operating, and Maintenance Standards shall have the meaning assigned to it in Section 4.1 of this Agreement.

User Fees shall have the meaning assigned to it in Section 4.5(a) of this Agreement.

## Rules as to Usage

1.      "Include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

2.      "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing in a visible form.

3.      Any agreement, instrument or Applicable Laws defined or referred to above means such agreement or instrument or Applicable Laws as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Applicable Laws) by succession of comparable successor Applicable

Laws and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.

      4.     References to a Person are also to its permitted successors and assigns.

      5.     Any term defined above by reference to any agreement, instrument or Applicable Law has such meaning whether or not such agreement, instrument or Applicable Law is in effect.

      6.     "Hereof," "herein," "hereunder" and comparable terms refer, unless otherwise expressly indicated, to the entire agreement or instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto. References in an instrument to "Article," "Section," "Subsection" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section, subsection or subdivision of or an attachment to such agreement or instrument. All references to exhibits, appendices or schedules in any agreement or instrument that is governed by this Exhibit are to exhibits, appendices or schedules attached to such instrument or agreement.

      7.     Pronouns, whenever used in any agreement or instrument that is governed by this Appendix and of whatever gender, shall include natural Persons, corporations, limited liability companies, partnerships and associations of every kind and character.

      8.     References to any gender include, unless the context otherwise requires, references to all genders.

      9.     "Shall" and "will" have equal force and effect.

      10.    Unless otherwise specified, all references to a specific time of day shall be based upon Central Standard Time or Central Daylight Savings Time, as applicable on the date in question in Houston, Texas.

      11.    References to "$" or to "dollars" shall mean the lawful currency of the United States of America.

      12.    The words "unreasonably withheld" shall mean "unreasonably withheld, conditioned or delayed."

      13.    Wherever the context requires, the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

      14.    The word "or" will have the inclusive meaning represented by the phrase "and/or".

## EXHIBIT C

## USE, OPERATING, AND MAINTENANCE STANDARDS

1.     **Use Restrictions**.     Pursuant to Section 2(b) of the Conservancy Deed, the Property (save and except those portions thereof designated from time to time for use as the Amenities Easement) is subject to the following restrictions, covenants and limitations relating to use:

(a)     The Property shall be used solely as an urban public park of high quality, reputation, and natural beauty, including, but not limited to, open green space, gardens and plantings and water features, for the use, benefit, and enjoyment of the residents of the City, and tourists and convention and business visitors and their families.

(b)     Regardless of whether the following types of uses, activities, and events might otherwise be considered to be typical of or permitted in public parks, the following uses of the Property are prohibited:

(i)     Fairgrounds or festival sites for major recurring festivals or other recurring mass gatherings or events using all or substantially all of the Property;

(ii)     Circuses, carnivals, or amusement park rides (provided, however, that children's carousels and other playground equipment for children shall not be prohibited);

(iii)     Museums, zoos (other than temporary petting zoos offered primarily for children in connection with specific activities or events on such Property);

(iv)     Overnight camping or sleeping;

(v)     Except for Block 127, "dog parks" or other pet-oriented facilities designed, intended or otherwise used primarily for the purpose of allowing animals to roam freely or rove about without leashes or other similar restraints; or

(vi)     Public or private parking lots or parking structures, except with the Conservancy's prior written approval; helicopter or balloon landing pads.

2.     **Operation and Maintenance Standards**.     Pursuant to Section 2(c)(i) through (iv) of the Conservancy Deed and Section 3(b)(i) and (ii) of the City Deed, the Property is subject to the following restrictions, covenants, and limitations relating to maintenance standards:

(a)     The Property (save and except those portions thereof designated from time to time for use as the Amenities Easement) shall be operated and maintained solely as an urban public park of high quality, reputation, and natural beauty, including, but not limited to, open green space, gardens and plantings and water features, for the use, benefit and enjoyment of residents of the City, and tourists and convention and business visitors and their families.

(b)     All improvements and fixtures situated on the Property shall at all times be operated and maintained in good, orderly, and clean condition, with appropriate lighting and security measures designed to reduce crime and vagrancy.

(c)     All receptacles for the accumulation and storage of trash (such as dumpsters, carts and large bins, but not the individual litter baskets or trash cans distributed throughout the Property for deposit and collection of trash) shall be concealed by fencing or shrubbery.    All maintenance equipment, vehicles, and materials shall be stored in secured enclosures.

(d)     All landscaping and plantings shall be maintained in attractive, healthy, and orderly condition, with adequate supplies of water, and with periodic mowing and trimming.

3.     **Additional Agreements**.

(a)     The Conservancy will not schedule any pyrotechnic events in the Park without the prior written approval of the Director, which approval will not be unreasonably withheld.

(b)     The Conservancy shall use reasonable efforts to cause any fencing necessary to fence off any part of the Park in connection with an event in the Park scheduled through the Conservancy to be, to the extent reasonably possible, of materials aesthetically compatible with the standards set out in this Exhibit.

(c)     The Conservancy shall use reasonable efforts to cause any portable toilet facilities used in connection with an event in the Park scheduled through the Conservancy to be situated so as to minimize view from Avenida de las Americas to the extent reasonably possible.

(d)     The Conservancy shall use reasonable efforts to prevent obstruction of the pedestrian easement along Avenida de las Americas; provided, however, the Conservancy shall have the right to temporarily close off parts of the pedestrian easement as necessary for repair of Improvements in the Park.

(e)     The Conservancy shall use reasonable efforts to prevent images or other lighting in connection with an event in the Park scheduled through the Conservancy from being projected directly on the Convention Center Hotel or the Convention Center without the prior approval of the Director.

(f)     The Conservancy will repair or cause to be repaired leaks into the Garage resulting from the improper maintenance, design, or construction of the water feature above the Garage; provided, however, the Conservancy shall have no obligation to repair or cause to be repaired any leaks into the Garage resulting from improper maintenance, design or construction of the Garage.

(g)     The Conservancy will develop and use reasonable efforts to comply with (i) operation and maintenance guidelines for the Improvements, including permanently constructed restroom facilities in the Park, (ii) plans for emergency procedures, and (iii) traffic

control and parking plans for Park Programming (as defined in <u>Exhibit D</u>) scheduled by the Conservancy in accordance with the Procedures.

**EXHIBIT D**

**PROCEDURES**

As provided in the Joint Development Agreement and the Operating Agreement to which this Exhibit is attached, this Exhibit sets out the Conservancy's Procedures (the "Procedures") for the advance scheduling of activities and events in the Park; advance bookings of the right to use or occupy particular Improvements or areas of the Greenscape for such activities in the Park; facilitating traffic flow and parking needs in the area; controlling excessive noise levels in the Park after 10:00 PM for residents of the Convention Center Hotel; and other issues of concern to the Parties. The procedures set forth in this Exhibit shall be effective as of the Park Dedication Date (and prior thereto, if applicable), and the Conservancy shall provide copies of the Procedures and any subsequent modifications, deletions or additions to such Procedures to the Corporation and the City in accordance with the notice provisions of the Operating Agreement, and any subsequent modifications, deletions or additions to such Procedures that materially adversely affect (i) such bookings and reservations by C&EF; (ii) traffic and parking needs in the area; or (iii) noise levels in the Park after 10:00 PM for residents of the Convention Center Hotel, shall be subject to the Mayor's Approval.

In addition to the terms defined in the Agreement to which this Exhibit is attached, for purposes of this Exhibit, the following terms have the following meanings:

**Area-wide Event:** Events conceived and planned to occur in the Park, the Convention Center and/or the general vicinity of both facilities, such as the Houston Marathon and major sports festivals. The Conservancy and C&EF shall mutually agree as to which entity will play the lead coordinating role based upon the relative level of activity in each facility and shall work together to accommodate the needs of the Area-wide Event.

**Booking Fee:** A fee charged by the Conservancy for a proposed Park Program prior to the start of a Programming Season to finalize a Park Program's date(s) on the Park Calendar. The Conservancy will prepare a schedule for partial refunds of Booking Fees in cases where a Park Program is cancelled, and refund rates will be based on the amount of advance warning prior to the deadline for proposals for a Programming Season. The Conservancy may also require additional deposits at times closer to the date of the Park Program.

**C&EF Licensee(s):** A third party contracted with C&EF for an event in the Convention Center.

**City-wide Convention Event:** A Convention Event other than an Area-wide Event with attendance exceeding 9,000 people per day, which involves significant vehicle staging and traffic direction in the vicinity of the Convention Center. A City-wide Convention Event may also be a Major Convention Event.

**Convention Center:** The City's George R. Brown Convention Center.

**Convention Center Calendar:** The electronic calendar used by C&EF to book Convention Events and document information related to Convention Events.

**Convention Event:**   An event at the Convention Center that is identified on the Convention Center Calendar, and which may or may not include any Park Programs.

**Donor:**  A financial contributor to the Conservancy or Corporation.

**Free Event:**  A Park Program related to a C&EF Licensee's Convention Event proposed by C&EF or a C&EF Licensee that will not be subject to User Fees as provided in this Agreement (but all Free Events will be subject to all set-up and breakdown costs and other direct, non-standardized expenses related to such activity or event; provided however, that C&EF shall have the right to provide such services for itself, at its expense and in accordance with Park Rules).  Free Events may not occur on more than twelve (12) days per calendar year, subject to any reservations or bookings previously scheduled or subject to hold according to these Procedures and to Park Rules.

**Increased Parking Rights:**  The increase in the number of Amenities Reserved Spaces and Additional Amenities Reserved Spaces pursuant to the provisos in Sections 14.1(a) and 14.1(b) of the Operating Agreement and the rights and privileges in connection with same as provided in the Operating Agreement.

**Large Park Event:**  An event or several events at the Park with a projected cumulative attendance of greater than 1000 people during any one hour time period.

**Major Convention Event:**  A Convention Event other than Area-wide Event, alone or in combination with other Convention Events scheduled during the same hours of the day in the Convention Center, for which 1,750 parking  spaces  are projected to be required on the Convention Center Calendar during a given daytime period (8:00 AM to 5:00 PM) or evening period (5:00 PM to 11:00 PM) except as described for Area-wide Events.  A Major Convention Event will be scheduled by each date and as daytime, evening or both to allow more Park Programs to occur during daytime or evening periods when projected parking requirements fall below the minimum threshold for a Major Convention Event.   To be considered a Major Convention Event, such Event must be included on the Park Calendar prior to the date for event proposal review and selection for a Programming Season as provided in Section 3 of this Exhibit.

**Mid-Size Park Event:**  An event or several events scheduled at the Park with a projected cumulative attendance of 500 – 999 people during any one hour period.

**Park Program:**  Collectively means any Large Event, Mid-Size Event or Scheduled Activity.

**Park Calendar:**  The schedule of Park Programs maintained by the Conservancy as described in Section 3 of this Exhibit.

**Parking Facility:**  Surface parking lots and garages controlled by C&EF and that C&EF can reserve for Convention Events.

**Parking Plan:**  A plan prepared by a Park Program sponsor or the Conservancy to accommodate visitor parking in conjunction with a Park Program scheduled to occur on the same date/time of day as a Major Convention Event.

**Programming Committee:**  As provided in Section 3 of this Exhibit.

**Programming Partner:**  A for-profit or not-for-profit entity that has entered into a verbal or written agreement to produce one of the following types of Park Programs during the course of a Programming Season (as opposed to one date):

      1.     Live music, theatrical, film and other productions involving an audience at the permanent stage or temporary stage.

      2.     Art, farmers, and other types of markets.

      3.     Events catered by the operator of the Restaurant Facilities located in the Amenities Easement.

      4.     Weekend events for families and children.

**Programming Season:**  A season for Park Programming for which proposals from outside event producers, including C&EF and its Licensees, must be submitted and scheduled in accordance with this Exhibit.  Each Fiscal Year will have two Programming Seasons:

Fall (July – December)

Spring (January – June)

The dates of the Programming Season may be changed by the Conservancy with prior written notice to C&EF in accordance with the Operating Agreement.

**Restaurant Facilities:**  The destination restaurant situated within the Amenities Easement near the intersection of Crawford and Lamar, the casual restaurant café situated within the Amenities Easement near the intersection of Crawford and McKinney, the Event Lawn, and other related outdoor dining and bar spaces.  Special events and activities at Restaurant Facilities will be reflected on the Park Calendar, but these events and activities will not be subject to the Procedures described in this Exhibit except for organized activities at the Event Lawn, which will be considered Park Programs and subject to the Procedures described in this Exhibit.

**Scheduled Activity:**  Activities or events planned by the Conservancy or a Programming Partner with a cumulative projected attendance of less than 500 people during any one hour time period.

      1.     **Booking Priorities and Advance Booking Privileges**

      A.     Booking priorities will be taken into consideration in scheduling and responding to Park Programs proposed for the same date and time as follows:

      i.     The hours of operation of the Park, park maintenance requirements, and Park Rules (including required "down time" for lawn areas necessary to keep lawns

healthy) have first priority at all times; however, the Conservancy will use reasonable efforts to accommodate Park Programs while taking into consideration these first priorities.

ii.     The Conservancy, its Donors and its Programming Partners will have second priority on all dates for their Park Programs except as described in Item iii and Item iv.

iii.     C&EF and its Licensees will have third priority on all dates; however, C&EF and its Licensees will have second priority for Monday, Tuesday and Wednesday during the day and evening and Thursday during the day until 5:00 PM  with the following exceptions:

-       The Conservancy may require expedited breakdown after a Park Program sponsored by C&EF or its Licensees on a Thursday if another Park Program is scheduled in the same area of the Park on Thursday after 6:00 PM.

-       Conservancy Donors retain second priority for all dates and times (as limited by Item iv below);

-       the Conservancy and its Programming Partners retain second priority on City Holidays; and

-       the operator of Restaurant Facilities in the Amenities Easement retains second priority for the Event Lawn.

iv.     A Donor that has contributed less than $100,000 to the Conservancy will have second priority in reserving a portion of the Park for a Scheduled Activity only.

v.     Booking priorities shall cease to apply once a Park Program date has been reserved in accordance with this Exhibit unless the required Booking Fee or proposal is not provided as required in this section.

B.     Prior to submission and selection of proposals as described in Section 3, C&EF may identify and reserve dates for Park Programs connected to a C&EF Licensee(s) Convention Event (including Free Events) in accordance with Sub-section A and as follows:

i.     For all dates and times, C&EF may reserve dates for Park Programs up to eight months in advance of the requested date; however, the required Booking Fee must be paid when the date is reserved and proposal information as described in Section 3E must be provided prior to the deadline for proposals for the relevant Programming Season.

ii.     For Monday, Tuesday and Wednesday during the day and evening and Thursday during the day until 5:00 PM, C&EF may reserve dates up to five years in advance; however, 50% of the Booking Fee must be paid at that time; the remainder of the Booking Fee must be paid eight months in advance of Park Program's date; and proposal information as described in Section 3E must be provided prior to the deadline

for proposals for the relevant Programming Season.   The Conservancy retains the right to revise requirements for these reservations if it experiences a high rate of cancellations of reservations that complicate its ability to plan its Programming Seasons.

iii.      For Thursday evenings after 5:00 PM, Friday, Saturday and Sunday, C&EF may identify a date for Park Programs connected to a C&EF Licensee(s) Convention Event (including Free Events) up to five years in advance of the date(s) sought.  The Conservancy will use reasonable efforts to avoid, and to cause its Donors and its Programming Partners to avoid scheduling Park Programs that conflict with such identified C&EF-connected Park Programs on these dates; however, these dates will not be considered to be reserved until eight months in advance of the date in question in the event that the Conservancy, its Donors or its Programming Partners have no reasonable option but to schedule their Park Programs at the same time and on the same date.

C.      The Conservancy may reserve dates at any time; however, the Conservancy will use reasonable efforts to establish the schedule for Large Park Events that it is sponsoring or co-sponsoring eight months prior to their scheduled dates.

D.      The parties recognize that Major Convention Events and City-wide Convention Events may be scheduled within eight months of their scheduled date, and the Conservancy and C&EF agree to work cooperatively to minimize the disruption to parking and traffic associated with Major Convention Events, City-wide Convention Events and Park Programs in these cases.

E.      The Booking Priorities in Section A and Advance Booking procedures in Section B describe special privileges for C&EF and its Licensees that have been included because of the grant of the Increased Parking Rights.   These privileges are based on the Increased Parking Rights being made available (but without waiving the obligation to pay for such spaces associated with the Increased Parking Rights in accordance with the terms and conditions of the Operating Agreement) and C&EF's compliance with all of its requirements under these Procedures, and if the Increased Parking Rights are no longer in effect or C&EF has failed to comply with these Procedures, then C&EF and its Licensees will follow the procedures as set forth for in Section 2 and Section 3 for Park Program sponsors without the Booking Priorities and Advance Booking privileges described in this section.

**2.      Scheduling Procedures**

A.      Notwithstanding anything in this Exhibit, the Park shall be maintained and used as an urban park with high standards of cleanliness, safety and natural beauty in accordance with all Park Rules, including limits on frequency of use of lawns for Park Programming in order to keep turf healthy.

B.      The Conservancy shall have the right to schedule, organize, promote and conduct activities and uses in the Park on its own initiative at any time except as limited by this Exhibit.

C.      All Park Program sponsors, including C&EF and C&EF Licensees, shall be required to agree in writing to the Procedures described in this Exhibit as a condition of approval

of Park Program(s). The Conservancy reserves the right to modify these Procedures in any manner and at any time except as described in Paragraph 1 of this Exhibit.

D.      The Conservancy and its Programming Partners may plan Scheduled Activities at any time; provided, however, C&EF approval will be required for use of Avenida de las Americas for valet parking and deliveries as described in Section 4 of this Exhibit and/or a reservation of parking spaces in the Garage in accordance the Operating Agreement. For purposes of coordination with C&EF, the Conservancy will use reasonable efforts to identify a Scheduled Activity on the Park Calendar, even when such Activity remains tentative.

E.      The Conservancy and its Programming Partners shall include Mid-Size Park Events on the Park Calendar a minimum of two (2) months in advance of a Mid-Size Park Event and obtain C&EF approval for use of Avenida de las Americas for valet parking and deliveries in accordance with Section 4 of this Exhibit and/or for reservation of parking spaces in the Garage in accordance with Operating Agreement. For purposes of coordination with C&EF, the Conservancy will use reasonable efforts to identify a Mid-size Park Event on the Park Calendar, even when such Event remains tentative.

F.      When considering multiple potential Park Programs, including those from (1) C&EF and its Licensees, (2) the Conservancy, its Donors or its Programming Partners, and (3) other proposers, for Park Programs on the same date/time, the Conservancy reserves the right, in its sole and absolute discretion, to approve two or more Park Programs after consideration of the potential conflict between the Park Programs based on the following criteria:

1.      Minor adjustments in the time of each Park Program to reduce conflicts after consultation with the sponsor of each Park Program.

2.      Requirements for set-up and break-down of each Park Program. The Conservancy may require reasonable special actions to minimize time required for set-up and break-down work associated with the Park Programs in order to reduce or eliminate a conflict.

3.      The projected attendance for each Park Program.

4.      The projected ability of each Park Program to accommodate associated parking demand desired for each Park Program.

5.      The physical separation between different Park Programs and likelihood of one Park Program creating disturbances (noise, access or crowds) for another.

G.      Unless approved by the Conservancy, Park Program sponsors, including Programming Partners, Donors, C&EF and C&EF Licensees, may only reserve and use for Park Programs those areas of the Park described on Site Plan A attached to this Exhibit; however, Park Program sponsors, C&EF and C&EF Licensees may not reserve all or part of (1) Area A, (2) Area B or (3) Area C for use on the same date and time of day (inclusive of set-up and break-down time).

H.    If an Area-wide Event is proposed at any time, the Conservancy and C&EF shall mutually agree as to which entity will play the lead coordinating role with the sponsor of the Area-wide Event based upon the relative level of activity in each facility associated with the Area-wide Event and shall work together to accommodate the needs of the Area-wide Event.

I.    No Park Program can include tents within fifty (50) feet of the outdoor dining areas associated with the Restaurant Facilities except a Park Program sponsored by the operator of the Restaurant Facilities or the Conservancy.

J.    The Conservancy shall provide C&EF with the initial fees, rental rates and other charges for use of the Amenities Easement for Park Programming when these fees, rates and charges are adopted by the Conservancy, and the Conservancy shall provide updated information to C&EF about these fees, rental rates and other charges as they are updated.

**3.    Programming Committee**

A.    On or before January 31, 2007, the Conservancy will organize and manage a committee (the "Programming Committee") to oversee Park Program scheduling, coordination and booking.  The Programming Committee will meet a minimum of every other month.

B.    A representative of C&EF will be a voting member of the Programming Committee.

C.    The Programming Committee will establish and regularly update a Park Calendar.

D.    The C&EF representative to the Programming Committee will make arrangements to provide the Conservancy with electronic access (view only) to the Convention Center Calendar in order to provide information about Convention Events (type of event, dates, projected attendance, projected parking requirements, vehicle staging requirements, related activities, etc.) for inclusion on the Park Calendar. The Conservancy will update the Park Calendar  on a monthly basis with regard to Convention Events and Park Programs scheduled during the previous month, including coordination with C&EF to identify:

1.    Dates and times of those Convention Events that will require removal of parking from the curb lane of Avenida de las Americas adjacent to the Park because of security concerns or the need to use this lane for vehicle staging.

2.    Dates and times to be used only for Convention Event unloading and breakdown activities.

3.    Major Convention Events and projected parking requirements.

4.    City-wide Convention Events and vehicle staging requirements.

5.    Convention Event sponsors and their sponsorship rights, including signage on the exterior of the Convention Center.

Both parties will use reasonable efforts to identify all such dates and conditions prior to selection of proposals by the Programming Committee.

E.      The Programming Committee will establish proposal requirements for all entities submitting proposals for a Programming Season, including C&EF and its Licensees; however, C&EF and the Conservancy may agree upon the information to be required with respect to any proposal by C&EF or its Licensees (insurance, set-up, site control, etc.) at least one (1) month prior to the proposal deadline for a Programming Season, and if these requirements have been agreed upon in this manner, C&EF and its Licensees will not be required to submit all such information with each of its proposals for Park Programs.

F.      The Programming Committee will review proposals for Park Programs produced by outside parties, including C&EF and its Licensees, in advance of each Programming Season. At least four (4) months prior to the start of each Programming Season, the Programming Committee will establish the deadline date for proposals for a Programming Season, which deadline date will be at least one (1) month prior to the start of the applicable Programming Season.   Booking Priorities described in Section 1 and Scheduling Procedures described in Section 2 will be used during the review and selection of proposals.

G.      During review and selection of proposals so long as the Increased Parking Rights are in effect and C&EF has otherwise complied with these Procedures, the C&EF representative on the Programming Committee will have the privilege to require:

1.      A Parking Plan for any Large Park Event proposed to be scheduled for the same dates and times of day (except those times allocated to loading and breakdown of the Major Convention Event) as a Major Convention Event

2.      Reasonable modifications to any Mid-Size Park Event or Large Park Event proposed to be scheduled for the same dates and times of day as a City-wide Convention Event to minimize impacts on traffic flow and clarify availability of parking for the Park Program.   Reasonable modifications will consider differing traffic and vehicle staging needs on different dates and times of a City-wide Convention Event based on loading activity, breakdown activity, and staging of vehicles for use by attendees.

3.      Restrictions on signs and logo for Park Program event sponsors if, and only if, the Park Program sponsor represents a competitor or opponent of a sponsor of a Convention Event scheduled on the same date when Convention Event sponsorship information is provided on the Park Calendar.

H.      The Programming Committee will require a Booking Fee for Park Programming associated with each proposal, and all Booking Fees will be due a minimum of 21 days prior to the start of each Programming Season except as provided in Section 1. Except as designated in Section 5 below, C&EF and its Licensees will be required to pay Booking Fees; User Fees; fees, rental rates and other charges for the Amenities Easement; and other expenses as established by the Conservancy from time to time, and as required for all Park Programs produced by outside vendors. Except for Free Events, Park Programs sponsored by C&EF or its Licensees will not be

placed on the final Park Calendar for a Programming Season until C&EF or its Licensee pays the Booking Fee.

I.      A final Park Calendar for a Programming Season will be established promptly after the deadline for paying Booking Fees and before the start of the applicable Programming Season.  After the start of a Programming Season, the Conservancy may make changes related to Park Programs at its sole and absolute discretion; provided, however, (1) C&EF must approve changes to Large or Mid-size Park Events or added Large or Mid-size Park Events that will impact traffic flow and/or parking demand proposed to occur at the same time as a City-wide Convention Event, and (2) C&EF may require a Parking Plan for added Large Park Events proposed to occur at the same time as a Major Convention Event or City-wide Convention Event.

4.      **Event Coordination**

A.      The Conservancy will establish Park Rules regarding control of noise after 10:00 PM to ensure compliance with the Noise and Sound Level standards set forth in Chapter 30 of the City's Code of Ordinances.  In doing so, the Conservancy will implement management procedures to govern amplified sound in the Park in order to minimize disturbance of Convention Events at the Convention Center and residents of the Convention Center Hotel.

B.      The Conservancy will develop and enforce procedures to be used during Mid-size Park Events and Large Park Events to control and direct traffic around the Park when such Park Program is projected to have a material impact on traffic, and will review these procedures with C&EF.

C.      The Conservancy will establish pre-designated zones to be used for valet parking, equipment delivery/ removal and other special uses serving the Park, and the anticipated hours and days of use of those zones located on Avenida de las Americas, Lamar and McKinney with written approval of C&EF.  On dates and times of day when City-wide Convention Events are scheduled or when parking is scheduled to be removed from the curb lane of Avenida de las Americas, C&EF must approve each permit for such use of zones on Avenida de las Americas in order to minimize impacts on traffic flow on those dates and times of day.

D.      The Conservancy shall include procedures intended to control crowds in its Park Rules, including a permit system for demonstrations by outside parties; however, in no event will the Conservancy be obligated to take extraordinary measures, such as contracting with and paying off-duty police officers, to control crowds associated with Convention Events or Park Programs associated with Convention Events.

E.      The Conservancy will include in its Park Rules operational standards to be used when the pedestrian easement along Avenida de las Americas (that is within the Park) is required for pedestrian activity associated with vehicle staging associated with a Convention Event. C&EF will use reasonable efforts to minimize the impact of such activity on the Park and Park Programs.

F.      While C&EF will use reasonable efforts to provide as much advance warning as possible prior to removing curb parking from Avenida de las Americas, there may be cases when such action is necessary on short notice in order to accommodate security concerns or vehicle staging associated with a Convention Event on the curb adjacent to the Park.  A minimum of twenty-four hours notice will be provided in all cases, and when such notice for use of the curb lane for convention-related vehicles staging is not provided prior to the start of a Programming Season, C&EF will coordinate closely with the Conservancy to minimize the impact of vehicle staging on the Park and Park Programs.  In addition, the Parties acknowledge that C&EF cannot control actions taken by other departments of the City of Houston for emergencies and street construction.

G.      Nothing in this Exhibit shall infringe upon C&EF's rights with regard to use and reservation of parking spaces in its Parking Facilities, including the Garage, nor upon the Conservancy's right to use the Garage as described in the Operating Agreement; provided, however, the Booking Priorities and Advance Booking privileges described in Section 1 and the privilege to review and require changes to Park Program proposals described in Section 3G are based upon the Increased Parking Rights being in effect and C&EF's compliance with these Procedures, including, but not limited to, any obligations of C&EF hereunder.

H.      Before the end of the first quarter of each Fiscal Year, the Conservancy and C&EF shall review projected Major Convention Event parking requirements with actual parking space usage in C&EF's Parking Facilities on the dates of each Major Convention Event.  C&EF will make actual parking space usage counts available for this purpose and will use reasonable efforts to adjust its projections of parking requirements if there are substantial variances between projected and actual parking space usage on those dates.

I.      Before the end of the first quarter of each Fiscal Year, the Conservancy and C&EF shall review impacts on traffic flow caused by different types and sizes of Park Programs, and the Conservancy may revise these Procedures (except for use of the curb lane of Avenida) to the extent that a certain type and size of Park Program for which a traffic plan is required does not have an impact on traffic flow in the area.  In addition, the Conservancy in cooperation with C&EF will change traffic control plans for certain types and sizes of Park Programs that are found to have an unanticipated negative impact on traffic flow in the area using the traffic plans in place at the time of those Park Programs.

5.      **Free Events**

A.      C&EF may designate an event or program as a Free Event, but such designation must be made as part of its proposal submitted in accordance with procedures described in Section 3.

B.      C&EF may designate up to twelve (12) dates for Free Events during each Fiscal Year.  C&EF may reserve a Free Event in accordance with Section 1.  A Free Event date during a Programming Season may be scheduled after the start of that Programming Season only with the approval of the Conservancy.

C.     C&EF's right to schedule Free Events is conditioned in all respects upon the City's full and timely payment of the Annual Management Fee directly to the Conservancy.

D.     C&EF will use reasonable efforts to sell Park Programs sponsored by its Licensees before designating it a Free Event.



Area A:  Great Lawn (west)

Area B:  Urban Garden Event Lawn, Event Grove and Putting Green

Area C:  Great Lawn (east), Stage and Amphitheater, and Waterside Landing/Garden Grove and Pond Greensward

**EXHIBIT E**

**BASELINE OPERATING EXPENSES**

(a)     "Baseline Operating Expenses" means, subject to the exclusions set forth below, all expenses, costs, disbursements and Park Costs of every kind and nature relating to or incurred or paid in connection with the ownership and operation of the Project, computed on an accrual basis and determined in accordance with generally accepted accounting principles consistently applied, including but not limited to the following:

(1)     wages and salaries of all employees of the Conservancy, if any, directly engaged in the maintenance of the Project up to the level of senior property manager, including taxes, insurance and benefits (including pension, retirement and fringe benefits) relating thereto; provided that for employees who are engaged in direct services to the Project but who also provide other services for other activities of the Conservancy, the employment costs of such personnel shall be allocated to the Project based upon the percentage of their time spent providing such services to the Project and such allocated portion shall be included in Baseline Operating Expenses;

(2)     the cost of all supplies, tools, equipment, and materials used in the operation and maintenance of the Project;

(3)     the cost of all utilities for the Project, including but not limited to the cost of water, sewer, storm drainage, gas, electricity, telephone, internet and other telecommunication and/or technological service and other utilities for the Project, but excluding those costs billed to specific events or users of the Project;

(4)     the cost of all maintenance and service agreements for the Project and all Improvements, Greenspace and related fixtures, systems and equipment therein, including but not limited to security and sanitation (including but not limited to litter collection, janitorial service, trash removal), but excluding those costs billed to specific events or users of the Project;

(5)     the cost of repairs and general, routine or periodic maintenance of the Improvements;

(6)     the cost of all maintenance, care, restoration and replacement of Greenscape, excluding (a) repairs and general maintenance paid by proceeds of insurance or by third parties, (b) alterations attributable solely to accommodate specific events or users of the Project, or tenants of the Amenities Easement, and (c) alterations of Greenscape in connection with modifications or additions of capital improvements or attributable to updates of and modifications to the design, plans or layouts of Greenscape from time to time from those set forth in the Approved Project Design;

(7)     the cost of all insurance relating to the Project, including but not limited to the cost of property and liability insurance applicable to the Project and the Conservancy's personal property located on and used in connection therewith, and the cost of deductibles paid on claims made by the Conservancy or any other named insured;

(8)     any lease payments made by the Conservancy for any equipment used in the operation or maintenance of the Project, excluding, however, any part of such lease payments that constitutes capital expenditures under generally accepted accounting principles; and

(9)     Contributions to maintenance and replacement reserve accounts reasonably designed to pay for Baseline Operating Expenses or other Park Costs attributable to periods subsequent to the fiscal year for which Baseline Operating Expenses are being determined.

(b)     In addition to the exclusions expressly set forth above, Baseline Operating Expenses shall exclude the following:

(1)     Leasing commissions, attorneys' fees, costs, disbursements and other expenses incurred by the Conservancy or its agents in connection with negotiations for leases with tenants, prospective tenants or other occupants of the Amenities Easement, and similar costs incurred in connection with disputes with and/or enforcement of any leases with tenants, prospective tenants or other occupants of the Amenities Easement;

(2)     "Tenant allowances", "tenant concessions", workletters, and other costs or expenses (including but not limited to permit, license and inspection fees) incurred in completing, fixturing, furnishing, renovating or otherwise improving, decorating or redecorating space leased to tenants or other occupants of the Project, or vacant, leasable space in the Amenities Easement, including space planning/interior design fees for same;

(3)     Real estate taxes allocable to the leasehold improvements of other tenants or occupants in the Amenities Easement, to the extent separately assessed by the taxing authorities;

(4)     Services, items and benefits for which any tenant of the Amenities Easement or user of the Project specifically reimburses the Conservancy (other than through the Annual Management Fee) or for which any tenant of the Amenities Easement or user of the Project wholly pays third persons;

(5)     Costs of a capital nature, including, but not limited to, capital additions, capital improvements, capital alterations, capital replacements, capital equipment and capital tools, and/or capital redesign, all in accordance with generally accepted accounting principles, consistently applied;

(6)     Depreciation and other "non-cash" expense items or amortization;

(7)     Payments of principal, finance charges or interest on debt or amortization on any bonds, mortgage, deed of trust or other debt;

(8)     Costs or expenses for sculpture, friezes, paintings or other works of art, including costs incurred with respect to the purchase, ownership, leasing, showing and promotion of same, but not including the costs of maintaining same;

(9)     Costs of correcting or repairing defects in the Project, and/or equipment or the replacement of defective equipment, to the extent such costs are covered by warranties of manufacturers, suppliers or contractors, or are otherwise borne by parties other than the Conservancy;

(10)    Costs of repairs, replacements or other work occasioned by fire, windstorm or other casualty, or the exercise by governmental authorities of the right of eminent domain, to the extent reimbursed by insurance or condemnation proceeds;

(11)    costs of conducting any capital campaigns, development programs, membership or subscriber programs or any other aspect of raising or soliciting donations, grants or other funds from public or private sources;

(12)    Consulting costs and costs for professional services incurred by the Conservancy, except to the extent same relate to the improved management or operation of the Project;

(13)    Compensation in the form of wages, salaries and such other compensation and benefits, as well as any adjustments thereto, for all executive employees and personnel of the Conservancy above the level of the on-premises manager of the Project;

(14)    Costs associated with the operation of the entity which constitutes the Conservancy, as distinguished from the Conservancy's operation of the Project, such as general overhead and general administrative expenses (individual, partnership or corporate, as the case may be), which costs would not be chargeable to operating expenses of the Project in accordance with generally accepted accounting principles, consistently applied;

(15)    Payments in respect of overhead and/or profit to any Affiliate (defined below) of the Conservancy, as a result of a non-competitive selection process for services on or to the Project and/or the Property, or for goods, supplies or other materials, to the extent that the costs of such services, goods, supplies and/or materials exceed the cost that would have been paid had the services, goods, supplies or materials been provided by parties unaffiliated with the Conservancy, of at least equal skill, competence and experience;

(16)    Penalties or interest charged for (i) failure to pay equipment lease payments, ad valorem taxes and/or other special assessments before they became delinquent or (ii) failure to promptly comply with laws related to the Project, but, in either case, only if said penalties or interest were not caused by the Corporation; or

(17)   Costs directly resulting from the negligence or willful misconduct of the Conservancy, its employees, agents and/or contractors.

The term "affiliate" shall mean and refer to any person or entity controlling, controlled by, or under common control with another such person or entity. "Control", as used herein, shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such controlled person or entity; the ownership, directly or indirectly, of at least fifty-one percent (51%) of the voting securities of, or possession of the right to vote, in the ordinary direction of its affairs, at least fifty-one percent (51%) of the voting interest in, any person or entity shall be presumed to constitute such control.

The Conservancy shall maintain complete and accurate records of all costs, expenses and disbursements which shall be paid or incurred by the Conservancy, its employees, agents and/or contractors, with respect to Baseline Operating Expenses and other Park Costs. The Corporation, at its sole cost and expense, and/or its authorized representatives, shall have the right to inspect and/or audit the Conservancy's books and records (which records shall be kept at the Project) relating to the calculation of Baseline Operating Expenses and other Park Costs for the immediately prior year, any such inspection and/or audit to be conducted at the Conservancy's office during normal business hours; provided, however, the Conservancy agrees to reimburse the Corporation for the reasonable cost of any such inspection and/or audit conducted by or for it in the event said inspection and/or audit shall prove that the Baseline Operating Expenses for the period of time covered by such inspection and/or audit shall have been overstated by two percent (2%) or more.

**EXHBIT F**

**REVIEWS AND APPROVALS**

Section 1.  Review and Approvals or Consent Rights.  The provisions of this Exhibit F shall be applicable with respect to all instances in which it is provided under this Agreement that any Party exercises Review and Approval or Consent Rights; provided, however, that if the terms of this Exhibit F specifying time periods for exercise of Review and Approval or Consent Rights shall conflict with other express provisions of this Agreement providing for time periods for exercise of designated Review and Approval or Consent Rights, then the terms of such other provisions of this Agreement shall control.  As used herein, the term "Review and Approval or Consent Rights" shall include, without limiting the generality of that term, all instances in which one Party (the "Submitting Party") is permitted or required to submit to the other Party or to the representative of that other Party any document, notice or determination of the Submitting Party and with respect to which the other Party or its representative (the "Reviewing Party") has a right or duty hereunder to review, comment, consent, approve, disapprove, dispute or challenge the submission or determination of the Submitting Party.  Unless this Agreement specifically provides that the Review and Approval or Consent Rights may be exercised in the sole and absolute discretion (or a similar standard) of the Reviewing Party, in connection with exercising its Review and Approval or Consents rights under any provision of this Agreement and whether or not specifically provided in any such provision, the Reviewing Party covenants and agrees to act in good faith, with due diligence, and in a commercially reasonable manner with regard to each and all of such Review and Approval or Consent Rights and to not unreasonably withhold, condition or delay its approval of or consent to any submission.

Section 2.  Standard for Review.  The Submitting Party shall use reasonable efforts to cause any matter submitted to the Reviewing Party by the Submitting Party and with respect to which the Reviewing Party has Review and Approval or Consent Rights under this Agreement to be submitted under cover of a request which (i) states the date of submission to the Reviewing Party by the Submitting Party (which date shall be determined pursuant to Section 15.5 of this Agreement), (ii) states the date by which a response is required under the terms of this Agreement, (iii) identifies the provision of this Agreement pursuant to which such Review and Approval or Consent is sought and (iv) identifies (by document or drawing title, identifying number and revision date, or other clear descriptor) all enclosures to such request with respect to which Review and Approval or consent is then being sought.  The Reviewing Party shall review the same and shall promptly (but in any event within any applicable time period specified in this Agreement) give the Submitting Party notice of the Reviewing Party's comments resulting from such review and, if the matter is one that requires approval or consent pursuant to the terms of this Agreement, such approval, consent or disapproval, setting forth in detail the Reviewing Party's reasons for any disapproval.  Unless otherwise provided herein, the Reviewing Party's right to disapprove any matter submitted to it for approval or consent and to which this Exhibit F applies shall be limited to the elements thereof:  (x) which do not conform substantially to approvals or consents previously given with respect to the same matter or (y) which are new elements not previously presented or (z) which propose or depict matters that are or are the result of which would be a violation of or inconsistent with the provisions of this Agreement or Applicable Laws.

Section 3.  Deemed Approval or Consent.  If no response from the Reviewing Party is delivered to the Submitting Party within thirty (30) days after the submission of a particular matter and to which this Exhibit F applies, or within fifteen (15) days of any re-submission thereof as hereinafter provided, such matters shall be deemed approved or consented to, as applicable, by the Reviewing Party; provided, however, that any matter with respect to which a period for approval, consent, disapproval, dispute or challenge of less than thirty (30) days upon the initial submission thereof is provided for in this Agreement, or with respect to which a period of less than fifteen (15) days is provided for upon the resubmission thereof in accordance with this Agreement, shall be deemed to have been approved by the Reviewing Party pursuant to this Exhibit F if the Reviewing Party shall have failed to respond to the Submitting Party with respect to such matter within the shorter period for review and response provided elsewhere in this Agreement.

Section 4.  Resubmissions.  If the Reviewing Party disapproves of a submission or any other matter to which this Exhibit F applies within the applicable time period, the Submitting Party shall have the right, within fifteen (15) days after the Submitting Party receives notice of such disapproval, to resubmit such matter to the Reviewing Party, altered to satisfy the Reviewing Party's basis for disapproval (all subsequent resubmissions with respect to such matter must be made within fifteen (15) days of the date the Submitting Party receives notice of disapproval of the prior resubmission).  The applicable Submitting Party shall use reasonable efforts to cause any such resubmission to expressly state that it is a resubmission, to identify the original submission and any prior resubmissions, and not include the matter for resubmission with an original submission unless the matter previously disapproved is expressly identified thereon.  Any resubmission made pursuant to this Section shall be subject to review and approval or consent by the Reviewing Party in accordance with the procedures described in this Exhibit F for an original submission (except that the time period for reviews and response by the Reviewing Party shall be fifteen (15) days rather than thirty (30) days), until such matter shall be approved or consented to, or deemed approved or consented to, by the Reviewing Party.

Section 5.  Duties, Obligations and Responsibilities Not Affected.  Approval or consent by the Reviewing Party of or to a matter submitted to such Party by the Submitting Party shall neither, unless specifically otherwise provided, (i) relieve the Submitting Party of its duties, obligations or responsibilities under this Agreement with respect to the matter so submitted, nor (ii) shift the duties, obligations or responsibilities of the Submitting Party with respect to the submitted matter to the Reviewing Party.

**EXHIBIT G**

**DELINEATION OF AMENITIES EASEMENT AND DESCRIPTION OF OPEN SPACE**

Follows this page.



OPEN SPACE EASEMENT
130,785 sf = 3 acres

AMENITIES EASEMENT
109,872 sf = 2.5 acres

HOUSTON DOWNTOWN PARK
AMENITIES AND OPEN SPACE EASEMENTS   09.13.06

HARGREAVES
ASSOCIATES